IN THE UNITED STATES COURTS OF APPEALS
FOR THE THIRD CIRCUIT

———————————————

No. 09-3360

———————————————

MARIO J. DIANA,
APPELLEE

V.

WILLARD OLIPHANT AND CARMEN ALTAVILLA,
APPELLANTS

———————————————

BRIEF FOR APPELLANTS

———————————————

APPEALS FROM THE ORDERS OF THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA ENTERED
FEBRUARY 13, 2009 AND AUGUST 6, 2009

Office of Chief Counsel
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA  17110
phone: 717-783-5568
fax:  717-772-2883

BARBARA ADAMS,
General Counsel

BARBARA CHRISTIE,
Chief Counsel
Pennsylvania State Police

DATE:  December 7, 2009

By:  Joanna Reynolds
    Assistant Counsel
     Pennsylvania State Police

# TABLE OF CONTENTS

TABLE OF AUTHORITIES-------------------------------------------- ii,iii,iv

STATEMENT OF JURISDICTION ------------------------------------------1

STATEMENT OF ISSUES -------------------------------------------------2

STATEMENT OF THE CASE ----------------------------------------------4

STATEMENT OF FACTS --------------------------------------------------8

      Facts Relating to Fee Petition ---------------------------------------- 11

STATEMENT OF RELATED CASES------------------------------------ 12

SUMMARY OF ARGUMENT------------------------------------------- 13

ARGUMENT
    I.     The Judgment On the Merits Should be Set Aside,
         In Whole Or In Part ------------------------------------------- 16

           A.     Altavilla and Oliphant are Entitled to
                  Judgment as a Matter of Law on the Basis
                  of Qualified Immunity with Respect to
                  the Fourth Amendment Claims and the
                  Federal Statutory Wiretapping Claims ------------ 16

           B.     Altavilla and Oliphant are Entitled to
                  Judgment as a Matter of Law with
                  Respect to the Federal Wiretapping
                  Statutory and Fourth Amendment
                  Claims on the Basis that their
                    Actions Fell Within the
                  "LAW ENFORCEMENT OFFICER
                  IN THE ORDINARY COURSE
                  OF HIS DUTIES" Exception to the
                  Federal Wiretapping Statute--------------------------- 20

           C.     Defendants are Entitled to Judgment
                  as a Matter of Law with Respect to
                  the State Statutory Wiretapping
                  Claim on the Basis that their Actions

Fell Within an Exception to
the Pennsylvania Wiretapping
Statute -------------------------------------------- 24

II.    The Case Should be Remanded for a New Trial,
Because of Judicial Errors ------------------------------------ 30

    A.    A New Trial Should be Granted Because the
Court Refused to Charge the Jury on the Good
Faith Defense Available to the Defendants Under
Both the Federal and State Wiretapping
Statutes -------------------------------------------- 30

    B.    A New Trial Should be Granted Because the
Court Refused to Define "Administrative
Purposes", as that Term is Utilized in
18 Pa. C.S. § 5704 (3), in its Charge to
the Jury ------------------------------------------- 35

III.    Issues Regarding Damages and Attorneys' Fees ---------------- 37

    A.    The Award of Compensatory and
Punitive Damages Should be Set
Aside or Reduced Accordingly if
Appellants Prevail on any of the
Preceding Arguments-------------------------------- 37

    B.    The Punitive Damages Award is
Disproportionate to the Remitted
Compensatory Damages Award and
Exceeds the Acceptable Ratio---------------------- 38

    C.    The Award of Attorney's Fees Should
be Set Aside or Reduced Accordingly if
Appellants Prevail on any of the Preceding
Arguments ---------------------------------------- 39

CONCLUSION ------------------------------------------------------- 41

CERTIFICATE OF COUNSEL ------------------------------------------- 42

CERTIFICATE OF SERVICE -------------------------------------------- 43

# TABLE OF AUTHORITIES

## Cases

Amati v. City of Woodstock, 176 F. 3d 952, 954 (7th Cir. 1999)................ 21

Basista v. Weir, 340 F.2d 74, 86-87 (3rd Cir. 1965) ..................................... 39

Blake v. Wright, 179 F. 3d 1003 (6th Cir. 1999) ......................................... 19

Boetger v. Miklich, 534 Pa. 581 (1993) ....................................................... 35

CGB Occupational Therapy Inc. v. RHA Health Services, 357 F.3d 375
    390 (3rd Cir. 2004)..................................................................................... 37

Exxon Shipping Co., et al. v. Baker, et al., ___U.S.___, 128 S. Ct. 2605,
    171 L.Ed 2d. 570 (2008).................................................................. 15,38,39

Farrar v. Hobby, 506 U.S. 103, 114 (1992).................................................. 39

Foraker v. Chaffinch, 501 F.3d 231 (3rd Cir. 2007)..................................... 16

Frierson v. Goetz, 227 F. Supp. 2d 889 (M.D. Tenn. 2002) ........................ 19

Hensley v. Eckerhart, 461 U.S. 424, 433-434 (1983) .................................. 39

Jandak v. Village of Brookfield, 520 F. Supp. 815, 821-25 (N.D. Ill. 1981)....
    ....................................................................................................................... 21

Jeffers v. United States, 432 U.S. 137 (1977) ............................................. 36

Lightening Lube, Inc. v. Wilco Corp., 4 F.3d 1153, 1166 (3rd Cir. 1993) ... 16

Smith v. Wade, 461 U.S. 30, 34 (1983)......................................................... 39

Tapley v. Collins, 211 F. 3d 1210 (11th Cir. 2000) ..................................... 19

Tennessee v. Garner, 471 U.S. 1,3 (1985).................................................... 18

## Statutes

Omnibus Control and Safe Streets Act, 18 U.S.C. § 2510, et seq. -------------
-----------------------------------------------------1,4,13,14,16,20,21,31,32,34,35

18 U.S.C. § 2520 -------------------------------------------------------14,30,31

Pennsylvania Wiretapping and Electronic Control Act,
    18 Pa. C.S. § 5701, et seq. ------------------------------------------- 1,4

18 PA. C.S. § 5704-------------------------------------2,14,24,25,26,29,32,33,35

18 PA. C.S. § 5747------------------------------------------------------- 14,31

28 USC § 1291----------------------------------------------------------------1

28 USC § 1331----------------------------------------------------------------1

28 USC § 1343----------------------------------------------------------------1

42 USC § 1983----------------------------------------------------------------1

42 USC § 1988-------------------------------------------------------------- 39

## Rules of Civil Procedure

F.R.C.P., Rule 58(a)(4) -----------------------------------------------------7

F.R.C.P., Rule 58(c)(2)(B) ------------------------------------------------ 1,7

F.R.C.P., Rule 58(d)--------------------------------------------------------7

## STATEMENT OF JURISDICTION

This is an appeal from a civil rights and statutory wiretapping action brought pursuant to 42 USC § 1983, 18 USC § 2510, et seq., and 18 Pa. C.S. § 5701, et seq., over which the district court had subject matter jurisdiction pursuant to 28 USC §§ 1331 and 1343.

This appeal is from two Orders issued by the District Court. One order addressed a Motion for Judgment as a Matter of Law, a Motion for a New Trial, and a Motion for Remittitur, the other order disposed of an attorney's fees petition. Each order is a final order (the first was reduced to a final order pursuant to operation of Fed. R. Civ. P., Rule 58 (c)(2)(B)), over which this Court has jurisdiction by virtue of 28 USC § 1291. The District Court's orders were entered on February 13, 2009, and August 6, 2009, respectively. App. 38-39. (merits order) and App. 54. (fees order). The notice of appeal of both orders was filed on August 10, 2009. App. 1-2. (Notice of Appeal)

## STATEMENT OF ISSUES

**Merits Issues**

1.    Whether appellants are entitled to judgment as a matter of law on the Fourth Amendment and the Federal Wiretap Act statutory claim on the basis of qualified immunity?

2.    Whether appellants are entitled to judgment as a matter of law on the Fourth Amendment and Federal Wiretap Act claim because of the statutory exception for law enforcement officers acting in the ordinary course of their duties?

3.    Whether appellants are entitled to judgment as a matter of law on the state statutory wiretapping claim because their actions fell within an exception to the Pennsylvania Wiretapping statute?

4.    Whether the case should be remanded for a new trial because the court did not instruct the jury on the good faith defense available under Title III and the Pennsylvania Wiretap Act, respectively?

5.    Whether the case should be remanded for a new trial because the court failed to instruct the jury on the definition of the term "administrative purposes", as that phrase was used in 18 Pa. C.S. § 5704 (3)?

6.      *Whether, in the event that the appellants prevail on any of the above issues, the award of compensatory damages and punitive damages against them must be reduced or vacated?*

7.      *Whether the punitive damages award must be reduced or vacated because it is disproportionate to the remitted compensatory damages?*

These issues, with the exception of the last two (which could only be raised after the court's Rule 50 (b) order below) were raised by the appellants in their motion for judgment as a matter of law or for a new trial. App. 611, 631, 934-949, and Brief in Support of Defendants' Motion Pursuant to Rule 50 (b). They were disposed of by the district court in its decision of February 13, 2009. The first three issues were also raised by the appellants in a Motion for Reconsideration and Summary Judgment filed prior to trial. App. 105-115.

**Fees Issues**

8.      *Whether, in the event that the appellants prevail on any of the merits issues, the fee award must be vacated for reconsideration in light of this changed outcome?*

## STATEMENT OF THE CASE

This is a civil rights and statutory action initiated by Appellee, Pennsylvania State Police Trooper Mario Diana through filing of a complaint on November 11, 2005, against the Appellants, two command staff officers, Lt. Willard Oliphant and Captain Carmen Altavilla[1]. Diana alleges that while he was on leave due to a work-related injury, he received a phone call from Lt. Oliphant on a recorded telephone line from the police barracks, regarding a return to work order. Lt. Oliphant made this call at the direction of Troop Commander Captain Altavilla, who was on vacation that day. Diana asserts that this phone call violated his Fourth Amendment right to privacy and his statutory rights under the Federal Communications Act – superseded by Title III of the Omnibus Crime Control and Safe Streets Act, 18 USC § 2510, et seq ("Title III") --and Pennsylvania's Wiretapping and Electronic Control Act, 18 Pa. C.S. § 5701, et seq. ("Pennsylvania Wiretap Act")

Diana claims that as a result of the recorded call, the defendants had violated his rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, as well as his statutory rights under Title III and the Pennsylvania Wiretap Act. App. 70-75. On January 6, 2006, Captain Altavilla and Lt. Oliphant moved to dismiss the First and Fourteenth

---

[1] Over time, the ranks of the parties have changed, and one has retired. (Tpr. Diana is now Cpl. Diana, Lt. Oliphant is now Captain Oliphant, and Captain Altavilla is now retired.) We describe them here with the rank and status they enjoyed at the time the events described herein occurred.

Amendment claim, and the Title III claim.  The Court granted the motion as to the Fourteenth Amendment claim, and denied the motion as to all other claims. (See Opinion and Order of August 21, 2006)  On May 29, 2007, Appellants moved for partial summary judgment on Diana's First and Fourth Amendment claims, which motion was denied on November 13, 2007. (See Opinion and Order of November 13, 2007.)

On November 28, 2008, Altavilla and Oliphant filed a motion for summary judgment and for reconsideration of the District Court's order of November 13, 2008, attaching the recorded tape of the call between Diana and Oliphant as evidence. App. 105-127. On January 14, 2008, the district court denied the motion for reconsideration as untimely. App.  142-148.

A jury trial on all remaining claims was conducted in April 2008. App. 149-1168.   Altavilla and Oliphant moved for judgment as a matter of law at the close of Diana's case and again at the close of their case.  App. 611, 631, 642-643, 863, 1169-1175.   At the close of the appellants' case, the district court granted their motion for judgment as a matter of law as to the appellee's First Amendment claim.  The remaining claims were submitted to the jury.  App. 889-890.  In response to a series of special verdict questions, the jury found in Diana's favor on all claims, and awarded him a total of $262,126 in compensatory damages and $238,878 in punitive damages. App. 1176-1180.  In accordance with the jury's finding of liability on the Title III

5

claim, the district court issued an Order awarding $10,000 in statutory damages against each appellant. App. 1181.

The jury's verdict was broken down as follows:

Fourth Amendment Claim:  The jury found that both Captain Altavilla and Lt. Oliphant violated Diana's Fourth Amendment rights.  App. 1176. The jury awarded $39,813 in compensatory damages and $39,813 in punitive damages against each Appellant for this claim. App. 1177.

The Pennsylvania Wiretap Law Claim:  The jury found that both Captain Altavilla and Lt. Oliphant were liable to Diana under the Pennsylvania Wiretap Law and awarded $91,250 in compensatory damages and $39,813 in punitive damages against Altavilla and Oliphant, respectively, for this claim. App. 1178-1179.

The Title III Claim:  The jury found that both Captain Altavilla and Lt. Oliphant were liable to Diana under the Federal Wiretap Law and awarded $39,813 in punitive damages against each appellant.  The court subsequently awarded $20,000 statutory damages against Captain Altavilla and Lt. Oliphant on the federal statutory claim (this was in addition to the punitive damages).

Oliphant and Altavilla moved for judgment as a matter of law, or in the alternative for a new trial, or for a remittitur.  The district court denied their motions for judgment as a matter of law and for a new trial, but granted

the remittitur in part. App. <u>38-39</u>. Diana was ordered to remit $212,126 in compensatory damages, so that the compensatory damages, if accepted, would have been reduced to $50,000. The Appellee was also ordered to remit $10,000 of the $20,000 awarded by the court. App. <u>38-39</u>. Diana later accepted the remittitur, but the court refused to enter the new judgment, (although requested by appellants), citing to Fed. R. Civ. P., Rule 58(a)(4). The Appellants filed a formal motion for judgment to be set out as a separate document pursuant to Fed. R. Civ. P. 58(d), which was denied by the court on August 3, 2009. <u>See</u> Order denying defendants' motion for judgment to be set out as a separate document (Docket No. 144). On August 6, 2009, the district court awarded Appellee's attorneys' fees and costs as follows: $27,820 was awarded to Don Bailey, $30,250 was awarded to Douglas Goldhaber, $1,125 was awarded to Sherry Coover, and $3,088.07 was awarded in costs, for a total of $62,283.07. App. <u>54</u>.

The Appellants filed an appeal from the February 13, 2009, order (citing to Fed. R. Civ. P., Rule 58 (c)(2)(B)), and the order on the fee petition on August 10, 2009.

### STATEMENT OF FACTS

The events that led to this lawsuit began when Appellee Diana, then a trooper, was off on leave for a work-related injury, which occurred on January 5, 2003. App. <u>381</u>. The troop to which Tpr. Diana was assigned in 2003 was Troop P, commanded by Appellant Captain Carmen Altavilla. App. <u>83-84, 209</u>. Lt. Willard Oliphant, the other Appellant, was assigned to Troop P, Headquarters as the Staff Section Commander. App. <u>210-211</u>.

On November 13, 2003, Altavilla received a "return to work" order for Tpr. Diana from a State Police Deputy Commissioner, Lt. Colonel Cynthia Transue, who directed Altavilla to serve the order on Diana. App. <u>221-222</u>. The order was served on Diana on November 14, 2003. It directed Diana to return to work, and noted that if he did not, his disability benefits might cease. App. <u>222, 1094-1095</u>. The order also requested that Diana call Altavilla to inform him of his intentions. App. <u>1095</u>.

Diana did call Captain Altavilla that same day and told him that his injury was not healed and he could not come back to work. App. <u>390</u>. Captain Altavilla told Diana in that phone call that he should have his doctor and PSTA lawyer contact the State Police Bureau of Human Resources and get the matter worked out. App. <u>229</u>. Diana says Altavilla instructed him to call back on Friday, November 21, 2003. App. <u>397</u>.

On November 21, Diana called Troop P Headquarters and requested to speak with Altavilla. App. <u>227</u>.  Captain Altavilla was out that day, but in follow-up, Altavilla called Lt. Oliphant and directed him to call Diana. App. <u>227</u>.  Altavilla specifically ordered Lt. Oliphant to call Tpr. Diana on a recorded phone line from the communications desk. App. <u>230-231</u>.

Defendant Oliphant called Diana and informed him that the order was still in effect and Diana had to return to work. App. <u>460</u>.  Although Diana maintains that he did not know the call was being recorded, because he did not hear any beeps, the only physical evidence of the phone call that was introduced at trial, a tape of the call, had imbedded a clear audible beep that can be heard approximately every 17-20 seconds on the tape. <u>See</u> Exhibit D-1A (attached to Appendix)  These beeps put former Trooper Diana on notice that the call was being recorded.  App. <u>369</u>.  Of note, Diana was familiar with the beeps made on a communications line, because he worked the communications desk before. App. <u>393-394, 415</u>.

Immediately at the conclusion of the call, Oliphant contacted Tpr. Ron Zukosky, Troop P's communications specialist, and requested that he make a tape of the recorded call.  App. <u>463</u>.  While Diana claimed that PSP could reduce the volume on the receiving end only of a recorded phone call, the more experienced Zukosky testified that that he knew of  no way to turn down the sound of the beep on one end of the line while keeping it turned up

on the other end. App. <u>500, 504, 529, 532-533</u>.  Of note, the trial court prohibited PSP counsel from cross-examining Diana on this point.  App. <u>441-446</u>.  While Zukosky was working on the recording requested by Oliphant, another police officer, Cpl. Gerald Williams, a police union officer, overheard a portion of the call.  App. <u>518</u>.  Williams said he heard no beeps on the portion he overheard. App. <u>306</u>.  Williams could not have heard more than about 10 seconds of the recorded call, since Officer Zukosky testified that is all he played out loud, before he began to record the call off the communications tape. App. <u>518-519</u>.

Diana never offered any explanation at trial as to any motivation for Captain Altavilla or Lt. Oliphant to turn off the beeping mechanism in the call made to Tpr. Diana or even why they would have tampered with the recording device.  The defense expert, Paul Ginsberg, testified at trial that the copy of the recording made of the phone call was not tampered with. App. <u>668-672, 681</u>.  Diana offered no expert evidence on the recorded call. The copy of the recording of the call was played at trial and clear audible beeps could be heard approximately every 17-20 seconds on the recording. (Exhibit D-1A – attached to Appendix).

**Facts Relating to Fee Petition**

Through his original Fee Petition, Diana sought $74,442.32 in fees and costs. App. 42. He sought payment for attorney time for the three attorneys who worked on the case - Don Bailey, Douglas Goldhaber and Sheri Coover, plus $3,229.93 in costs. The petition was not supported by any affidavits, nor did it include any other evidence supporting the rates charged. App. 49.

In response, Appellants objected to the lack of supporting documentation and the reasonableness of plaintiff's motion. App. 42. Particularly, Appellants objected to the lack of any evidence establishing that the hourly rates sought reflected prevailing market rates. App. 49. Moreover, the appellants objected to the high rates sought by one of appellee's counsel, Mr. Bailey, given the criticism lodged against him by several Pennsylvania federal district court judges. App. 51.

The District Court reduced the fees, primarily because of the lack of any affidavits regarding prevailing market rates to $59,195 and costs of $3,088.07. App. 54.

## STATEMENT OF RELATED CASES

This case has not previously been before the Court, and there are no pending or completed cases to which it is related.

## SUMMARY OF ARGUMENT

I.    **Merits Issues**

A.    Appellants Altavilla and Oliphant are entitled to qualified immunity under both the Fourth Amendment and Title III, because they reasonably believed that their actions were pursued in the ordinary course of their duties and therefore compliant with 18 U.S.C. § 2510(5)(a)(ii). Because Altavilla and Oliphant were recording a business call about a work-related matter between a police supervisor and a police subordinate, reasonable officers in the position of Altavilla and Oliphant would have believed they were following federal statutory law and would not have known they were violating clearly established law.  If the appellants reasonably believed they met the federal statutory exception, in relying on it, they cannot have violated the Fourth Amendment.

B.    Altavilla and Oliphant met the requirements of the liability exception to the Federal Wiretapping Statute because the recording was done by "a law enforcement officer [i.e. Oliphant] in the ordinary course of his duties."  18 U.S.C. § 2510 (5)(a)(ii).   Therefore, this issue and the related Fourth Amendment issue should have been decided in the appellants' favor as a matter of law.

C.    Altavilla and Oliphant are entitled to judgment as a matter of law with respect to the state wiretapping claim because they met the three

requirements under the Pennsylvania Statute that render the recording lawful: 1) the recording line was used for administrative purposes and there was a periodic beep; 2) the recording made by the system could be destroyed at any time; and 3) at least one non-recorded telephone line was made available for police use at the Pennsylvania State Police troop from which the call was made. 18 Pa. U.S.C. § 5704(3).

## II.    Judicial Errors

A.    A new trial should be granted because the District Court refused to charge the jury on the good faith defenses available to Captain Altavilla and Lt. Oliphant under both the federal and state wiretapping statutes, at 18 U.S.C. § 2520 and 18 Pa. C.S. § 5747(d), respectively.  The Appellants in good faith relied on the language in both statutes granting the exception to the general prohibition on wiretapping, 18 U.S.C. § 2510 (5)(a)(ii) and 18 Pa.C.S. § 5704 (3), and were entitled to a charge with respect to those defenses.

B.    A new trial should be granted because the district court refused to define "administrative purposes", as that term is utilized in 18 Pa.C.S. § 5704 (3), in its charge to the jury.  By not explaining the term "administrative purposes" to include the type of activity the appellants were engaged in with Tpr. Diana (i.e. ordering him back to work), the court allowed the jury to define the term indiscriminately and mistakenly, when

the meaning of the term was essential to the Appellants' argument that they met the requirements of the exception to the prohibition on wiretapping found in the Pennsylvania wiretapping statute.

### III.    Issues Regarding Damages and Attorneys' Fees

A.    If the appellants succeed in any part of their appeal on the merits, the compensatory damages must be re-assessed and the punitive damages re-calculated.

B.    The punitive damages award is disproportionate to the remitted compensatory damages award and exceeds the acceptable ratio announced by the U.S. Supreme Court in Exxon Shipping Co, et al. v. Baker, et al., ____ U.S. _____, 128 S. Ct. 2605, 171 L.Ed. 2d 570 (2008). The Exxon case established the upper limit ratio of compensatory damages to punitive damages as a 1:1 ratio. The ratio of compensatory damages to punitive damages in this case is approximately 1:4, and therefore, the punitive damages should be reduced accordingly.

C.    If the appellants succeed in any part of their appeal on the merits, the fee award must be vacated and reconsidered in light of Diana's actual "degree of success."

## ARGUMENT

I.    **The Judgment on the Merits Should be Set Aside, In Whole or in Part.**

Scope of Review – The Court exercises plenary review over the grant or denial of a Rule 50(b) motion for judgment as a matter of law.  Foraker v. Chaffinch, 501 F.3d 231 (3rd Cir. 2007).   Although the court draws all reasonable and logical inferences in the verdict winner's favor, the motion must be granted if "it is apparent that the verdict is not supported by legally sufficient evidence. Id., quoting Lightening Lube, Inc. v. Wilco Corp., 4 F.3d 1153, 1166 (3rd Cir. 1993).

A.    **Altavilla and Oliphant are Entitled to Judgment as a Matter of Law on the Basis of Qualified Immunity with Respect to the Fourth Amendment Claims and the Federal Statutory Wiretapping Claims.**

The court below allowed the Fourth Amendment and Federal Statutory Wiretapping claims to go to the jury even though it was clear that Altavilla and Oliphant's actions were supported by a clear exception to Title III of the Omnibus Control and Safe Street Act, 18 U.S.C. § 2510, et. seq., at Section 2510 (5)(a)(ii).  That exception states that recordings can be made of telephone conversations, as long as the recording is being made "by an investigative or law enforcement officer in the ordinary course of his duties." Based on this exception, the Appellants maintain that they did not violate a

16

clearly established constitutional right and are therefore entitled to qualified immunity.

Both Captain Altavilla and Lt. Oliphant testified that the act of ordering a subordinate to call a trooper on a recorded line and the act of calling a trooper on a recorded line respectively were in the course of their duties. App. 831-833, 474-479. Altavilla indicated that he ordered Oliphant to make the call to Diana on a recorded line to ensure that the order was transmitted, and that Diana understood the order. App. 825-826. Diana even admitted on cross-examination that Oliphant was carrying out a State Police duty when he made the phone call to Diana. App. 430. Diana also testified at trial that he himself had talked to troopers on recorded lines regarding employment matters, including calling off sick or calling members to cover shifts, so it was not unusual for recorded lines to be used for personnel matters. App. 418-419.

Since the Appellants would reasonably have believed that their actions were in the ordinary course of their duties, "reasonable officers" in the position of Altavilla and Oliphant would not have known that they were violating clearly established law under the circumstances of this case, since they were following federal statutory law. Therefore, they are entitled to the defense of qualified immunity.

The District Court ruled that even if the Appellants relied on the law enforcement exception in Title III, that would not relieve them of their responsibilities under the Fourth Amendment.  Such an interpretation is not supported by case law, particularly since the Title III language on "the ordinary course of police duties" has never been ruled unconstitutional, and therefore its constitutionally is assumed.  See Tennessee v. Garner, 471 U.S. 1, 3 (1985) (Officer who acted in good-faith reliance on the wording of a Tennessee statute was within the scope of his qualified immunity, even if the statute is determined to be unconstitutional after the fact.)

The court below further stated that it would not consider the qualified immunity argument as to the Title III claim because it was not raised by the defendants in their Rule 50 pre-verdict motion.  However, a reading of the transcript indicates that the defendants made the qualified immunity argument both as to the Fourth Amendment and the federal statutory claim.  App. 633-637.  Moreover, the defendants noted that the Title III and Fourth Amendment arguments were inextricably linked (App. 635), because the defendants were relying on the statutory exemption to establish the defense to constitutional liability.

In two circuits that have considered the defense of qualified immunity for public officials in wiretap cases, both circuits have indicated that the defense is available under the constitution and the Federal Wiretap Act.  In

Tapley v. Collins, 211 F.3d 1210 (11th Cir. 2000), the 11th circuit ruled that qualified immunity was a defense to claims brought under the Federal Wiretap Act, and remanded the case for consideration of the defense. Id., 211 F.3d at 1216-17.  Also see Frierson v. Goetz, 227 F. Supp. 2d 889 (M.D. Tenn. 2002) (Officer who intercepted cordless telephone conversation but complied with statutory procedures of Tennessee law entitled to qualified immunity.)

In Blake v. Wright, 179 F.3d 1003 (6th Cir. 1999), the 6th Circuit Court of Appeals held that a police chief was entitled to qualified immunity for recording personal and business calls on recorded police lines, under both the Fourth Amendment and Title III.  The facts of Blake should be compared with the facts of this case – in Blake, there was no audible tone to alert the callers that their conversations were recorded; in this case, Oliphant testified that there was an audible beep on the line (App. 462-463) and the recording of the subject call introduced into evidence (Exh. #D1-A attached to Appendix) had distinct audible beeps on the line.  In Blake, the recorded calls included personal calls; here, the only call at issue was one made in the course of State Police business, from one employee to another about a work-related matter. App. 462-831.  Finally, there was no notice to the plaintiff in Blake that their personal calls were recorded; here, Diana testified that he

was familiar with the fact that the State Police often did business – including business relating to personnel issues – on recorded lines. App. <u>418-419</u>.

Under the reasoning of <u>Blake v. Wright</u>, it is clear that the Appellants were entitled to qualified immunity, under both the Fourth Amendment and Title III, since any constitutional violations, if there were any, were not clearly established at the time, and reasonable police managers standing in the Appellants' shoes could not have known that this action violated clearly established rights.

> **B.    Altavilla and Oliphant are Entitled to Judgment as a Matter of Law with Respect to the Federal Wiretapping Statutory and Fourth Amendment Claims on the Basis that their Actions Fell Within the "LAW ENFORCEMENT OFFICER IN THE ORDINARY COURSE OF HIS DUTIES" Exception to the Federal Wiretapping Statute.**

Under the provisions of the Federal Wiretapping Statute, 18 U.S.C. § 2510(5)(a)(ii), it is not unlawful for a telephone conversation to be intercepted (i.e. recorded) if the intercepting device is used:

> "…by a provider of wire or electronic communication service in the ordinary course of its business, or <u>by an investigative or law enforcement officer in the ordinary course of his duties</u>…" [emphasis added]

In this case, Altavilla and Oliphant produced substantial evidence that they met the criteria to qualify for an exception to the general prohibition of interception of telephone communications. Therefore, this issue should not have gone to the jury and Altavilla and Oliphant were entitled to judgment

20

as a matter of law with respect to the claim under Title III of the Omnibus Control and Safe Streets Act, 18 U.S.C. § 2510, et seq.

Tpr. Diana alleged that Altavilla and Oliphant violated the federal wiretapping statute by calling the plaintiff on a recorded telephone line without audible beeps. However, beeps are not required under § 2510, so long as the recording is being made "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). Several federal courts have recognized that it is routine and a standard police practice for all calls to and from the police to be recorded. See Amati v. City of Woodstock, 176 F.3d 952, 954 (7th Cir. 1999); Jandak v. Village of Brookfield, 520 F. Supp. 815, 821-25 (N.D. Ill. 1981).

The evidence presented by both parties overwhelmingly established that the call to Tpr. Diana was placed and recorded in the ordinary course of law enforcement duties. Defendant Oliphant testified that he made the call from a recorded line at State Police Troop P headquarters. App. 462. It is clear that the call was placed to Tpr. Diana for a work-related purpose, that is, to inform him that he was subject to a back-to-work order, and to explain his options. App. 462. The communication of orders and the discussion of police business matters on recorded lines is a routine and ordinary practice in the Pennsylvania State Police. App. 474, 476-478, 480-481, 780-782,

<u>784-785, 831-832</u>.  Diana himself admitted that Oliphant was carrying out a State Police duty when he made the phone call. App. <u>430</u>.

Against the evidence outlined above, the court cited what it referred to as "substantial evidence" that supported the jury's finding that the call from Oliphant was not made in the ordinary course of police business.  First, the court said that <u>Diana</u> testified that it was common practice for one officer to inform another if the originator called from a recorded line and that he received no such notification from Oliphant. App. <u>12</u>.  However, the federal statute does <u>not</u> state that such notification has to take place before the statutory exception may apply, so this "fact" is not relevant.

Secondly, the court cited to the inconsistencies exhibited by Oliphant in directing Tpr. Zukosky to make a copy of the recorded call to Diana when compared with the policies and procedures contained in the Pennsylvania State Police communications manual. App. <u>12</u>.  However, again, the federal statutory exception is not dependant on what is contained in the Pennsylvania State Police communications manual, which addresses the procedures that the communications unit must use in copying a recording, so this reference to the record is irrelevant. Moreover, even the Pennsylvania State Police communications specialist, Tpr. Ron Zukosky, implied that the Pennsylvania State Police communications manual was not always followed to the letter when copies were made of recordings, because he testified that

he made the copy of the recording for Oliphant at the lieutenant's oral request. App. 507-508. The only significant inconsistency noted between what the manual said and what was done by Oliphant, was that the copying of a recorded line was supposed to be accompanied by a written request, and Oliphant orally made the request to Tpr. Zukosky. Again, the fact that an oral request, rather than a written request was made, to make a copy of the recording of the call, does not mean that the <u>call</u> was not made in the ordinary course of police business.

The court also noted that Diana presented evidence that the call, was made, was made to gather information regarding Diana's Workers' Compensation claim and this was allegedly improper because neither Appellant had responsibility for investigating such claims. However, the court cites to no reference in the record to support this "fact". Altavilla testified that the call was made to deliver the order from the Deputy Commissioner and Oliphant testified he made the call on a recorded line for the purpose Altavilla indicated, at the direction of Altavilla. App. 462, 806, 825-826. There is no compelling evidence to the contrary, and the "evidence" offered by the court on this point is mere conjecture, not drawn from the testimony of record. Moreover, even if Altavilla told local union president Joseph Plant that he was instructed to make the call by someone in Harrisburg, likely with the Pennsylvania State Police Bureau of Human

Resources, as Plant testified and the court cited to, such a statement does not indicate that there was a "nefarious" intent on the part of Altavilla (i.e. the Bureau of Human Resources was under the command of the Deputy directing delivery of the order to report to work, so therefore it would not be unusual for Oliphant or Altavilla to discuss the order to return to work with Human Resources personnel.)   That such a conversation with the human resources office occurred does not mean at all that the call was not made in the normal course of Altavilla's and Oliphant's duties.

Since the overwhelming evidence was that the Appellants met the requirements of the law enforcement exception to the general prohibition of interception of telephone communications, they were entitled to judgment as a matter of law on that issue, and consequently on the Fourth Amendment issue as well, since one cannot be following viable federal law yet be found to have violated the Constitution.

**C.    Defendants are Entitled to Judgment as a Matter of Law with Respect to the State Statutory Wiretapping Claim on the Basis that their Actions Fell Within an Exception to the Pennsylvania Wiretapping Statute**.

Pursuant to 18 Pa. C.S. § 5704 (3), it is <u>not</u> <u>unlawful</u> for "police …communications systems to record telephone communications coming into and going out of the communications system of … a police department …" if the system meets the following criteria:

"(i) the telephones thereof are limited to the exclusive use of the communication system for administrative purposes and provided the communication system employs a periodic warning which indicates to the parties to the conversation that the call is being recorded;

(ii) all recordings made pursuant to this clause, all notes made therefrom, and all transcriptions thereof may be destroyed at any time, unless required with regard to a pending matter; and

(iii) at least one nonrecorded telephone line is made available for public use at the Pennsylvania Emergency Management Agency and at each police department, fire department or county emergency center."

In this case, Altavilla and Oliphant produced overwhelming evidence that they met the three criteria to qualify for an exception to the general prohibition of interception of telephone communications. Therefore they are entitled to judgment as a matter of law with respect to the claim under the Pennsylvania Wiretapping and Electronic Surveillance Control Act.

First, the telephone that recorded the phone call between Oliphant and Diana was limited to "the exclusive use of the communication system for administrative purposes." 18 Pa. C.S. § 5704 (3)(i)    The term "administrative", modifying "purposes" is not defined in the statute and was not defined by the court in this case. App. 23. Therefore, the word "administrative" (from the point of view of Altavilla and Oliphant) can be given its everyday meaning, which according to Webster's New Collegiate Dictionary (5th ed., 1977) is "of or relating to management, or the execution

of public affairs; executive." Under this definition, the phone call made by then-Lt. Oliphant, for the purpose of relaying information to Tpr. Diana about his work status, was made for an "administrative" purpose. Moreover, as Oliphant and Altavilla testified, the recorded phones were used for the purpose of carrying out the business of the police department. App. 474-476; 831-832.

The other provision of section (i) of the exception that must be met is that the telephone system employ "a periodic warning which indicates to the parties to the conversation that the call is being recorded." 18 Pa. C.S. § 5704 (3)(i). The overwhelming evidence in this case is that the telephone on which defendant Oliphant had the conversation with Tpr. Diana employed a periodic warning beep. This evidence consisted of the following:  1) the tape of the conversation itself, introduced into evidence as Defendants' Exhibit #D1-A, which contained clear periodic audible beeps (See Exhibit #D1-A, attached to Appendix),  2) Oliphant's testimony that he called Diana on a recorded line that utilized periodic beeps (App. 462),  3) Paul Ginsberg's (Altavilla and Oliphant's expert) testimony that the tape he examined – the same one introduced at trial as #D1-A – was an authentic recording of a conversation between two individuals, that it had not been tampered with, and that it had automatically inserted beeps consistent with the beep tone generator utilized by the PSP on their recorded phones, (App.

667-671) and  4) Tpr. Ron Zukosky 's testimony that the phone line from which he made the Maxell recording, identified as #D1-A, was a recorded beeped line (App. 519), he had no reason to believe the recording or the TLP-107 unit had been tampered with (App. 520), and he knew of no way to keep the audible beep on one end of the recorded call and delete or mute it on the other. (App. 532-533) (Zukosky was the Troop Communications Specialist, and he was responsible for troop communications, including the telephones. App. 500.)   Zukosky also testified that he knew of no-one else at Troop P, Wyoming, other than himself, who would know anything about the technical aspects of the telephone system used there. App. 504, 522.

The only evidence offered by Diana to suggest that the beeps could not have been heard by Diana was:  1) Diana's own self-serving testimony that he did not hear any beeps (App. 393), and an assertion by Diana, unsupported by expert testimony, that one of the plugs from the "beep box" could be disconnected, so that the beeps could still transmit to the State Police end of the conversation, but not on the receiving end (App. 441), and 2) testimony from Cpl. Williams, who said he did not hear any beeps on the recording of the call when he heard a short portion of the original recording, as Zukosky was making the copy of the recording. App. 306.

There are multiple problems with Diana's evidence:  1) Cpl. Williams' testimony is not consistent with Diana's testimony and theory that Oliphant

somehow unplugged the device that made the beeps on one part of the line, rendering it operative on Oliphant's end of the line, but not on Diana's end. Even under Diana's theory, Cpl. Williams should have heard beeps as Trooper Zukosky prepared a copy of the call because the beeps would have been present on the Pennsylvania State Police end of the line.  2) The court did not allow the defense to re-cross Diana on his theory that the beep box could be disconnected as to one end of the line. App. <u>446</u>.  Had it been permitted to do so, the defense would have asked critical questions, such as Diana's familiarity with the TLP-107 and if he ever tested out his theory that one end of the line could be disconnected, as well as other relevant questions.  3) Tpr. Diana's opinions about the operation of the TLP-107 are clearly not sufficient to support his theory that there were no beeps that could be heard on his end of the line. He testified that his only familiarity with the equipment was based on incidents when repairmen came to fix it. App. <u>419-420</u>.

The evidence offered by Diana should be disregarded because there was <u>no</u> evidence presented that the recording (the best evidence of what occurred during the conversation between Oliphant and Diana) had been tampered with, that Oliphant or Altavilla had motive or opportunity or enough knowledge to tamper with the recording or the equipment that

produced the beeps, or that Diana had enough knowledge of the TLP-107 to know how it worked.

The second part of the exception in § 5704 that must be met here is that the recordings made pursuant to the exception may be destroyed at any time, unless required with regard to a pending matter. 18 Pa. C.S. § 5704 (3)(ii)  Here, the original recording made on the Seltronics recorder was not preserved, because at the time, there was no matter pending, and the only request for the recording indicated that a copy was appropriate. App. 827-829.  A copy of the recording was sent to the individual who requested it, a union attorney representing Tpr. Diana, for a workers' compensation case. App. 828-829.    Since Pennsylvania State Police regulations allow destruction of the original recording after 60 days (Exhibit #D-2, App. 1127), and since no matter was pending at the time of destruction that would have required the retention of the original, the copying of the original, therefore, and the subsequent destruction of the original digital recording was lawful under the Act.  App. 513-514.

The third part of the exception in § 5704 requires that police maintain at least one non-recorded telephone line for public use.  18 Pa. C.S. § 5704 (3)(iii).  This element was not at issue in this case, but there was testimony that there were unrecorded lines available at Troop P, Wyoming, when the phone call was made. App. 239, 502, 507.

Since the overwhelming evidence was that Altavilla and Oliphant met the requirements of the exception to the general prohibition of interception and disclosure of telephone communications, contained in the Pennsylvania Wiretapping and Electronic Surveillance Control Act, Altavilla and Oliphant are entitled to judgment in their favor on that issue.

The District Court did not address that issue because they deemed it to be waived. However, it was raised in a Motion for Reconsideration and Motion for Summary Judgment filed by Altavilla and Oliphant prior to trial in this matter, so the issue was preserved and should be addressed by this court. App. 110-112; 124-126.

## II.    The Case Should be Remanded for a New Trial, because of Judicial Errors.

### A.    A New Trial Should be Granted Because the Court Refused to Charge the Jury on the Good Faith Defense Available to the Defendants Under Both the Federal and State Wiretapping Statutes.

18 U.S.C. § 2520 of the Federal Wiretapping Act provides a complete defense against any civil or criminal action brought under the Act if the defendant has a good faith reliance on:

> "(1) a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization;
> (2) …
> (3) …"                    [emphasis added]

Altavilla and Oliphant maintain that they relied in good faith on the provisions of a statutory authorization that permitted them to record telephone communications while in the ordinary course of their duties.  That statutory authorization is 18 U.S.C. § 2510 (5)(a)(ii), read in conjunction with 18 U.S.C. § 2520.

Altavilla and Oliphant pled this defense sufficiently in the "Third Defense" to their Answer, which states that:

> "The facts of this case fall into one or more exceptions to liability found in the federal and state wiretap statutes…"

Similarly, the defendants relied on the good faith provisions of the state wiretapping statute, at 18 Pa. C.S. § 5747 (d), which provide that:

> "A good faith reliance on:
> (1) A court or order, a grand jury subpoena, a legislative authorization, or a statutory authorization…
> (2) …
> (3) …
> is a complete defense to any civil or criminal action brought under this subchapter or any other law."
> [emphasis added]

The defendants maintain that they relied in good faith on the provisions of the statutory authorization that allowed recording of telephones coming into and going out of a police department provided the phones were used for administrative purposes; there was a periodic warning beep on the phone; all recordings could be destroyed, except when required for a

31

pending matter; and a non-recorded line was available to the public.  <u>See</u> 18 Pa. C.S. § 5704 (3)

Altavilla and Oliphant asked the court, at the charging conference, to read an instruction to the jury informing them of the good faith defense under both the federal and state acts.  <u>App. 946-956</u>.  The court, after deliberation, refused to charge on the good faith defense, on the basis that the court did not know what statutory provisions Altavilla and Oliphant were relying upon. App. <u>972</u>.

A new trial is warranted on the basis of the court's failure to give the good faith defense instruction for both Altavilla and Oliphant under both the federal and state statutory frameworks.  During the discussion about the good faith defense during the charge conference, defense counsel made several references to the federal and state statutory provisions the defendants were relying upon for the defense.  The court understood that the statutory authorization for the federal good faith defense was that Altavilla and Oliphant were acting in the ordinary course of police duties, under 18 U.S.C. § 2510 (5)(a)(ii), since he spoke about the language of that section during the discussion of the defense. App. <u>946, 948-949</u>.  The Court also knew that the provision Altavilla and Oliphant were relying upon as the statutory authorization for the good faith defense under the Pennsylvania statute was

18 Pa.C.S. § 5704 (3), because of the context of the discussion concerning "administrative purposes." App. 950-956.

In addition to the discussion at the charge conference about the charge on the good faith defense, there was also extensive testimony that demonstrated that defendants met the factual requirements to have the defense presented to the jury under both statutes. With respect to the issue of whether the recording was done "in the ordinary course of his duties", Oliphant testified that he believed after speaking to his supervisor, Captain Altavilla, that it was his obligation to call Tpr. Diana on a taped line and advise Tpr. Diana that his return to work order still stood. App. 460-462. Advising a subordinate of their work obligations is "the ordinary course of duties" for a police supervisor. Lt. Oliphant also testified that he has used recorded lines in the past to deliver business messages to state troopers (App. 474); again, indicating how "ordinary" this process was. App. 480-481. He said that he made phone calls on tape-recorded lines as a routine part of police business (App. 475), and other troopers did the same. App. 476-477. Oliphant also testified that he did not believe he did anything wrong or improper when he called Tpr. Diana on the recorded line (App. 475), which, again, is indicative of someone relying on the provisions of the statute. (*i.e.* Oliphant in good faith thought he was making a recorded phone call in the ordinary course of police business under the meaning of 18 U.S.C.

§ 2510 (5)(a)(ii).)  Finally, Oliphant testified that he was following Captain Altavilla's order to call Tpr. Diana, and that following orders is a normal part of a police officer's duties. App. <u>478</u>.

Captain Altavilla, too, testified that the order he gave then-Lt. Oliphant to call Tpr. Diana on a recorded line was done in the ordinary course of police business.  He testified that he believed he could use the taped communications lines at Pennsylvania State Police barracks, "as long as it was police-related." App. <u>831-832</u>.  He believed that as long as it involved "an administrative police matter", or "police business", the conversation could be accomplished on recorded lines. App. <u>831-832</u>. Altavilla also opined that other troopers, commanders, and supervisors used the taped phones in the same manner he did, for business-related reasons. App. <u>833</u>.

All of the above-referenced testimony from both Oliphant and Altavilla also establishes that they were not only relying on the "ordinary course of business" language in the federal statute, but that they both believed the phone call to Tpr. Diana was made for "administrative purposes" under the Pennsylvania Statute. (see particularly the use of the term "administrative police matters," utilized by Captain Altavilla (App. <u>831</u>.))  Therefore, both Altavilla and Oliphant believed when the phone call was made to Tpr. Diana about a work-related matter on a recorded line, that

34

their actions were legal and permissible under both the federal and state statutes on wiretapping. Therefore, both were entitled to have the good-faith defense from both statutes presented to the jury for consideration. See Boetger v. Miklich, 534 Pa. 581 (1993) (The good faith defense is available when the defendant relies upon the specific provisions of the Pennsylvania Wiretap Act.)

> **B.     A New Trial Should be Granted Because the Court Refused to Define "Administrative Purposes", as that Term is Utilized in 18 Pa. C.S. § 5704 (3), in its Charge to the Jury.**

In the charge conference there was a discussion of what the term "administrative purposes" meant in the context of the defense outlined in 18 Pa. C.S. § 5704 (3). App. 951-956, 964-965. The defense was obviously concerned about the effect it would have on the case if the jury were left to determine what that term meant, since the jury's interpretation and the police officer's interpretation could differ.

The court in its charge defined the meaning of "ordinary", utilized in the phrase "ordinary course of … duties", in explaining the exception defendants relied upon in the federal statute, 18 U.S.C. § 2510 (5)(a)(ii). However, despite the fact that there was ample evidence from the charge conference that defendants believed the jury could misinterpret the meaning of "administrative purposes" under the Pa. Act, at 18 Pa. C.S. § 5704 (3), the court gave no instruction on the term "administrative purposes." This failure

on the part of the Court left the term to be defined by the jury, and they could have chosen to define the term much more narrowly than the defendants did.  (*e.g.* the jury could have concluded that "administrative purposes" meant routine daily business purposes of the State Police, instead of conversations between supervisors and subordinates such as was involved here, or they could have concluded that "administrative purposes" was restricted to publicly recognizable police activity such as investigating crimes, but did not include personnel matters.)

It is true that a trial court need not define specific statutory terms when they are within the common understanding of a juror.  See Jeffers v. United States, 432 U.S. 137 (1977).  However, because a jury might not understand for what "administrative purposes" a telephone could be utilized, from a supervisory police officer's perspective, the term should have been defined in this case, since the statutory exception in which the phrase in contained is directed to the police.

Because the term "administrative purposes" was not defined, and because a jury would not know what a police officer's administrative duties would include, the court should grant the defendants a new trial based on the fact that the failure to instruct on the meaning of the term could have resulted in a miscarriage of justice.

### III.    Issues Regarding Damages and Attorneys' Fees

####    A.    The Award of Compensatory and Punitive Damages Should be Set Aside or Reduced Accordingly if Appellants Prevail on any of the Preceding Arguments.

After remittitur, the judge awarded a total of $50,000 in compensatory damages and left intact the jury's punitive damages award of $238,878.  The judge's remitted compensatory damages award was not ascribed to particular claims.  However, the punitive damages were allocated amongst the three claims.

Therefore, if any part of the merits award is set aside, in accordance with the preceding arguments, it would be impossible to determine how compensatory damages should be allocated between these claims, and the surviving claims, if any.  Therefore, the issue should be remanded.  With respect to the punitive damages, damages should be reduced accordingly if appellants prevail on any of the preceding issues.  See CGB Occupational Therapy Inc. v. RHA Health Services, Inc., 357 F.3d 375, 390 (3rd Cir. 2004) (Court held in a similar factual situation that the award of punitive damages had to be remanded for a new trial, including liability and the amount of award.)

**B.**    **The Punitive Damages Award is Disproportionate to the Remitted Compensatory Damages Award and Exceeds the Acceptable Ratio.**

The jury awarded $262,126 in compensatory damages against appellants Diana and Oliphant. The judge reduced this, pursuant to post-trial motions, to $50,000. However, he left the punitive damages award of $238,878 intact. When one adds the $10,000 statutory damages ultimately assessed by the court on the Title III claim to the compensatory damages total, one can clearly note that the ratio of compensatory damages to punitive damages is approximately 1 to 4. This ratio exceeds the acceptable ratio between compensatory and punitive damages.

In Exxon Shipping Co., et al. v. Baker, et al., _____U.S. _____, 128 S. Ct. 2605, 171 L.Ed. 2d 510 (2008), the U.S. Supreme Court addressed the issue of the acceptable ratio between compensatory damages and punitive damages and held that a 1:1 ratio of punitive damages to compensatory damages constitutes the upper limit on punitive damages under the federal common law standard. Although Exxon is a maritime case, it is apparent that the holding of the Court is not limited to maritime cases. The court cited to state law damages awards that did not involve claims under maritime law, and nowhere in its decision does the court suggest that its holding was anything unique to maritime law. The applicability of the Exxon analysis to this case is apparent because punitive damages in both

civil rights and maritime cases are governed by federal common law. <u>Smith v. Wade</u>, 461 U.S. 30, 34 (1983), <u>Basista v. Weir</u>, 340 F.2d 74, 86-87 (3rd Cir. 1965)

The punitive damages award in this case vastly exceeds the 1:1 ratio of punitive to compensatory damages that the Supreme Court found constituted the "upper limit" that could be awarded. This court should therefore vacate the award of punitive damages, and if defendants' other arguments are rejected, decide the proper amount of punitive damages based on the <u>Exxon</u> analysis.

### C. The Award of Attorney's Fees Should be Set Aside or Reduced Accordingly if Appellants Prevail on any of the Preceding Arguments.

If the appellants succeed in any part of their appeal or the merits, the fee would have to be vacated and remanded to the district court for reconsideration in light of that altered situation.

A prevailing party in a civil rights action is entitled to a reasonable attorneys' fee. 42 U.S.C. § 1988. The usual starting point for determining the amount of a reasonable fee is the "lodestar" – i.e. the number of hours expended on the litigation multiplied by a reasonable hourly rate. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433-434 (1983). In adjusting the lodestar, "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992).

When a plaintiff achieves only limited success, the lodestar may be excessive, and therefore the court, in assessing fees, must give paramount consideration to the amount of damages obtained as compared to the amount sought. <u>Id</u>.  If this Court agrees that all or part of the verdict in Tpr. Diana's favor should be set aside, then the appellee's "degree of success" will be altered also.  In that event, the fee award should be vacated and remanded for the district court to consider to what extent the altered "degree of success" demands downward adjustment in the fee award.

## CONCLUSION

For these reasons, the Court should direct the district court to enter judgment in favor of the appellants. Alternatively, the Court should remand the case for a new trial on the claims. The fees award should be vacated and/or reduced, depending on the degree of success of the appellants in this appeal.

Respectfully submitted,


s/Joanna N. Reynolds_____
Joanna N. Reynolds
Assistant Counsel
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA  17110
Attorney ID #37436
(717) 783-5568


Dated:  December 7, 2009

## **CERTIFICATE OF COUNSEL**

I, Joanna N. Reynolds, Assistant Counsel, Pennsylvania State Police, hereby

certify as follows:

1.     That I am a member of the bar of this Court.

2.     That the text of the electronic version of this brief is identical to the

text of the paper copies.

3.     That the following virus detection program, McAfee VirusScan

Enterprise version 8.5.0i, was run on the file and no virus was detected.

4.     That this brief contains 8,678 words within the meaning of Fed. R.

App. Proc. 32 (a)(7)B.  In making this certificate, I have relied on the word

count of the word processing system used to prepare the brief.


Date: December 7, 2009                    s**/ Joanna N. Reynolds**
                                          **JOANNA N. REYNOLDS**
                                          **Assistant Counsel**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | |
|---|---|
| **MARIO J. DIANA,** | : |
|         **Appellee** | : **No. 09-3360** |
| | : |
|    **V.** | : |
| | : |
| **WILLARD OLIPHANT AND** | : **(3:05-CV-2338)** |
| **CARMEN  ALTAVILLA,** | : |
|         **Appellants** | : (Electronically Filed) |

## <u>CERTIFICATE OF SERVICE</u>

I, **Joanna N. Reynolds**, Assistant Counsel for the Pennsylvania State Police, hereby certify that on this date I caused to be served a copy of the foregoing, **Brief for Appellants and the Appendices** by filing a copy electronically with the United States Court of Appeals for the Third Circuit and via U.S. Mail on counsel listed below:

> **Don Bailey, Esquire**
> **Law Offices of Don Bailey**
> **4311 N. 6th Street**
> **Harrisburg, PA  17110**
> **(Counsel for Appellee)**

**<u>s/ Joanna N. Reynolds</u>**
**JOANNA N. REYNOLDS**
**Assistant Counsel**

**DATE:  December 7, 2009**