# IN THE UNITED STATES COURTS OF APPEALS
# FOR THE THIRD CIRCUIT

---

## No. 09-3360

---

## MARIO J. DIANA,
### APPELLEE

## V.

## WILLARD OLIPHANT AND CARMEN ALTAVILLA,
### APPELLANTS

---

## APPENDIX – VOLUME 5
## (P. 929 – 1183)

---

## APPEALS FROM THE ORDERS OF THE UNITED STATES
## DISTRICT COURT FOR THE MIDDLE DISTRICT OF
## PENNSYLVANIA ENTERED
## FEBRUARY 13, 2009 AND AUGUST 6, 2009

**Office of Chief Counsel**
**Pennsylvania State Police**
**1800 Elmerton Avenue**
**Harrisburg, PA 17110**
**phone: 717-783-5568**
**fax: 717-772-2883**


**DATE:  December 7, 2009**

**BARBARA ADAMS,**
**General Counsel**

**BARBARA CHRISTIE,**
**Chief Counsel**
**Pennsylvania State Police**

**By:  Joanna Reynolds**
    **Assistant Counsel**
    **Pennsylvania State Police**

## TABLE OF CONTENTS

**Volume 1**

Notice of Appeal (August 10, 2009) -------------------------------------------1

Memorandum and Order (February 13, 2009)-----------------------------------3

Memorandum and Order (August 6, 2009) ------------------------------- 40


**Volume 2**

District Court Entries----------------------------------------------------------- 55

Complaint----------------------------------------------------------------------- 70

Defendants' Answer to Complaint ----------------------------------------- 76

Memorandum and Order (November 13, 2007) ------------------------------- 81

Defendants' Motion for Reconsideration and for Summary Judgment-----105

Defendants' Memorandum in Support of Motion for Reconsideration
    and for Summary Judgment-----------------------------------------------116

Plaintiff's Brief in Opposition to Defendants' Motion
    for Reconsideration -------------------------------------------------------128

Memorandum and Order dated 1/14/08 ----------------------------------142

Trial Transcript
    April 7, 2008
        Judge's Instructions -------------------------------------------158
        Plaintiff Opening Remarks-----------------------------------------171
        Defendant Opening Remarks -------------------------------------191
        Altavilla-------------------------------------------------------------204
        Plant-----------------------------------------------------------------265
    April 8, 2008
        Williams ------------------------------------------------------------300
        Caputo --------------------------------------------------------------312

## **Volume 3**

Trial Transcript
   April 8, 2008 (cont'd)
      Oliphant-------------------------------------------------343, 447
      Diana ------------------------------------------------------378
      Zukosky----------------------------------------------------499
      Gannis------------------------------------------------------545
      Kreidler ---------------------------------------------------556


## **Volume 4**

Trial Transcript
   April 9, 2008
      Rule 50 Motion -------------------------------------------611
      Forney-----------------------------------------------------646
      Paul Ginsberg --------------------------------------------655
      Studenroth-------------------------------------------------696
      Bonney-----------------------------------------------------749
      Walsh ------------------------------------------------------768
      Peter -------------------------------------------------------777
      Altavilla----------------------------------------------------803


## **Volume 5**

Trial Transcript
   April 10, 2008
      Motion for Reconsideration-----------------------------931
      Plaintiff Closing -----------------------------------------973
      Defendant Closing-------------------------------------- 1008
      Plaintiff Rebuttal -------------------------------------- 1024
      Jury Instructions --------------------------------------- 1027
      Juror Question #1--------------------------------------- 1062
      Juror Question #2--------------------------------------- 1063
      Verdict ------------------------------------------------- 1068


Trial Exhibits
   P-6:  Order to Return to Work (11/14/03)----------------------- 1094
   P-7:  Email, Simon to Altavilla re Tpr. Diana (11/24/03)------------- 1096
   P-12: Email, Simon to Bonney re Tpr. Diana (11/20/03)-------------- 1098
   P-13: Memo, Oliphant to Director, Integrity & Professional Standards
        re Letter of Complaint from Caputo (4/29/05)------------------- 1101

P-16: Email, Simon to Altavilla re Tpr. Diana (11/20/03)------------- 1104

D-1A:  Recording of telephone call made between
       Tpr. Diana and Lt. Oliphant ------------------ (tape attached hereto)
D-2:  Operation Manual 7-8 --------------------------------------------- 1108
D-3:  Order to Return Work, dated 11/12/2003 ------------------------- 1145
D-4:  Memo, Altavilla to Director, Human Resources re: Order to
       Return to Work (11/14/2003) ------------------------------------ 1161
D-6:  Email, Oliphant to Bonney re Tpr. Diana's Return to
       Work (11/21/03) ---------------------------------------------------- 1164
D-12: Email, Oliphant to Altavilla re Tpr. Diana (11/21/03) --------- 1165
D-21: Letter, A. Caputo to Altavilla re Tpr. Diana (12/4/08) --------- 1166
D-22: Letter, Altavilla to A. Caputo re Tpr. Diana (12/5/08) --------- 1168

Defendants' Motion for Judgment as a Matter of Law --------------------- 1169

Special Verdict Slip ---------------------------------------------------------- 1176

Order Assessing Damages (April 14, 2008) --------------------------------- 1181

Judgment – Decision by Court (April 17, 2008) ---------------------------- 1182

Judgment – Decision by Jury Verdict (April 17, 2008) -------------------- 1183

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Mario Diana                    :
                               :
                               :
                               :
        vs                     :        3:05-CV-02338
                               :
                               :
                               :
Williard Oliphant, et al.      :
                               :
                               :


        BEFORE:          Honorable A. Richard Caputo

        PLACE:           Wilkes-Barre, Pennsylvania

        PROCEEDINGS:     Jury Trial

        DATE:            Thursday, April 10, 2008

        VOLUME:          Four


APPEARANCES:

For the Plaintiff:     Don Bailey, Esq.
                       Douglas R. Goldhaber, Esq.
                       4311 North Sixth Street
                       Harrisburg, PA  17110

For the Defendants:    Joanna N. Reynolds, Esq.
                       Keli M. Neary, Esq.
                       PA State Police
                       Office of Chief Counsel
                       1800 Elmerton Avenue
                       Harrisburg, PA  17110

2

**INDEX TO WITNESSES**

| FOR PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS | COURT |
|---|---|---|---|---|---|
| Motion for Reconsideration | | | | | 3 |
| Closing Argument<br> By Mr. Goldhaber:  45 | | | | | |
| Rebuttal Argument<br> By Mr. Goldhaber:  96 | | | | | |
| Judge's Instructions to the Jury | | | | | 99 |
| Question #1 | | | | | 134 |
| Question #2 | | | | | 135 |
| Verdict | | | | | 140 |

| FOR DEFENDANT: | DIRECT | CROSS | REDIRECT | RECROSS | COURT |
|---|---|---|---|---|---|
| Closing Argument<br> By Ms. Reynolds:  80 | | | | | |

**INDEX TO EXHIBITS**

| PLAINTIFF: | IDENTIFIED | ADMITTED |
|---|---|---|

| DEFENDANT: | IDENTIFIED | ADMITTED |
|---|---|---|

```
 1                      (9:06 a.m., convene.)

 2                 (Whereupon the following excerpt was

 3    previously transcribed:)

 4                 (Whereupon, the following conference was

 5    held in chambers:)

 6                 THE COURT:  I see I got a motion for

 7    reconsideration.

 8                 MR. GOLDHABER:  Specifically with regard to

 9    Defendant Altavilla, your Honor, not Defendant Oliphant.

10                 THE COURT:  Yeah.  I looked it over.  Do you

11    want to argue?

12                 MR. GOLDHABER:  I don't have anything to add

13    from what's in the motion, and to what we said

14    yesterday, your Honor.

15                 THE COURT:  All right.  Anything from your

16    side?

17                 MS. REYNOLDS:  Yeah, just briefly.  I don't

18    think he said this was the only Worker's Comp. case he

19    had in a long time.  I mean, this is the only -- well,

20    let's see what it says here.  This is the first time in

21    years he had to deal with a Worker's Comp situation.  I

22    think it said he said it was the first time in years he

23    had to deal with a return to work order.  I think he's

24    had other Worker's Comp situations, it's just that this

25    is the first time he had to deal with -- and I don't
```

4

1   think that there was any indication that he was trying

2   to retaliate against the plaintiff to try and coerce and

3   intimidate him into returning to work.  If anything, he

4   was trying to give him the reasons why he didn't have to

5   come back to work.

6           THE COURT:  I understand your position.

7   Your position essentially is because -- I know you made

8   a point of saying, well, he had nothing else to do, and

9   then yet there was the phone call.  But there was the

10  intervening call from Trooper Diana.  I mean, it should

11  not have gone unanswered.  And I don't think you can

12  ramp that up to constitute some ultra vires act, as it

13  were, on the part of Altavilla.

14          MR. GOLDHABER:  But your Honor, I believe

15  the message, even based upon on Captain Altavilla's

16  testimony was, he received a message from TAM, the troop

17  administrative manager Cheryl Burton, that Mario Diana

18  had left a message for him.  Didn't say what the message

19  was about.  He also testified Monday that as of Thursday

20  when he left work he thought the matter had been taken

21  care of.  So as of Friday morning, when he got that

22  message from Cheryl Burton that Mario Diana had called,

23  in his mind there would have been nothing to indicate

24  that there was any misunderstanding.

25          THE COURT:  Oh, I didn't understand her

5

1  testimony that way.  I understood his testimony to be

2  that she said there was confusion, that's what I

3  understood, on the part of -- what was her name, Burton?

4          MR. GOLDHABER:  Cheryl Burton, your Honor.

5          THE COURT:  Yeah, that's what --

6          MR. GOLDHABER:  I don't believe he said that

7  yesterday.

8          THE COURT:  Well, he said it during his

9  testimony sometime.  All right.  In any event, my

10  reasons haven't changed, and respectfully I'm going to

11  deny your motion.

12          MR. GOLDHABER:  Yes, your Honor.

13          THE COURT:  Let's go on to the instructions.

14  First of all, let me tell you what I do.  Don knows this

15  because he had -- was in a case.  What I do is I

16  instruct the jury, I tape-record the instructions.  It

17  may be inappropriate in this case, but in any event, I

18  tape-record the instructions on an independent

19  tape-recorder, and I give them an outline, which I'll

20  give to both sides, so that they can find out where

21  essentially on the tape a particular subject may be if

22  they want to refer to the instructions.  So, that's what

23  I do.  I send the tape-recorder out with the tape, and

24  the outline.

25          Okay.  So, what do we have?  In terms of

6

1  substance, we have the Fourth Amendment claim elements.

2  Essentially I don't know how to -- I've dealt with the

3  subjective expectation of privacy and the objective

4  expectation of privacy in fairly general or vanilla

5  terms, and I say in terms of this case, if you find that

6  there were beep tones on the telephone line during

7  the conversa- -- during the telephone call made by

8  Captain Oliphant to Corporal Diana, you must find for

9  the defendants.

10          If, on the other hand, you find that there

11  were no beep tones on the telephone line during the time

12  of the telephone call between Olyphant and Diana you

13  should find for the plaintiff.  That's essentially all

14  the tailoring that I've done on that one.  Okay?

15          MS. REYNOLDS:  The -- I'm supposed to state

16  my objections now?  I don't do these cases very often.

17          THE COURT:  Yeah, sure.

18          MS. REYNOLDS:  Okay.  The only -- and this

19  was a part that we had brought up in the argument that

20  you heard before --

21          THE COURT:  Go ahead.

22          MS. REYNOLDS:  -- about the federal

23  statutory -- we believe that --

24          THE COURT:  Well, I'm on the Fourth

25  Amendment.

7

1       MS. REYNOLDS:  I understand that, but I
2   think that the exception under the statute is relevant
3   to the Fourth Amendment, just if you had like a
4   statutory exclusionary rule, it's the same sort of
5   thing.  I mean, they're allowed to -- they are permitted
6   to speak on recorded lines when they're acting in the
7   ordinary course of police business, and police would be
8   on notice that that was -- that that was acceptable
9   under federal statute.  The federal statute blends with
10   the Fourth Amendment for purposes of the privacy right I
11   believe.
12       THE COURT:  Well, you find me some authority
13   to that effect and I'll buy it.  I don't know where a
14   statute can trump the constitution.
15       MS. REYNOLDS:  And I understand what you're
16   saying, but the -- but the -- then there would be -- the
17   police would be relying on the statute and then you
18   would say they would be violating the constitution, so
19   it would -- the constitution would overwhelm the
20   statute, so you have to assume that the statute was
21   unconstitutional then.  In other words, the statute has
22   to be assumed to be constitutional and has to be read in
23   conjunction with the Fourth Amendment.  If they have the
24   exception under the statute, they also have to have the
25   exception under the Fourth Amendment because otherwise

8

```
 1   you'd have a constitutional statute over here.
 2           THE COURT:  Well, you better find me some
 3   authority and I'll buy into it.  But right now there is
 4   no authority.  And my way of thinking is the
 5   constitution does trump the statute.  It may be that
 6   they're allowed to bring -- it may be that there's no
 7   cause of action under the statute because the statute
 8   has been satisfied, but they still have to protect
 9   against Fourth Amendment violations, I would think.
10   Now, that's my view.  Why don't I hear from your side?
11           MR. GOLDHABER:  I agree with you, your
12   Honor.
13           THE COURT:  I mean, if you give me some
14   authority I'd be happy to look at it.
15           MS. REYNOLDS:  I don't have any authority.
16           THE COURT:  Okay.
17           MS. REYNOLDS:  It's basically because --
18   it's really a commonsensical argument, you can't allow
19   police to do things under a federal statute.  The rights
20   are derived from the constitution and from the federal
21   statutes.  The -- if the federal statute allows them to
22   do it without the beeps on the line you can't then say,
23   but you need beeps on the line under the --
24           THE COURT:  Well, it just says it's not a
25   violation of federal statute.  It doesn't say it's not a
```

9

1  violation of the constitution.

2        MS. REYNOLDS:  But then you would have to --

3  you would be creating a situation where they could

4  violate the constitution but still be following the

5  statute, and that doesn't make sense.

6        THE COURT:  Well, it depends on the facts

7  and circumstances of the case, doesn't it?  You could

8  conceive of cases where that wouldn't be true.

9        MS. REYNOLDS:  I'm not sure of that.

10        THE COURT:  Well, certainly if somebody

11  calls in, then how do you -- how do you call that a

12  search?  If I call in the police department?  It seems

13  to me the initiation may have something to do with it,

14  but I don't think I need to get into that right here.

15  All I need to say is, it seems to me that I can't allow

16  a statute to overrule the Fourth Amendment.

17        MS. REYNOLDS:  And what I'm saying is I

18  don't think it does.  I think you have to read them im

19  paramateria here.

20        THE COURT:  Yeah.  But you're saying that if

21  the -- you're saying if the federal wiretap law is -- if

22  there's no cause of action under the wiretap law, ergo

23  the Fourth Amendment is not violated?

24        MS. REYNOLDS:  That's what I'm saying in

25  this particular situation.

10

```
 1            THE COURT:  Okay.

 2            MS. REYNOLDS:  Because the police have the

 3   right to rely on the contents of the Federal Wiretap

 4   Law.

 5            THE COURT:  Well, I understand your point.

 6            MR. BAILEY:  Your Honor, very quickly.  I

 7   believe the exception was carved out under Commonwealth

 8   v. White.  And the reason for that was exigent

 9   circumstances on the call-in, the preservation of

10   emergency stuff.  As to the issue of business exception,

11   what's contemplated by the federal statute in that

12   exception case, you know, there's a dearth of case law,

13   and secondly, you don't know what that -- you know, what

14   they meant by it.  So you can't claim that you take this

15   business -- course of business and expand it to

16   overwhelm the Fourth Amendment.

17            THE COURT:  Well, that's my view.  I'm not

18   -- I hear you.  Your position is on the record.  A

19   higher authority than I will have to tell me that I'm

20   wrong about that because --

21            MS. REYNOLDS:  Right, I understand.

22            THE COURT:  -- it's fundamental to me that

23   Fourth Amendment is paramount.

24            MS. REYNOLDS:  And I would agree with you

25   where there was no federal exception --
```

11

1        THE COURT:  Yeah, I understand.

2        MS. REYNOLDS:  -- where there was no

3   statutory exception.

4        THE COURT:  Federal statutes pale in front

5   of the constitution all the time.  I'm not going to say

6   it's unconstitutional because I don't have to.  All

7   right.  The elements of the federal wiretap claim now,

8   that's the next one.  And it would be he would have to

9   prove by a preponderance of the evidence that Captain

10  Oliphant and/or Captain Altavilla were in violation of

11  the wiretap law.

12        Three elements.  Defendants intentionally

13  intercepted or- -- intercepted any aural communication.

14  This is what that was.  Intercept is defined as aural,

15  meaning A-U-R-A-L, which means audio, or other

16  acquisition of the contents of any aural communication

17  through the use of any electronic, mechanical or other

18  devise.

19        Oral communications, O-R-A-L, is anything

20  uttered by a person who exhibits an expectation that his

21  words are not subject to interception under the

22  circumstances.

23        This means that they have a personal

24  expectation that such communication would not be subject

25  to interception.  It essentially sounds like the same

12

1  Fourth Amendment test.  This explanation -- expectation

2  must also be objectively reasonable.  The test for

3  whether corporal Diana has a subjective and objective

4  expectation is the same as the test for the Fourth

5  Amendment violation.  First, you must consider if

6  Plaintiff Diana by his conduct exhibited an actual

7  subjective expectation to privacy.  This inquiry

8  essentially considers whether the individual has shown

9  that he seeks to preserve something as private.  The

10 question is whether he personally exhibited a reasonable

11 expectation of privacy.

12         A subjective expectation of privacy may be

13 defeated when plaintiff is on notice of the recording.

14 Such notice could occur when beep tones exist on the

15 line at the time of recording when plaintiff consents to

16 the recording or when plaintiffs are told the line is

17 recorded.

18         Second.  You must consider whether plaintiff

19 Diana had an objective expectation of privacy.  The

20 objective expectation asks whether society is willing to

21 recognize that the expectation of privacy was

22 reasonable.  In other words, whether the expectation

23 viewed objectively is justifiable under the

24 circumstances .  This is an expectation of privacy --

25 this would be an expectation of privacy that society

1    would recognize and permit.

2            Objective expectation of privacy may also be

3    defeated when plaintiff is on notice of recording.

4    Again, this may occur when beep tones exist, when

5    there's consent or when there's -- when he's told that

6    he's being recorded.

7            Therefore, if Corporal Diana did not exhibit

8    a subjective and objective reasonable expectation of

9    privacy in the phone call the call does not fall within

10   the definition of an oral communication and you must

11   find for the defendants.  If on the other hand you find

12   that he heard beeps on the line -- oh.  And if you find

13   that he heard beeps on the line there was no expectation

14   of privacy and you must find for the defendants.

15           Defendants argue that their conduct falls

16   within the exception of -- to the federal law.  The

17   definition of electronic, mechanical or other device

18   means a device or apparatus which can be used to

19   intercept an aural communication other than a telephone

20   being used to investigate -- being used by an

21   investigative or law enforcement officer in the ordinary

22   course of his duties.

23           An investigative or law enforcement officer

24   means an officer of a state who is empowered by law to

25   conduct investigations, make arrests for offenses under

14

1   the Federal Wiretap Act.  For purposes of the exception,

2   the term ordinary is properly interpreted to refer to

3   routine, non-investigative recording of telephone

4   conversations, not only to use -- not only to use if the

5   wiretapping occurs in the furtherance of an

6   investigation.  If you find that Captain Altavilla or

7   Lieutenant Oliphant used the phone in the ordinary

8   course of their duties, then you should find for the

9   defendants.

10          If you find, however, that the call was not

11  made in the ordinary course of duties -- of their duties

12  you must find for the plaintiff.  That's essentially

13  that instruction.

14          MR. BAILEY:  Your Honor, the problem is if

15  you find that they used it in the ordinary course of

16  business it takes you out from under that eight [ph]

17  problem in the notice provisions.  And you know, they

18  didn't have a right to a warrantless search here --

19          THE COURT:  Right.

20          MR. BAILEY:  -- if he doesn't hear the

21  beeps.  And the trouble with that is that we're

22  saying -- it seems to me we're saying to the jury, if

23  you find -- and this becomes very confusing, I think,

24  because your Honor, in all fairness here I think,

25  there's not an objective -- a judicial notice can be

15

```
 1   taken of the objective criteria here.  In other words,

 2   it is not -- this is a warrantless search and it is not

 3   lawful to conduct a warrantless search unless there's

 4   notice.

 5            Now what we're doing here is -- you know,

 6   we're all in agreement on this, I'm sure.  Is that we're

 7   saying, okay, if the beeps were there, given his

 8   background and experience, you can find that he had

 9   notice, if you believe that he heard the beeps.  But

10   when you come up with the objective tests on the other

11   hand, I don't think that's an issue in this case because

12   judicial notice can be taken that if he didn't hear

13   those beeps, if you find that, obviously an objective

14   criteria are not met because there's no --

15            THE COURT:  Yeah.  Go back.  You piqued my

16   interest on the exception.

17            MR. BAILEY:  Yes, sir.

18            THE COURT:  Go back to that.

19            MR. BAILEY:  Okay.  On the issue with the

20   subjective thing.

21            THE COURT:  Get me the statute.

22            MR. BAILEY:  It seems to me yesterday -- by

23   the way, I want to apologize, even my client told me

24   that, you know, I may have been out to the defendants --

25            THE COURT:  You don't have to apologize.
```

1    MR. BAILEY:  Okay.  Then I --

2    THE COURT:  You're an advocate.  Others

3  might get upset by that, but I don't.

4    MR. BAILEY:  Okay, sir.  Here's the issue

5  that I'm raising here, if I keep my mind straight on it.

6  There's not an objective test or a need to find for an

7  objective test here.  I think judicial notice can be

8  taken if you conduct a warrantless wiretap, and that's

9  plaintiff's -- it's a matter of undeniable fact here it

10  was a warrantless recording.

11    And if the recording is made and there's no

12  notice, you know, it becomes a subjective issue, either

13  he heard it or not.  If he heard it he's put on notice

14  by virtue of his background of being a trooper.  But if

15  the jury has to go through -- and I think it's hard for

16  us, it's prejudicial to the plaintiff in a sense, if the

17  jury has to labor through deciding the objective test,

18  because there is no objective test needed here.  It's

19  not at issue.

20    Now, the objective test would be do the

21  facts support a compliance with law?  Clearly, if it's a

22  warrantless search, what happens here is it all boils

23  down to the jury saying, Well, I believe that he heard

24  the beep, and in which case he's on notice and you have

25  that clear right there in terms of instruction.  And if

17

1   he doesn't hear the beep, okay, then you've got to find

2   for him because he was not on notice.  You have really

3   answered the objective criteria test right there, and I

4   think it confuses the jury if you overdo that.

5           THE COURT:  What's your point on it?

6           MS. REYNOLDS:  Well, the problem with that

7   is that that assumes that whether he heard the beep is

8   the relevant factual inquiry here, it isn't the relevant

9   factual inquiry, it's whether there was a beep.

10          THE COURT:  Well, that's right.

11          MS. REYNOLDS:  That's the objective, yeah.

12          THE COURT:  That's what I said, Were there

13  beeps on the line?

14          MS. REYNOLDS:  Right.

15          THE COURT:  I didn't say, Did he hear them?

16  I said, Were there beeps?

17          MS. REYNOLDS:  Right.  The issue that I have

18  with the instruction is that it allows -- it's a

19  two-layered instruction, in that you go into the same

20  inquiries on the Fourth Amendment for those -- you know,

21  whether or not there were beeps on the line.  Our

22  position is that there is a absolute defense for the --

23  for the police officer who was acting in the -- in the

24  ordinary course of his duties, that you don't even have

25  to go into that analysis.  And in addition to that, in

18

1   the statute it says there is a defense of a good faith

2   reliance on the statutory authorization.  So, if the

3   officer had a good faith reliance on that statutory

4   authorization, that is, if the officer believed that he

5   was acting in compliance with the statute, then he is

6   entitled to that defense, and the instruction also

7   doesn't say anything about that.

8           But we don't believe that you even need to

9   get into the beep issue with the federal statutory issue

10  because that is -- you know, there's an exception for

11  this, the officers acting in the ordinary course of

12  their business, and they have a good faith reliance

13  defense in addition to that based on that statutory

14  authorization.

15          THE COURT:  Well, but it's up to somebody to

16  decide whether this was in the ordinary course of

17  business.

18          MS. REYNOLDS:  Yes.

19          THE COURT:  If it wasn't in the ordinary

20  course of business, then that's gone.

21          MS. REYNOLDS:  Okay.

22          THE COURT:  Isn't it?

23          MS. REYNOLDS:  Yes, yes.  Again though, the

24  instruction doesn't say anything about the good faith

25  reliance defense.

1           THE COURT:  Where is that?

2           MS. REYNOLDS:  That is in -- it's in the

3  defense section of the statute, Section 2520 under D,

4  defense.

5           MR. BAILEY:  But your Honor, there's no --

6  there's no good -- in a warrantless search there's no

7  good faith reliance.

8           THE COURT:  Is this the whole statute here?

9           LAW CLERK:  That's another section.

10          THE COURT:  Oh.  All right.  Let me see.

11 Hold your thought a second.

12          MS. REYNOLDS:  It's 2520(d) defense, a good

13 faith reliance on, and then it says a court warrant or

14 order, a grand jury subpoena, a legislative

15 authorization or a statutory authorization, and what

16 we're saying is this is a statutory authorization for

17 them to make phone calls in this manner, and they have a

18 good faith reliance on that.

19          MR. BAILEY:  Your Honor, what opposing

20 counsel is suggesting is that these officers can have a

21 good faith reliance on Mario -- you know, they don't

22 tell him expressly -- on his being able to hear the

23 beeps, that they're supplying notice.  I mean, that's

24 really what their argument is.  They're saying, look,

25 this is a recorded line, they're saying we had beeps on

1  the line.  Without confirming with him, without saying

2  to him, Can you hear the beeps?  Without saying to him,

3  Can we record it?  We want to record it.  So that

4  objective, that good faith reliance can't exist.

5           THE COURT:  What is -- what qualifies this

6  for the good faith reliance?

7           MS. REYNOLDS:  The statutory authorization.

8           THE COURT:  Which is what?

9           MS. REYNOLDS:  Which is the other provision

10  of the Federal Wiretap Law.

11           THE COURT:  Well, why do they say "a

12  statutory authorization" if they're talking about this

13  statute?  I read this as some other extrinsic matter

14  like a grand jury subpoena, a legislative authorization,

15  a warrant or order, or a statutory authorization, not

16  something that's self-contained in the same act.

17           MS. REYNOLDS:  But that is the statutory --

18           THE COURT:  But I am instructing on -- I am

19  instructing on the good faith -- the ordinary course of

20  business, and if the jury finds it's in the ordinary

21  course of business then you're home free.

22           MS. REYNOLDS:  Yeah, I understand.

23           THE COURT:  There's not a second defense

24  that they relied on that and they were wrong, I don't

25  believe.

21

1          MS. REYNOLDS:  Well, that's the argument

2    we're making.

3          THE COURT:  All right.  Well, okay, I

4    disagree, all right.  So that covers that one.  By the

5    way, I make the -- I'm telling you these things now to

6    hear your objections.  At the close of the instruction I

7    always turn to counsel and say, Anything from counsel?

8    If you have an objection to what I've said, I give you

9    an opportunity to come to side-bar and say We object to

10   the instruction on blank because -- now, you don't have

11   to repeat the objections you made here, but if there's

12   something new that arises, you can come to side-bar and

13   put it on the record.  So, you're not foreclosed at this

14   conference, okay?  Or by reason of this conference, I

15   should say.

16          All right.  Now, the Pennsylvania Wiretap

17   Law is somewhat different.  The elements are almost the

18   same apparently.  Intentionally intercepted an oral

19   communication.  They argue their conduct falls within

20   the exception.  Corporal Diana must prove by a

21   preponderance of the evidence that defendants do not fit

22   within the exception.  Now, the exception holds that the

23   line was a police communication system used to record

24   telephone communications coming in and going out.

25   Telephones are limited to the exclusive use of the

22

1    communication system for administrative purposes.  The

2    communication system employs periodic warning that

3    indicates to the parties a conversation is being

4    recorded.  The department provides all recordings, notes

5    and transcriptions may be destroyed at any time unless

6    required, with regard to a pending matter and at least

7    one non-recorded line remains available for public use.

8    If he proves that the defendants did not meet one of

9    these elements by a preponderance you must find for

10    plaintiff.

11           On the other hand, Defendants Oliphant and

12    Altavilla, if they fall within the exception, you must

13    find for the defendants.  Is there a disagreement about

14    this?

15           MR. GOLDHABER:  I'm sorry, go ahead.

16           MS. REYNOLDS:  There is one that I have.

17    Again, there is a defense and this time the defense is

18    better for me.  The defense in this case says that is a

19    defense to an action brought pursuant to subsection A,

20    which is the cause of action, that the actor acted in

21    good faith reliance on a court order or the provisions

22    of this chapter.  And there again is a good faith

23    reliance, but it's saying on the provisions of this

24    chapter.  So --

25           THE COURT:  Yeah.  So what's in the chapter

23

1   that they would rely on?

2           MS. REYNOLDS:  I guess what I'm saying is

3   there's no definition of administrative.  So if the jury

4   finds, well, we think this is what administrative means,

5   and this wasn't administrative, what if they -- if they

6   were acting in good faith reliance on their

7   interpretation of administrative isn't that what that's

8   there for?  That has to have a meaning, that defense, in

9   subsection C of Section 5725.  It has to have that

10  they're relying on that wording.  There's no definition

11  of it.  How is a police officer supposed to know if he's

12  in violation of it?  If he thinks that administrative

13  means this, he's relying on good faith -- and good faith

14  on the provisions of that chapter.

15          MR. BAILEY:  Your Honor, the answer to that

16  is very, very simple.  There's no good faith reliance on

17  a warrantless search.  I mean, it's -- it's basic

18  constitutional law.  This is a warrantless search.

19  They're not allowed for administrative purposes or any

20  other purpose unless a judge, the way the state system

21  is set up it's a superior court judge, tells them it's

22  okay to wiretap.  They can't do that.  And that statute

23  does not provide an exception.

24          MS. REYNOLDS:  Mr. Bailey is completely

25  wrong about that.  That's exactly the purpose here.

24

```
 1    This has nothing to do with constitutional bases.  This
 2    has to do with the statutory violation, and it says that
 3    it is a defense to an action brought pursuant to this if
 4    the actor acted in good faith reliance on the provisions
 5    of the chapter.  There has to be some separate meaning
 6    to that, otherwise they just put in the exception, and
 7    you know, says if you fit within the exception that's
 8    fine.  But it says good faith reliance.
 9              MR. BAILEY:  But the law doesn't say if you
10    conduct a warrantless search.  I mean, it doesn't say
11    that in the statue.  It doesn't.  And it can't, because
12    it's clearly unconstitutional.  They'd never write it
13    that way.  And I may be missing -- I apologize if I'm
14    missing something here.  But it just seems to me that
15    you can't just carve out, well, if you have a good faith
16    reliance on some administrative goal that you're trying
17    to achieve that you can warrantless conduct a wiretap.
18              MS. REYNOLDS:  And I would say that if
19    administrative was defined adequately in the statute,
20    that there might be the law enforcement officer was put
21    on notice.  But otherwise I think they're entitled to
22    have that -- they're entitled to have that defense right
23    to the jury.
24              MR. GOLDHABER:  Your Honor, if I may
25    interject.  I do agree with the court, that the
```

**952**

25

1    defendants have to establish all of those elements under

2    the exception in order to claim the exception.  And if

3    the plaintiff can establish that one of those have not

4    been met, then they don't get the benefit of that

5    exception.  The exception with regard to the telephone

6    line, your Honor, I think is very important.  The way

7    the statute reads, it says if the telephones thereof are

8    limited to the exclusive use of the administrative

9    system for administrative purpose, so it's not just one,

10   they have to show that this phone is used for

11   administrative purposes, they have to show that that is

12   the exclusive use of this telephone, which by their own

13   admission they use this for personal calls and so forth.

14   So I don't think the good faith exception applies.

15            MR. BAILEY:  The system.

16            MR. GOLDHABER:  So the fact that they by

17   their own admission used these phones --

18            THE COURT:  Well, that's an argument you

19   would make.

20            MR. GOLDHABER:  Certainly.

21            THE COURT:  Certainly.

22            MR. GOLDHABER:  But I think kind of vitiates

23   the need to even get into the good faith exception.

24            THE COURT:  The good faith defense.

25            MR. GOLDHABER:  But I don't think contrary

26

1  to what Attorney Reynolds was saying, with all due

2  respect, it's not just -- they have to show -- this is a

3  phone line that's generally used for administrative

4  purposes.  It's not generally.  The phone has to be

5  exclusively limited --

6          THE COURT:  I see that.

7          MR. GOLDHABER:  -- for administrative

8  purposes.

9          MR. BAILEY:  Right, that system.

10          MR. GOLDHABER:  And if it's used for

11  administrative purposes, and they also use it for other

12  things, then the exception is not met.  So I don't think

13  it's just they have to show that this phone is used for

14  administrative purpose as well, it can only be used for

15  administrative purposes.

16          MS. REYNOLDS:  Well, if that is correct, if

17  that's correct, then there are police departments all

18  across this Commonwealth that are violating the law.

19          THE COURT:  That may be.

20          MS. REYNOLDS:  But I mean, that's -- that is

21  an observed construction of the --

22          THE COURT:  Is that the -- we're all

23  violating and therefore it doesn't apply?

24          MS. REYNOLDS:  No.  What I'm saying is,

25  administrative purposes aren't defined.  And to say --

27

1   and to tell the jury that this exclusive use for

2   administrative purposes means only that, you know, you

3   can't call out and get sandwiches on it.  I mean, I can

4   say that's an administrative purpose.  An administrative

5   purpose in keeping me going as an employee during the

6   day.

7          MR. BAILEY:  That's the duty of the statute.

8   If the statute is going to exist under a very -- under

9   an umbrella of considerations over very precious

10  federally guaranteed rights, let alone state rights here

11  by the way, you have to -- you need to define and

12  explain those things.

13         THE COURT:  I looked at your proposed

14  instructions.  This is the first you're telling me about

15  this good faith defense.

16         MS. REYNOLDS:  I realize that, your Honor.

17  I found this out the other night when I was reading

18  through it again, and I apologize.

19         THE COURT:  I'll think about it.  No, you

20  don't have to apologize.  I'll think about it.  At the

21  moment I'm not sure I agree with you.  I'll think about

22  it.  If I change my mind I'll give an instruction about

23  a good faith defense, but essentially what I'll be

24  saying is, it will be your burden -- do you agree with

25  that?

28

```
 1          MS. REYNOLDS:  Yes.

 2          THE COURT:  -- to prove by a preponderance

 3   of the evidence that you relied on this -- on what

 4   provisions?

 5          MS. REYNOLDS:  The provisions concerning

 6   administrative.  You know, whatever administrative

 7   means.  It's not defined in the statute.

 8          THE COURT:  Okay, all right.  I'll give it

 9   some thought.  I know everybody's position.

10          Okay.  Now, here's the trick it seems to me.

11   We have damages under 1983, compensatory, which I'll

12   give a federal instruction under the Third Circuit

13   instructions form.  We have state wiretap damages.

14   However, while the jury can pick them, essentially is --

15   essentially what I'm saying about that is this:  If you

16   find Altavilla or Oliphant are liable to Corporal Diana

17   you must find an amount of money damages you believe

18   will fairly and adequately compensate him for the injury

19   that he had sustained as a result of the occurrence of

20   the violation of the Pennsylvania Wiretap Law.

21          The amount you award must compensate him

22   completely for any damage he sustained in the past, as

23   well as damage he may sustain in the future.  However,

24   this amount must be at least equal to the amount known

25   as liquidated damages.  Liquidated damages under The Act
```

29

1   are computed at the rate of $100 per day per violation,

2   or a thousand dollars total, whichever is greater.

3   That's in the statute.  Okay?

4               MS. REYNOLDS:  Uh-hum.

5               MR. BAILEY:  The only fear would be that

6   it's clearly separated that the compensatory --

7               THE COURT:  I said wiretap -- oh, yes.

8               MR. BAILEY:  -- is not confused with the

9   meaning of compensatory damages for the violation of a

10  federally guaranteed right.  My fear would be the jury

11  would --

12              THE COURT:  The Fourth Amendment I'm giving

13  a separate instruction on.

14              MR. BAILEY:  Okay.

15              MS. REYNOLDS:  We're talking about the

16  state --

17              THE COURT:  I'm only talking about the state

18  wiretap, because the federal wiretap law, it says "the

19  court" --

20              MR. BAILEY:  Right.

21              MS. REYNOLDS:  Yeah, it does.

22              THE COURT:  -- "will award damages,

23  liquidated damages."  But it doesn't say the court will

24  consider punitive damages, it says punitive damages may

25  be awarded.

30

```
 1              MR. BAILEY:  By the jury.

 2              THE COURT:  Yeah.  So, the way I read it,

 3  I'm giving punitive damages to the jury under the

 4  Federal Wiretap Law and the State Wiretap Law of course,

 5  but the compensatory damages under the Federal Wiretap

 6  Law, if they find in favor of the plaintiff, it's up to

 7  me to assess damages between a hundred -- of a 100 to

 8  10,000, I think those are the limits.

 9              MS. REYNOLDS:  Well, I'm not sure it's clear

10  that the jury gets the punitive damages.

11              THE COURT:  Well, it doesn't say the court.

12              MS. REYNOLDS:  Well, I realize that.  It

13  says damages under subsection C and punitive damages in

14  appropriate cases.  I mean, I'm wondering if --

15              THE COURT:  Well, look at what it says.  If

16  you go to subsection C.

17              MS. REYNOLDS:  It only talks about --

18              THE COURT:  It says -- let me see,

19  subsection C.

20              LAW CLERK:  (c)(2).

21              (Pause.)

22              MS. REYNOLDS:  I mean, it's linked there.

23  It almost looks to me like -- and they didn't make it

24  clear, but it almost looks to me like they're linking --

25              THE COURT:  No, this is not what I'm looking
```

31

```
 1   for -- oh here.  If you look at Relief, look at B.
 2              MS. REYNOLDS:  Right.
 3              THE COURT:  It says Relief.  Under this
 4   action -- section, appropriate relief includes
 5   equitable.  Two.  Damages under subsection C, okay?
 6              MS. REYNOLDS:  Uh-hum.
 7              THE COURT:  Let's go there.  Subsection C.
 8   Violation of -- the court may assess damages, whichever
 9   is the greater of.
10              MS. REYNOLDS:  Uh-hum.
11              THE COURT:  If you go to 2, (c)(2).
12              MS. REYNOLDS:  Right.
13              THE COURT:  Okay?  But up there it says
14   punitive damages in appropriate cases doesn't refer to
15   C.  C says the court.  Punitive damages just hangs out
16   there.
17              MS. REYNOLDS:  I'm wondering though, they're
18   talking about subsequent occasions.  In other words, I'm
19   wondering if they're limiting damages, because it says
20   punitive damages in appropriate cases.
21              THE COURT:  Appropriate cases.
22              MS. REYNOLDS:  I wonder if they're limiting
23   the punitive damages to where they've done it more than
24   once.
25              THE COURT:  Well, you can argue what you
```

32

1    want, but I --

2         MS. REYNOLDS:  Because there is a separate

3    section on that.  It says, If on one prior occasion the

4    person engaged in this conduct has been enjoined or has

5    been found liable the court shall assess, so there's an

6    additional damage.  So I mean, that may be looked at as

7    the punitive damages.

8         MR. BAILEY:  An additional punitive damage.

9    You can't imply -- or you can't inject that, you can't

10   infer that.

11        THE COURT:  If you come up with some

12   authority I'm happy to look at it.  But right now my

13   belief is punitive damages goes to the jury.  I deal

14   with the damages for violation.

15        MS. REYNOLDS:  It also says punitive damages

16   in appropriate cases.  I mean --

17        THE COURT:  Yeah.

18        MS. REYNOLDS:  -- doesn't that leave it to

19   you to decide whether this is an appropriate case as to

20   whether to give a punitive damage?

21        THE COURT:  Sure, I suppose.

22        MS. REYNOLDS:  And I don't think this is.  I

23   mean, you know, given the facts and circumstances here,

24   this isn't the kind of case where this guy was really

25   damaged here.  I mean, what happened to him?

33

1          THE COURT:  I don't think it's a question of

2   damage, punitive damages talk about wanton malicious

3   conduct and the need for punishment as to whether

4   someone stepped over the line.  It doesn't really have

5   anything to do with compensatory damages.  So I

6   understand your point.  I'm going to give the question

7   to the jury.

8          Nominal damages, I'm instructing on that

9   under 1983.  And I have two different punitive damage

10  instructions unfortunately, because one is federal for

11  the Fourth Amendment and the other is the state punitive

12  damage instruction, which is a little different.  And

13  those are the substantive instructions.  The rest of the

14  stuff is -- are things you've heard, direct and

15  circumstantial, inferences, credibility, expert

16  testimony, impeachment, and the general administrative

17  things like election of a foreperson and so forth,

18  preponderance of the evidence.

19          MS. REYNOLDS:  Just so I'm clear then,

20  you're giving a punitive damage instruction on all three

21  provisions?

22          THE COURT:  Yeah, yeah.  Federal punitive

23  damage instruction, which essentially covers both the

24  Fourth Amendment and the wiretap, and I'm giving one on

25  the state wiretap.

34

1          MS. REYNOLDS:  And I would object to those

2    because I don't think there's any evidence in this case

3    of wantonness or maliciousness.

4          THE COURT:  All right.  Now the verdict

5    slip.  The verdict slip, we fiddled with it and we

6    fiddled with it and I've arrived at this:  I generally

7    do not instruct -- re-instruct the jury in the verdict

8    slip.  This verdict slip is closer to the plaintiff's

9    verdict slip than it is to yours.  Essentially it's

10   this:  Do you find that Corporal Diana has proven by a

11   preponderance of the evidence that Captain Altavilla

12   violated his Fourth Amendment rights?  Yes or no?

13          Do you find that he's proven Oliphant has?

14   Yes or no?  If you answered yes to either of these,

15   either one or two, proceed to Question Three.  Then that

16   is, State the amount that you would believe would

17   compensate him for the conduct under the Fourth

18   Amendment.  Do you award punitive damages against either

19   under the Fourth Amendment?  Yes or no for Altavilla,

20   yes or no for Oliphant.  If no or yes to either, go to

21   five.  How much do you award?  And then he has

22   Altavilla/Oliphant.

23          Question Six.  Do you find that Corporal

24   Diana has proven by a preponderance of the evidence that

25   Captain Altavilla is liable under the Pennsylvania

35

1   Wiretap Law?  Yes or no?  Next, the same question

2   regarding Oliphant.  Please state the amount of -- you

3   believe would compensate him for his damage under the

4   Wiretap Law, Altavilla, Oliphant.  Proceed to Nine.  Do

5   you award punitive damages to either for the

6   Pennsylvania Wiretap Law?  Yes or no?  You have them

7   both down.

8        Then, If so, how much do you award in

9   punitive damages?  Do you find that they proved by a

10  preponderance of the evidence that Altavilla is liable

11  under the Federal Wiretap Law?  Do you find that

12  Oliphant is liable under the Federal Wiretap Law?  Yes

13  or no?  Do you award punitive damages under the Federal

14  Wiretap Law?  Yes or no, and if so how much?

15       And the nominal damages is in the

16  compensatory damage instruction, and it says in

17  parentheses, If you find they failed to show they

18  suffered actual damage you must award one dollar as

19  punitive damages -- as nominal damages, I'm sorry.

20  That's under -- compensatory under the Fourth Amendment.

21       MS. REYNOLDS:  Okay.  The Fourth Amendment

22  right one, I would have the same issue about the

23  exception there, that I stated previously with respect

24  to the jury instructions, and that's that -- that it

25  just is asking about violation of Fourth Amendment

36

 1    rights without recognizing that there is a statutory

 2    exception that the officers can rely on.

 3                THE COURT:  Okay.

 4                MS. REYNOLDS:  With respect to the

 5    Pennsylvania Wiretap Law and Federal Wiretap Law, it

 6    doesn't go through the individual parts of the

 7    exception.  And the issue there is that I think there --

 8    I think the jury can determine, for example, in the

 9    Pennsylvania Wiretap Law about the beeps, I think that's

10    a purely factual question.  However, if they're

11    interpreting administrative, then I think that is a

12    mixed -- that may be a mixed fact in law question.  And

13    if I don't know what basis they use for their

14    determination there, then I don't know how -- if I don't

15    know that they determined that the reason that they're

16    awarding damages is because it was for administrative

17    purposes, then I don't know how I preserve that for

18    purposes of appeal.

19                In other words, I don't know -- I don't know

20    what the jury found there.  They may have found that

21    there were beeps on the line but they didn't use it for

22    administrative purposes.  The administrative purposes is

23    the part that I can't -- that I think I have a valid

24    appeal on because of the -- because that's a mixed fact

25    in law question.  So what I'm saying is, when you mix

37

 1   all the elements together I can't separate out what

 2   they're deciding on.

 3          MR. GOLDHABER:  Well, I think it would be.

 4   If they found a violation of the State Wiretap Law and

 5   awarded plaintiff damages, but found against the

 6   plaintiff for the Fourth Amendment, I think that would

 7   be clear that it was the beeps, or they found that this

 8   was not used for administrative purposes.  If they rule

 9   against him on the Fourth Amendment then it most likely

10   is going to be because they said they believe he heard

11   beeps, which doesn't preclude them from finding a

12   violation of the State Wiretap Law.

13          So I think based upon how the decisions come

14   or the verdicts come, you can figure out what the jury

15   was thinking without changing the special verdict

16   questions.

17          MR. BAILEY:  I don't want to reresurrect a

18   corpse, but the fact is unless you expressly notify

19   somebody, we're doing all this implied presumption on

20   Mario if he heard the beeps, and I realize that.  But I

21   just want to make sure that our position is very, very

22   clear.  You need to tell this guy this is a recorded

23   line and you're going to be recorded.  The whole idea

24   behind the beeps is an exigent circumstance exception

25   carved out because of the nature of incoming calls and

38

1  emergencies.

2          And again, we would have to specifically

3  disagree with you.  I mean, he has to be notified, has

4  to be told, has to be given opportunity to respond to

5  notice.  We're all doing this on the basis of the jury

6  deciding on a credibility issue whether he heard the

7  beeps or didn't hear the beeps, so --

8          THE COURT:  Well, it seems to me, I don't

9  know that you're -- I don't know that you would be -- if

10  they found in favor of the plaintiff, your point would

11  be what on the wiretap law?

12          MS. REYNOLDS:  That they were looking at the

13  word administrative and interpreting it.  And what I

14  would say is that because of the good faith defense,

15  especially on the Pennsylvania law, that if they thought

16  that they were utilizing it for administrative purposes,

17  that they're entitled to that defense.  And I wouldn't

18  know on what basis they made their decision.  I wouldn't

19  know if it was because of the administrative purposes,

20  if it was because they didn't have a periodic warning,

21  you know, I wouldn't know on what basis.

22          THE COURT:  There are only three things that

23  exist, so you'd cover all three.  I don't like to

24  instruct -- I don't like to instruct and ferret out in

25  the verdict slip because all that ever happens is it

1  gets confusing and the verdict slip becomes an issue on

2  appeal.  This way the instruction is the instruction.

3  If there's something wrong with the instruction, fine.

4  But all the verdict slip does is say read -- listen to

5  the instruction and then tell me whether someone

6  recovers, and if so, how much.

7       All right.  I understand.  Your position is

8  on the record, I'm not going to change that.  So the

9  only open question for me now is to delve in a little

10  bit to this good faith defense question under the State

11  Wiretap Law.  All right.  I'll do that before we start.

12       MR. GOLDHABER:  Your Honor, I don't believe

13  either defendant testified that they had direct

14  knowledge of the law --

15       THE COURT:  I don't either.

16       MR. GOLDHABER:  -- so they could claim a

17  good faith defense.

18       THE COURT:  By the way, I didn't hear

19  anything about a good faith defense.  Come to think of

20  it, I don't think there's anything in the record.

21       MS. REYNOLDS:  I didn't hear anything about

22  this thing that was talked about today about exclusive

23  use of the communication system for administrative

24  purposes.  I mean, like nobody raised that as an issue.

25  I thought the only issue under the Pennsylvania --

40

1        THE COURT:  That's what the statute said.

2        MR. GOLDHABER:  That's the statute.

3        MS. REYNOLDS:  I understand that, but what

4   I'm saying is they have to show some evidence about

5   exclusive use of the communication system.  There was

6   nothing --

7        THE COURT:  Well, you can argue that to the

8   jury.

9        MR. BAILEY:  Not only that --

10       MR. GOLDHABER:  Well, your Honor, I'm not

11  going to argue that it is used exclusively, because the

12  testimony of everybody, even the defendant said, No,

13  it's, you know, we'll just pick up the phone, call the

14  wife, you know, call for -- it's used for a lot of

15  purposes.  Attorney Reynolds even said for lunch.

16       MS. REYNOLDS:  And I did try to ask a couple

17  of times about wording under the statute.  It was

18  objected to.  So I mean, what I'm saying here is that I

19  think the good faith defense can be raised based on the

20  totality of the testimony there.  You know, that they've

21  already indicated that this was a common business

22  practice, that everybody did it, and that they believed

23  that it was consistent with state police regulations and

24  not improper.

25       MR. GOLDHABER:  But the good faith defense

41

1    means they're -- they have knowledge of the statute and

2    are specifically relying with the statute and believe

3    they're in compliance with the statute.  They can't

4    claim the good faith defense if they don't know the

5    terms and the elements of the statute.

6              MR. BAILEY:  The point is that the

7    defendants had the statute, had the complaint, all of

8    this before them, if you're presenting some affirmative

9    defense on the basis of the statute you had an

10   opportunity to carve that out, present it to the Court,

11   confront us with it, and you never did.

12             MS. REYNOLDS:  Well, again, I didn't get

13   this case until late in the game here so I didn't really

14   have an opportunity.

15             THE COURT:  All right.

16             MR. BAILEY:  That's not a defense.

17             THE COURT:  I'll make a determination on it.

18   I'll either give some instruction on good faith defense

19   or I'll advise you before you begin that I will not.

20             Now, as far as closings are concerned, I

21   don't give any -- I don't have any limits.  Use your own

22   judgment.  Be sensible in terms of how long the jury is

23   going to be interested in hearing from you.  Plaintiff

24   goes first, defendant goes second.  Plaintiff can have a

25   brief rebuttal if they so desire, and I do mean brief, I

42

1  would like to say no more than ten minutes.

2         MR. GOLDHABER:  Oh, I would have been happy

3  with five, but ten will be great.

4         THE COURT:  Five's good, five is better.  I

5  had a rebuttal the other day and it was like 20 minutes,

6  and it was -- you know, it was back over the same stuff.

7  That's not the purpose of rebuttal, as you well know,

8  and -- okay.

9         MR. GOLDHABER:  Ten is more than

10 satisfactory, your Honor.

11        THE COURT:  That's fine.

12        MR. GOLDHABER:  It won't even be that long.

13        THE COURT:  But I mean, otherwise I don't

14 care as far as your closings are concerned.  Okay?

15        MR. GOLDHABER:  Your Honor, I only have one

16 point.  The court obviously granted the Rule 50 motion

17 on the First Amendment claim.

18        THE COURT:  Yes.

19        MR. GOLDHABER:  I wasn't going to mention

20 that to the jury, and I would just request --

21        THE COURT:  No, I'm not going to mention it.

22        MR. GOLDHABER:  Well, I would just request

23 that Attorney Reynolds not mention it.  I don't want the

24 jury to think, well --

25        MS. REYNOLDS:  I wasn't going to.

43

```
 1            MR. GOLDHABER:  Okay, I didn't know.  I just
 2   wanted to make sure that wasn't brought --
 3            MS. REYNOLDS:  I would think that that was
 4   prohibited.
 5            THE COURT:  I don't -- well, I have said at
 6   times that when they know a claim is in the case that
 7   it's no longer in the case.  There's no need to mention
 8   it because they won't be instructed on it.  If a
 9   question comes back from the jury when they go out to
10   deliberate, I would simply respond to it by saying, in
11   your presence and after we've looked at the question,
12   It's no longer in the case.  But there's no need for me
13   to raise it, no need for anybody to raise it.
14            MR. GOLDHABER:  Very good, your Honor.
15            THE COURT:  Anything else?
16            MR. GOLDHABER:  No, your Honor.
17            MS. REYNOLDS:  No.
18            THE COURT:  All right.  We'll see you at
19   ten.  Now you're okay with closing and then instructing?
20            MR. GOLDHABER:  Yes.
21            MS. REYNOLDS:  Uh-hum.
22            THE COURT:  All right.  Because when people
23   agree, I've instructed before closings.
24            MR. GOLDHABER:  Oh, no, I prefer to have you
25   instruct after, your Honor.
```

1            THE COURT:  All right, fine.  Thank you.

2      (9:54 a.m., end of previously transcribed excerpt.)

3              (10:09 a.m., reconvene.)

4                (Jury not present.)

5            THE COURT:  Good morning again.  I wanted to

6 resolve the one open question we had on the instructions

7 which had to do we the good faith defense under the

8 Pennsylvania Wiretap instructions that I'm going to give

9 regarding the Pennsylvania Wiretap claim.

10           It seems to me that the good faith defense

11 instruction need not be given because I don't think that

12 there's really any evidence in the record of reliance or

13 suggested reliance on the -- on the wiretap law per se.

14 Moreover, I don't know what provision -- I heard nothing

15 about what provision would have been relied on, and the

16 discussion we had, there was some discussion about

17 administrative, but that's not a -- that's not a

18 particular provision of the act.  That is only a

19 requirement for the exception that the lines be limited

20 to the exclusive use of communication system for

21 administrative purposes.  So, consequently, I'm not

22 going to give a good faith reliance on the act

23 instruction under the Pennsylvania Wiretap law

24 instruction that I give to the jury.  So --

25           MS. REYNOLDS:  My exception to that is

45

1   preserved.

2              THE COURT:  Is noted, certainly.  All right.

3   Now we'll bring the jury in.

4              (Jury entered courtroom at 10:12 a.m.)

5              THE COURT:  Good morning, members of the

6   jury.  You're now going to hear closing arguments from

7   counsel.  The plaintiff's counsel will address you first

8   and then defense, and then the plaintiff under the rules

9   has an opportunity to give a brief rebuttal if they so

10  desire.  After that I'm going to instruct you on the law

11  that applies to the facts as you find them.  Counsel,

12  are you ready to proceed?

13             MR. GOLDHABER:  I am, your Honor.  Thank

14  you, your Honor.  Good morning.  I know we spent a large

15  part of the week together, but I haven't been permitted

16  to directly address you, and I hope you do not think I

17  have any type of a disdain or being rude.  I thank you

18  for your service.

19             My name is Douglas Goldhaber.  As I

20  introduced myself to you the other day, I'm the attorney

21  for the plaintiff in this matter, Corporal Mario Diana

22  of the Pennsylvania State Police.  At the beginning of

23  this case both sides presented what is called opening

24  statements.  What I'm doing now actually is -- may

25  sometimes be referred to as a closing statement, but the

46

1  proper classification of it is a closing argument.

2         There was a comment made at the beginning of

3  this case in the opening statements for the defendants

4  which stated that even if these defendants had done what

5  they were accused of, even if they had improperly and

6  illegally wiretapped this man, how was he hurt?

7         Now, actually, there's a Nobel Prize author

8  named Eli Weisel -- Weisel, I'm sorry, who when I heard

9  him make that comment it reminded me of some words he

10 wrote years ago.  Those words are, There may be times

11 when we are powerless to prevent injustice, but there

12 must never be a time when we fail to protest.

13 Neutrality benefits the oppressors, never the oppressed.

14        This man was powerless to prevent what

15 happened to him.  He didn't know about it until after

16 the fact.  There was nothing he could have done to

17 prevent it.  Was it wrong?  Absolutely.  Were the

18 defendants wrong?  Absolutely.  Should he protest?

19 Absolutely.

20        Now, this case is not Pennsylvania State

21 Police versus Pennsylvania State Police .  The

22 Pennsylvania State Police is a lot like most businesses.

23 They have managers, they have laborers.  The two

24 defendants in this case, Captain Oliphant, former

25 Lieutenant Oliphant, and retired Captain Altavilla are

47

1   management.  They handle the day to day administrative

2   matters, scheduling, dealing with troopers, assigning

3   shifts, so forth.  This man, Corporal Mario Diana, would

4   be classified as one of the laborers.  He gets in the

5   patrol vehicle.  He goes out.  He responds to incidents.

6   When he leaves for the day he's not spending a day in

7   the office.  It's not a situation where when he leaves

8   his wife has to sit at home and think, Well, the most

9   that's going to happen to him is a paper cut.

10          He puts his life on the line every day for

11  us.  So, this is not a case of Pennsylvania State Police

12  versus Pennsylvania State Police.  This is a case of a

13  Pennsylvania State Police trooper who dedicated his

14  life, you heard his testimony, to protecting the

15  citizens of this commonwealth.  And management, without

16  his consent, without his knowledge, improperly recorded

17  a telephone conversation.

18          How is he hurt?  This is not the type of

19  injury, similar to losing a finger that is visible.  It

20  is not that type of injury.  Last night when I was

21  preparing this case, about 8:30 at night I called my

22  daughter from the hotel room I'm staying at this week.

23  I called to say goodnight.  She told me how her day at

24  school was.  She explained to me how she went to

25  gymnastic class afterwards and how for the first time

**975**

48

1  she could make a flip on the balance beam without

2  falling off afterwards.  She asked me when I'm coming

3  back.  She said she missed me.  There was nothing

4  incriminating said during the phone call.  There were no

5  matters of national security being discussed.  But the

6  point is, that was a private moment between me and my

7  daughter.

8          Would I have lost income if that phone

9  conversation had been recorded?  No.  Would my rights

10  have been violated if that phone call had been recorded?

11  Absolutely.  The fact, for instance, in that example, if

12  somebody had recorded my phone call with my daughter,

13  that I would have had no direct quantifiable loss of

14  income, does that make what happened right?  No.  This

15  type of offense is actually in some cases worse than a

16  physical injury.  Physical injuries heal.

17          This is a violation similar to a burglary.

18  A lot of burglary victims will testify and state, if you

19  ever have an opportunity to speak with one of them, is

20  that the biggest problem they have is not the

21  replacement of the items that have been stolen, the

22  insurance company generally takes care of that.  The

23  biggest problem they have is getting over that feeling

24  of insecurity.  That feeling that they've been violated.

25  Most will state that they never get over it.

49

1          In this case this man, a dedicated

2    Pennsylvania State Police trooper was injured in the

3    line of duty.  At the time of the injury he had been a

4    Pennsylvania State Police trooper for ten years.  He

5    responded to a domestic incident and was hurt.  He was

6    hurt to such a degree that he needed surgery.  You saw

7    him testify here today.  The only thing he wanted to do

8    was to heal and get back to work.  He was asked why not

9    just find a different line of employment?  I asked him

10   that question.  He put his life in danger, he got hurt

11   protecting people.  Why not find a different job?

12         Corporal Diana stated because this is what

13   he does; this is who he is.  This isn't something he

14   does just for the money.  Being an officer of the

15   Pennsylvania State Police, going out, protecting and

16   serving is not a cliche to this man.  It is his core.

17   He holds words like honor, integrity, trust, courage

18   with esteem.  He values those words.  He believes in

19   that badge that he wears.  He believes it stands for

20   something.  It does not stand for the proposition that

21   by wearing a badge means you can violate the law.  He

22   believes it stands for the proposition that by wearing

23   the badge you should hold yourself above the minimum

24   required to comply with the law.  You should do

25   everything you can to be a symbol for others to follow

50

1    the law.

2            The claims in this case aren't that

3    extensive.  After my closing argument, and after

4    Attorney Reynolds, the Judge will explain to you in more

5    detail than I will during my statement right now exactly

6    what the law is and what the elements of that law are to

7    be applied to the facts in this case.  The claims that

8    you're to address are allegations that these two

9    defendants, Defendant Willard Oliphant and Defendant

10   Carmen Altavilla violated what is referred to as the

11   Fourth Amendment, and we'll get into that in a few

12   moments.  Also, that they violated the Federal

13   Communications Act, as well as the Pennsylvania

14   Wiretapping Act.

15           The Fourth Amendment to the United States

16   Constitution guarantees the rights of the people to be

17   secure in their persons, houses, papers and effects

18   against unreasonable searches and seizures.  That is a

19   term that most people are familiar with, unreasonable

20   searches and seizures.

21           The United States Supreme Court has held

22   that the Fourth Amendment has secured the right also of

23   a person to be free from government-initiated electronic

24   surveillance.  The government does not have the right to

25   arbitrarily, just because they want to, without

51

1  following proper course, without following proper

2  process, to just initiate electronic surveillance on

3  someone.   These are rights that not only Corporal Diana

4  has, but that every one of us is entitled to as a

5  citizen of this country.

6          The test that you will have to apply, and as

7  I said, the Judge will explain this to you in somewhat

8  more detail, to determine whether these two defendants

9  violated the rights that Corporal Diana has guaranteed

10  under the United States Constitution are first, whether

11  he had an expectation of privacy.  Whether when he was

12  at home that day, November 21, 2003, at approximately

13  1:33 a.m., when he got out of the shower to answer that

14  phone did he, as a citizen of the United States, have an

15  expectation of privacy?  The answer certainly is yes.

16  It's the same expectation of privacy that everyone has

17  when they're in their home and they answer a telephone.

18          The second question under a Fourth Amendment

19  analysis is, is that expectation of privacy reasonable?

20  We'll get into a little more discussion about that

21  shortly.  The Federal Communication violation here has

22  several prongs, again.  But the corner of that as well

23  is did this man have an expectation of privacy?  And if

24  you find that he did, then you must find a violation of

25  the Federal Communications Act by these defendants.

52

```
 1         The judge will instruct you that there is a
 2  provision in the Federal Communications Act which gives
 3  them an exception.  Lie a get out of jail free card in
 4  Monopoly.  Whereby if they can establish to you that
 5  when they placed this phone call to Corporal Diana, when
 6  they recorded him without his knowledge, that they were
 7  doing that and recording him in the ordinary course of
 8  their duties, then that's a permissible exception.
 9         Now, there's been testimony from the
10  defendants themselves that they do not do Worker's
11  Compensation.  They don't do Worker's Compensation
12  investigations, that's just not what they do.  Now, in
13  this case, there's been testimony about a return to work
14  order, a great deal of testimony.  A return to work
15  order is not the issue here.  Contrary to all the
16  testimony about it, there's never been any allegation
17  that that return to work order was illegally issued.
18  That is not what Corporal Diana is alleging here.
19         There's no question in Carmen -- I'm sorry,
20  Defendant Altavilla actually admitted this, that his
21  only obligation under that order were to prepare and
22  have it personally served on this man, which he did.  He
23  fulfilled his obligation.  The call that these two
24  placed to him on November 21, 2003, was not in the
25  ordinary course of business.  Now, they've testified
```

53

1    they didn't want to see him get jammed up.  He was

2    family.  And when you're deliberating, ask yourselves

3    how many times when you try to help out a family member,

4    how many times have you called him and recorded a

5    conversation?

6              Defendant Altavilla testified the first

7    thing that if he had been working November 21, 2003,

8    that he himself would have placed a phone call from his

9    office on a non-recorded line because it wasn't really

10   for the Worker's Comp, he was just trying to help

11   Corporal Diana.  You have to look at that in the context

12   of all the testimony.  If one, he would have been

13   willing to do that while he was at work, if it was a

14   simple matter of clarifying what he believed to be a

15   misunderstanding, why didn't he simply call Corporal

16   Diana from home?

17             He obviously didn't have a problem calling

18   up troopers or other officers from home.  He contacted

19   Lieutenant Oliphant.  Why not just cut out the middle

20   man, call Corporal Diana and fix this thing, if his

21   statement is to be believed?

22             But he also said that if he had been there,

23   once again, he would have done it in his office on a

24   non-recorded phone.  The day before the morning of

25   Thursday, November 20, 2003, Defendant Altavilla sent an

54

1    e-mail to major Sidney Simon advising that he was made

2    aware that Corporal Diana was contesting the Worker's

3    Comp. return to work order and that a hearing was

4    scheduled.  And that defendant Altavilla specifically

5    asked, Is my order superceded?

6         When defendant Altavilla sent that e-mail he

7    knew, one, that Corporal Diana had gotten a hold of a

8    Worker's Comp. attorney.  He knew that Corporal Diana

9    was taking the steps he had to under the provisions of

10   the return to work order itself so he wouldn't get in

11   any trouble.  Where was the misunderstanding?

12        If Defendant Altavilla thought that there

13   was a misunderstanding on Friday, then he would have

14   thought there was a misunderstanding on Thursday when he

15   sent that e-mail.  When he sent the e-mail he was in his

16   office.  He could have simply picked up the phone, a

17   non-recorded line, called up this man and clarified any

18   misunderstanding if in fact there had been one.  The

19   reason he didn't do it is that there was no

20   misunderstanding.

21        Lieutenant Oliphant testified actually three

22   times in this case, but I'm referring specifically to --

23   actually, I think the first and second time.  He

24   testified that he gave a written statement about a

25   conversation that he had with Defendant Altavilla.  He

1    admitted that written statement was prepared closer in

2    time to these events.  He also admitted that when the

3    document was prepared closer in time to an event,

4    generally that's the better recollection as to what

5    happened.  The more time passes, the more your

6    recollection fades.

7                In the written statement, which you'll be

8    given at least part of it as evidence, he wrote that

9    Defendant Altavilla specifically told him himself that

10   Defendant Altavilla advised Corporal Diana that he did

11   not have to return to work based upon the return to work

12   order.  He did not have to return to work.  Where is the

13   misunderstanding?

14               Lieutenant Oliphant testified under

15   questioning by Attorney Reynolds, well, it contained

16   typographical errors.  Typographical errors are you get

17   a letter wrong.  You hit a wrong key on a computer.

18   Typographical errors are not including words you did not

19   mean to include.  It's not uncommon when somebody is

20   typing a letter or a memorandum, you're typing quickly,

21   you're thinking about what you want to type, to leave

22   words out.  You don't add extra words that you didn't

23   intend.

24               Lieutenant Oliphant has a written statement

25   saying one thing.  His testimony here denies it.  He

56

1  didn't deny he wrote it.  He denies the content of it.

2  He didn't mean that.  He didn't mean to include the word

3  not in two separate paragraphs confirming the same

4  information.  What are the chances of making the same,

5  quote, typographical error in two different paragraphs

6  in the same exact location since those two statements

7  are totally in line with each other?  What are the

8  chances of that happening?  Those are factors you have

9  to look at in determining the credibility of the

10 witnesses here today.

11         You have to look at why they called him.

12 There's been great testimony, and I'm not going to go

13 into it exhibit by exhibit with you at this point, about

14 e-mails going back and forth, the Thursday before this

15 phone call and the Friday morning of the phone call.

16 You'll be given copies of e-mails, you can go through

17 them.  I would just ask that you look at them in

18 conjunction with one another.

19         Specifically, Plaintiffs's Exhibit 12 and

20 Plaintiff's Exhibit -- I'm sorry, Plaintiff's Exhibit 12

21 and 16 and Defendant's Exhibit 12.  These e-mails

22 establish that after Defendant Altavilla sent his e-mail

23 to Major Sidney Simon asking had his order been

24 superceded, Major Sidney Simon contacted Sergeant Joe

25 Callon.  Sergeant Joe Callon was the executive officer

57

 1    for Lieutenant Colonel Cindy Transue, the person who

 2    originated this order.  Sergeant Joe Callon responded

 3    back, do Not, and "not" you'll see is all in capital

 4    letters, so there's no confusion.  "Do Not enforce the

 5    order requiring Trooper Diana to return to work."

 6    There's no misunderstanding about the intent of that

 7    e-mail.

 8            That e-mail was sent to Major Sidney Simon

 9    and -- excuse me -- Defendant Altavilla was copied on

10    that.  Major Sidney Simon further sent an e-mail to

11    Captain Altavilla stating that he advised Sergeant

12    Callon that he wasn't happy and they would not have

13    known about -- this is in the e-mail -- the unofficial

14    rescinding of this order if they hadn't asked about it.

15    And this is Thursday, the day before this call.

16            Major Sidney Simon and Linda Bonnie of human

17    resources exchange e-mails.  One was sent from Major

18    Sidney Simon to Linda Bonney Thursday afternoon.  Linda

19    Bonney responded Friday morning.  Those are the Exhibits

20    12 that I've asked you to look at.  Plaintiff's 12 is

21    the e-mail from Major Sidney Simon to Linda Bonney.

22    Defendant's 12 is Linda Bonney's response back to Major

23    Simon.

24            And those e-mails are what Linda Bonney

25    forwarded to Lieutenant Oliphant, which Lieutenant

58

1    Oliphant stated he read to Captain Altavilla before they

2    made this call.  The e-mail from Major Sidney Simon to

3    Linda Bonney Thursday afternoon said, We contacted the

4    deputy's office.  It explained we contacted her office,

5    that would be Lieutenant Colonel Cynthia Transue because

6    she has authority over the order.  Human resources may

7    have asked that this order be issued, but Lieutenant

8    Colonel Transue's office is the one that had the power

9    to issue it, and the one that had the power to rescind

10   it.

11           This e-mail indicates that Major Sidney

12   Simon contacted Lieutenant Colonel Transue's office and

13   that the order was being unofficially rescinded.  That

14   is why Sergeant Callon sent that e-mail saying "do Not

15   enforce".

16           Defendant's 12, the e-mail from Linda Bonney

17   to Sidney Simon in response to this simply said, No

18   problem.  We're not changing or unofficially rescinding

19   the order.  She's just clarifying that it was Lieutenant

20   Colonel Transue's office doing it and not her office.

21   That e-mail further identified, and this is all before

22   the phone call, that human resources was advised by

23   Corporal Diana's Worker's Compensation attorney that he

24   did not intend to return.  The e-mail, which Lieutenant

25   Oliphant admits having received, which Lieutenant

59

1    Oliphant admits having read to Defendant Altavilla and

2    which Lieutenant Altavilla admits Lieutenant Oliphant

3    read to him, stated that Corporal Diana believed that it

4    would be physically harmful for him to return to work

5    because of this injury that he was still trying to

6    recover from.

7            The e-mail states that it would be resolved

8    in the litigation process.  Linda Bonney and Kim

9    Studenroth both from the Pennsylvania State Police human

10   resource office testified yesterday that at that point

11   it's hands off.  You let it go to the hearing.  They

12   testified they never directed Lieutenant Oliphant or

13   Defendant Altavilla to call him up and record it.  They

14   testified they never told him to call up Captain Diana

15   -- or sorry, Corporal Diana period.

16           When they're advised, and this is the e-mail

17   which both defendants were fully aware of before he

18   initiated this call, that when somebody from Worker's

19   Comp. has an attorney, has expressed their intent that

20   they're not returning to work, it's hands off.  You

21   don't do anything.  You let it work -- and the e-mail

22   will say this -- through the process.

23           The call he placed to Corporal Diana was not

24   in the ordinary course of business.  It is not in the

25   ordinary course of business for these two men to place

60

1    calls regarding Worker's Compensation. It is not in the

2    ordinary course of business for these two men to make

3    phone calls regarding an order that they have already

4    been advised not to enforce, that they have already been

5    advised was unofficially rescinded and already been

6    advised that it would be dealt with through a litigation

7    process. What they did was not in the ordinary course

8    of business.

9           There's been testimony that these phone

10   lines are utilized for a number of purposes. Both

11   defendants have admitted that. If you're near the phone

12   and you need to make a call you pick it up.

13          Now, Captain Altavilla testified yesterday

14   that there was a time he had directed another trooper to

15   use a recorded line to call somebody. The odd thing is,

16   when I asked him, did he make a copy of that call, his

17   response was no, the Celtronic would have recorded it,

18   or the Celtronic would have it. Well, the call to

19   Corporal Diana was recorded on the same Celtronic

20   machine. Why was it necessarily to immediately, near

21   the moment after this conversation had been completed to

22   have a copy made? To have it turned over to Lieutenant

23   Oliphant? Ask yourself that.

24          Lieutenant Oliphant and I discussed in some

25   length what you'll be given as Defendant's Exhibit No.

61

22.  Classify it as OM, Operations Manual 7-8, the

communications manual for the Pennsylvania State Police

in effect at the time this occurred.  Lieutenant

Oliphant and I discussed the provisions permitting

access to the Celtronic E1000.  He confirmed that he

permitted access to this device to the TCM, the troop

communications specialist, one, to check to see if it's

recording properly.  And he admitted when he directed

Trooper Zukosky to make this copy of the tape that's not

what he was trying to do.  He wasn't trying to test to

see if the machine was working properly.

        The only other section was if you believe

that there was a distortion in the phone call, and he

admitted he wasn't operating under the request for a

copy under that section either.  There's one other

provision that permits access to this device to make

copies of recordings.  And that's if it's a part of a

criminal investigation, a BPR investigation, some

investigation by the Pennsylvania State Police, which

the defendants are not saying this was.

        The police communications manual, and it's

really only two pages you'll see that are important

here, indicates that even when it's a part of an

investigation, documents have to be filed, written

requests have to be prepared before accessing this

62

1    equipment.   Lieutenant Oliphant admitted none of that

2    was done.   For you to believe this was done in the

3    ordinary course of business, you'll have to believe that

4    it is the ordinary course of business to just blatantly

5    ignore the internal regulation of the Pennsylvania State

6    Police.

7            If this was a properly made call, there

8    would have been no need to immediately have a copy made

9    in violation of the regulations since this Celtronic

10   E1000 would have maintained a conversation anywhere.

11   There would have been no need for that call to be made.

12   Unless it was made for some purpose other than being

13   made in the ordinary course of their duties, which

14   they've already admitted have nothing to do with

15   Workman's Compensation.

16           The Pennsylvania Wiretap Act, which once

17   again the court will explain to you, is very similar in

18   part to the Fourth Amendment and the Federal

19   Communications Act, but like anything else in the law,

20   it's a little different because it's state versus

21   federal.   The law in Pennsylvania, for the Pennsylvania

22   Wiretap Act is actually listed, not in the -- in this

23   code book.   It was actually listed specifically in the

24   Pennsylvania Crimes Code.

25           Section 5703 of the Crimes Code makes it a

63

1  felony of the third degree to intentionally intercept an

2  electronic communication, a telephone call, as well as

3  disclose and/or use the contents of that intercepted

4  phone call for any purpose.

5          Now, the real interesting thing in this case

6  is the defendants aren't stating they didn't violate the

7  Wiretapping Act.  They've never contended they didn't

8  violate it.  What they're saying is, they're falling

9  under an exception to it, under 5704.  They're not

10  saying they didn't violate 5703, by which their actions

11  will be a felony.  They're saying, Well, you know, hey,

12  we have this exception over here.  And the Judge will

13  explain to you, as I'm about to, what the elements of

14  that exception are.

15          What is an exception to the law, some people

16  use the term affirmative defense.  It's -- it's like if

17  you're charged with murder, and you say, well, you

18  killed somebody in self-defense or you're insane when

19  you committed it, that's an affirmative defense.  You're

20  not denying that you did something, you're just saying,

21  Hey, well I -- a get out of jail free card, so to speak.

22          The exceptions which the defendants contend

23  relieve them from liability under 5703, which make their

24  actions felonies, has two parts -- actually it's got a

25  multitude of parts, but I believe only two or really

64

1    relevant for your consideration here.  The first factors

2    -- well, before I get into the first factor, the two

3    parts, the way it works is if the defendants don't meet

4    both parts or they can't meet literally every one of

5    these factors under the law, they just won.  They do not

6    qualify for the exception and they're in violation of

7    the Pennsylvania Wiretap Act.

8              The first factor for the exception is that

9    the telephone lines that were utilized to make this

10   call, the telephone lines utilized to record this call

11   with this man on November 21, 2003, must be limited to

12   the exclusive use of the communications system for

13   administrative purposes.  Limited to the exclusive use

14   of the communications system for administrative

15   purposes.  That means several things.

16             Administrative purposes means this has to be

17   something they're doing similar to the Federal

18   Communications Act in the course of their duties, which

19   I contend to you, as in the Federal Communications Act

20   they were not.  The other thing is, this must be a

21   telephone line that has no other use but for

22   professional police business.  Under Defendant's Exhibit

23   22, once again the communications manual, it indicates

24   in there that these phone lines are for emergency

25   communications, emergency calls going in, emergency

1  calls going out.  If the phone line utilized to record

2  this man was in any fashion utilized in a non-exclusive

3  fashion, then the exception is not met.  The defendants

4  themselves have stated, Heck, these phone lines are used

5  for a multitude of purposes.  The fact that they

6  commonly use it for a number of purposes doesn't mean

7  it's right.  The fact that they wear a badge doesn't

8  mean -- well, I don't want to go back to my office and

9  use a non-recorded phone, I'm just going to grab this

10  one.  That's a violation.

11         There's no question based upon the testimony

12  of everyone here who has been asked it, the majority of

13  the phones in any Pennsylvania State Police barracks are

14  non-recorded lines.  Every Pennsylvania State Police

15  barracks has a very limited number of lines.  Why?

16  Because it's a limited number of lines for the exclusive

17  purpose of emergency calls, for the exclusive purpose of

18  the administration, of the responsibility of the

19  Pennsylvania State Police in responding to and dealing

20  with emergency and dangerous situations that they're

21  sending out troopers like Corporal Diana to respond to.

22         The second factor under the Pennsylvania

23  Wiretap Act is that the telephone line must have a

24  periodic beep to alert all of the parties that

25  conversation is being recorded.  If one of the factors

66

1  is met and not the other, then the defendants do not

2  qualify for the exception, and if they do not qualify

3  for the exception, then they've committed acts which

4  will constitute a felony and they're in violation of the

5  Pennsylvania Wiretap Act.

6           For example, if there were beeps in the

7  phone, which everybody could hear, but the phone line at

8  the police station was not limited to the exclusive use

9  of the communication system, that's a violation.  So,

10 even if Corporal Diana stated he heard the beeps, if

11 this phone was not used one hundred percent exclusively

12 for communications functions, that's a violation.

13          If the telephone line is limited to the

14 exclusive use of communication systems for

15 administrative purposes, but the beeps cannot be heard

16 by all parties, that's a violation of the Pennsylvania

17 Wiretap Act.

18          Now, the facts of this case, which you are

19 the sole judge of, aren't that extensive.  When you get

20 into the exhibits, as you'll see, you get a little

21 bogged down because you've got multiple pages of

22 exhibits, you have an e-mail here, it's a little

23 difficult and you have to figure out the time and the

24 succession of e-mails because they're not necessarily

25 going in order.  But this case is not that complicated.

67

1  The case is actually very simple.  I'm just going to
2  lead you.
3          The judge will explain to you the factors
4  that you can and are to apply when determining the
5  credibility of witnesses and how much weight to give a
6  witness's testimony if you so choose.  As a juror, you
7  have the option of believing one witness completely, not
8  at all, or you just accept part of their testimony.  How
9  do they respond to questions?  Were there
10  inconsistencies in their testimony?  Does their
11  testimony not make sense?  Have they said things one day
12  and now they're sort of taking it back?  What is the
13  motive of these people in testifying.
14          There are only two people to this phone
15  call, Lieutenant Oliphant and Corporal Mario Diana.
16  Now, the interesting thing is that on the first day of
17  testimony -- excuse me -- Defendant Altavilla was asked
18  about a motto that the Pennsylvania State Police have.
19  Honesty, integrity, trust, courage.  And I asked him
20  specifically, Does Corporal Diana represent those
21  elements?  Does he assemble those elements?  And
22  Defendant Altavilla said yes, he is.
23          Defendant Altavilla himself stated that this
24  man, an officer with the Pennsylvania State Police,
25  injured in the line of duty, is a good trooper.

68

1    Defendant Oliphant testified and admitted he had

2    testified this way previously in a deposition that if

3    this man says even though he was being recorded, that he

4    believed that Corporal Diana did not know he was being

5    recorded.

6              It's not very often you have a case where

7    the defendants themselves admit that the plaintiff, the

8    man suing them has integrity, that he's truthful, that

9    he's a good trooper, and I commend him for admitting

10   that.  But the fact of the matter is, he is a good

11   trooper.  He's been promoted to the rank of corporal.

12   He puts his life on the line every day.  And you saw his

13   testimony.  All he wanted to do was get back to work.

14             His testimony was when Corporal Diana found

15   out his conversation had been recorded, it felt like

16   somebody punched him in the face.  Even before he found

17   out it was being record, months before, he was worried.

18   He testified he had a newborn daughter.  A few months

19   before this happened he and his wife had been blessed

20   with a child.  He testified -- I guess she was pregnant

21   with twins and luckily one survived.  But he was worried

22   what would happen?  When he found out he had been

23   recorded, that fear, that stress compounded.  He was

24   just a trooper at the time.

25             To find out that a lieutenant and a captain

**996**

69

1   of the Pennsylvania State Police had illegally

2   wiretapped him, that would affect a regular citizen, but

3   one of their own?

4          He testified he was stressed.  He testified

5   he was depressed.  He didn't know what he had said, what

6   were they trying to do, why were they doing this to him?

7   Were they out to get him?  He didn't know.  He felt

8   violated; he lost weight; it caused incredible strain on

9   his marriage.  You saw him.  He even testified because

10   of the strain and the stress that this caused to him,

11   his wife started to doubt whether she wanted to be with

12   him.  Whether he was the man she wanted to spend the

13   rest of his life with.  How was he hurt?  That's how he

14   was hurt.

15          He questioned, were they doing something to

16   make him lose his job?  Were they going to do something

17   that he'd lose his benefits?  He'd loss his income?

18   He'd lose his medical benefits, and anyone with a small

19   child knows that is something you don't want to lose.

20          The interesting thing is that the

21   Pennsylvania State Police have -- have rules internally

22   as to how members have to behave.  If you falsely accuse

23   another member of the Pennsylvania State Police of

24   criminal activity, you get BPRd.  When you get BPRd they

25   do an investigation on you and then they discipline you.

70

 1    Pennsylvania State Police also have a regulation that if

 2    you know that some other member violated one of the

 3    rules, you have to report them.

 4         The testimony has been that Corporal Diana

 5    accused Lieutenant Oliphant and retired Captain

 6    Altavilla of illegal and improper acts.  The testimony

 7    was he was never being BPRd for that.  No one ever

 8    accused him of making a false allegation against another

 9    member of the state police.  Why?  Because he didn't.

10    One of the questions I'm sure you've been asking

11    yourself is the beeps.

12         The beeps -- and they're referred to in the

13    law as a periodic warning signal.  Now, there's been

14    testimony from a number of people here today -- not

15    today but this week -- that Trooper Ron Zukosky, George

16    Gannis from Transcorp who supplies equipment to the

17    Pennsylvania State Police, as well as Paul Ginsberg, the

18    expert that they brought in that they paid -- excuse me,

19    I believe the total was $18,200 to analyze that tape and

20    to appear in court.

21         The way the recording equipment operates of

22    the Pennsylvania State Police barracks, or at least did

23    at the time in question, is there's a device called a

24    TLP-107, a telephone logger patch.  It generates the

25    beeps in the Celtronic and into the phone.  The device

71

1  has, and all the witnesses who have been asked about

2  this admitted it, has what's called an adjustment beep

3  volume screw.  You just turn it down and the beeps go

4  down in the phone call.

5         Now, Trooper Zukosky indicated that he

6  really didn't know what happens once it gets in the

7  Celtronic.  And he stated, Well, you'll have to ask the

8  expert about that.  Now, George Gannis, who testified

9  from Transcorp immediately thereafter, immediately after

10  Trooper Zukosky testified, was asked how difficult is it

11  to turn that screw down?  Do you have to be technically

12  proficient?  And his response, if you recall was, my

13  ten-year-old can do it quicker than I can.  All it takes

14  is a turning of the screw and the person you call on

15  that phone can't hear the beep, but the beep is still

16  sent to the Celtronic E1000.  The TLP-107 just sends the

17  beeps out.  It doesn't monitor the beeps and makes sure

18  that every part or every component is receiving them.

19         Now, when Mr. Gannis was questioned about

20  the possible manipulation of the TLP-107 he actually

21  stated there were other ways to manipulate it.  You

22  unplug the power cord, that eliminates the beeps

23  completely from the phone call.

24         The copy of the tape that's been admitted

25  into evidence does not accurately reflect the phone call

1  that occurred.  The content of the conversation is

2  there, but the beeps are put on by this device, the

3  TLP-107.  The fact that the TLP-107 puts them in the

4  Celtronic E1000 does not mean they were on the phone

5  conversation itself.

6          Now Trooper Ron Zukosky is a troop

7  communications specialist.  He testified that the day he

8  made the tape he listened to a portion, albeit a small

9  portion of the tape two times.  He heard the tape or at

10  least that portion again in court.  When he testified in

11  court he said, Well, I heard the beeps today.  He

12  admitted under oath that both times he listened to it

13  while he was making the copy and right after, he did not

14  hear one beep.

15          Now, he explained that away by saying that

16  he was not listening for the beeps.  And there's a

17  problem there.  The beeps are supposed to be

18  discernible.  The beeps themselves are supposed to be

19  the warning.  It's not a situation where -- where you're

20  supposed to be told you have to listen for the beeps to

21  be able to detect the beeps.  If you have to

22  specifically listen for the beeps, there's a problem.

23          The beeps or the TLP-107 is not serving its

24  purpose.  There's no question that Lieutenant Oliphant

25  did not tell Corporal Diana that he was recording the

1   phone call.

2          Lieutenant Oliphant indicated to Corporal

3   Diana I'm calling because Captain Altavilla told me to.

4   What he left out was the second part, where Captain

5   Altavilla told him to record it as well.   Lieutenant

6   Oliphant testified that he told Captain Diana that the

7   order had not been rescinded.   When the evidence fully

8   shows that he received an order that it was not to be

9   enforced and it was unofficially rescinded.   I don't

10  know why he did that.   What I do know is that is not

11  within the regular course of duties of a Pennsylvania

12  State Police officer.

13         Gerald Williams, a corporal with the

14  Pennsylvania State Police, was walking by when Trooper

15  Ron Zukosky was making this copy of the tape.   He

16  testified he believed he heard approximately 30 seconds

17  of the conversation and he didn't hear any beeps.   Now,

18  aside from how long of the conversation he heard, both

19  he and Trooper Ron Zukosky heard the same conversation.

20  They were both there.   And it's a little odd, they have

21  a troop communication specialist, and a corporal with

22  the Pennsylvania State Police, hearing the same part of

23  the conversation and neither one of them hears any

24  beeps.   The reason for that is, the beeps weren't there.

25  Mr. Gannis already testified as to the simple

74

1  manipulation of this device.  A mere turn of the screw

2  and the beep goes to such a low, almost undiscernible

3  level that you never know it's there, even though it's

4  being fed into the recorder.

5          So it comes down to who do you believe.

6  Whose testimony didn't sit right?  Who seemed to change

7  their story when they felt trapped?  Who evaded

8  questions?  These are factors you on the jury are going

9  to have to make a decision with regard to.

10          The Judge at the beginning of this case

11  indicated to you, used a term called burden of proof.  A

12  burden of proof is a term most people are familiar with

13  from watching television shows, but most people are only

14  familiar with beyond a reasonable doubt burden of proof.

15  That's reserved for criminal matters.  This is not that

16  type of burden of proof.  The burden of proof to be

17  utilized here is what is called a preponderance of the

18  evidence.

19          Preponderance of the evidence, as the judge

20  said at the beginning, is similar to a scale.  You put

21  all the plaintiff's evidence here, you put all the

22  defendant's evidence here.  Which ever one has a little

23  more wins.  All the plaintiff needs is for you to be on

24  his side a little more than the defendants, it's a

25  plaintiff's verdict.

75

1          With preponderance of the evidence the case

2    does not have to be established similar to a criminal

3    matter beyond a reasonable doubt.  Who's version sounds

4    more likely?  Once again, who do you believe?  If you

5    believe Corporal Diana's testimony then you must find

6    for plaintiff for a Fourth Amendment violation, for a

7    violation, excuse me, of the Federal Communications, as

8    well as a violation of the Pennsylvania Wiretap Act.

9          Did this man have an expectation of privacy?

10   It would be a little different at a minimum if

11   Lieutenant Oliphant had called him up while he was at

12   home and said, I'm on desk, which is what troopers

13   generally do to alert other troopers or other officers

14   that they're calling from a recorded line.  That was not

15   done here.  He did not tell Corporal Diana that he was

16   being recorded.  All Corporal Diana knew is he was in

17   the shower, his cell phone rang and he answered it.

18         Did he have an expectation of privacy in

19   that phone call?  The answer was yes.  Was that

20   expectation reasonable?  That answer is yes.  If you

21   answered those two questions yes, a Fourth Amendment

22   violation has been established here.

23         With regard to the Federal Communications

24   Act, as I said, the Judge will explain this to you

25   somewhat in more detail, but it gets into again the

76

1    issue of expectation of privacy.  Did this man believe

2    that when he's at home answering a phone, did he expect

3    that that would be a private conversation?  Absolutely.

4    Did these people in the regular course of their duty

5    make this call?  No. Human resources said no. His

6    attorney stated he's not returning to work.  He's saying

7    he's going to be harmed.  Hands off this guy.

8              E-mails were sent around saying "do Not

9    enforce".  Lieutenant Oliphant himself sent an e-mail to

10   Linda Bonney of human resources stating that upon

11   further discussion with Major Simon and Lieutenant

12   colonel Transue's office the decision was made not to

13   enforce the order.  Lieutenant Oliphant sent that e-mail

14   before he made this phone call.  They knew the order

15   wasn't to be enforced.  They knew what was going on.

16             Human resources testified yesterday, and

17   they have an attorney, the attorney says they're not

18   coming back, that they're contesting it, saying they're

19   going to be harmed or the injury is going to be worse,

20   you deal with it in the litigation process.  You don't

21   call him up and record it.  They did not do this in the

22   ordinary course of business.  And therefore you should

23   find a violation of the Federal Communications Act as

24   well.

25             With regard to the Pennsylvania Wiretap Law,

1   as I indicated before, there are a multitude of factors.

2   Only two I believe are really relevant here.  The

3   periodic warning and was the phone line utilized in

4   calling Corporal Diana limited to the exclusive use for

5   communication purposes, or administrative purposes in

6   the Pennsylvania State Police?  The communications

7   manual states -- Lieutenant Oliphant testified to this

8   when he sat here several times this week -- that the

9   recording policy in the Pennsylvania State Police is for

10  emergency calls coming in and going out of that desk.

11          There are a very limited number of lines

12  that are recorded.  Why?  Because they're solely for

13  emergency calls.  Most of the phone lines at the

14  barracks are not recorded because they're to be used for

15  other things.  They're to be used for overtime, for

16  shift change, for ordering lunch.  The testimony is that

17  if a trooper calls in on a recorded line for an overtime

18  schedule or a shift change they're directed to a

19  non-recorded line.  Why?  Because that's not the phone

20  line they're supposed to be on.  The fact that these

21  defendants may utilize these lines for other calls, one

22  of which was to call Corporal Diana establishes that

23  these phone calls and these phone lines are not utilized

24  exclusively, which the law requires, for the

25  communication purposes and administrative purposes.

78

```
 1   That in and of itself constitutes a violation of the

 2   Pennsylvania Wiretap Act and a felony.  Combined with

 3   the fact that this man testified that there were no

 4   beeps on the line, combined with the fact that

 5   Lieutenant Oliphant himself testified that if this man

 6   is saying he did not know that call was recorded, he

 7   didn't know it was recorded.  So we would ask that you

 8   find in favor of the plaintiff against both defendants

 9   on all counts.

10          Now, that brings us to what is generally

11   referred to as the damage phase of your deliberations.

12   Now, there were multiple damages that were requested

13   here, and once again, the judge would explain to you,

14   they're going to be broken down for each violation.

15   There are compensatory and punitive damages.  With

16   regard to the Federal Communications Act, if you find a

17   violation of that act you don't award the compensatory

18   damages, the court does.  But you would award the

19   punitive damages.

20          The compensatory damages for both the Fourth

21   Amendment violation and the Pennsylvania Wiretap Act

22   would be to compensate this man for the violation of his

23   rights.  To compensate him for the violation that he

24   felt when he found out that his privacy had been

25   invaded.  To compensate him for the stress, the
```

1  depression he suffered, the pain this has caused him and

2  still causes him.  You saw him testify.  It felt like

3  somebody punched him in the face.  And they ask, even if

4  they did it, how was he hurt?  That's not the point.

5  The law has been broken.  He doesn't have to show a

6  black eye, he doesn't have to show a bruise.  The law

7  has been broken.  The fact that he can't show a bruise

8  doesn't mean he hasn't been hurt.  He testified how he's

9  being hurt.

10        If somebody had recorded my call last night

11  with my daughter I wouldn't have lost any money over it,

12  but I would have been hurt.  It wasn't an embarrassing

13  call, but I would have been hurt nonetheless.  Why?

14  Because it was private.  It was a private moment between

15  me and her.  It wasn't for anybody else's ears.

16        So the compensatory damages are to

17  compensate him for the violation of his Fourth Amendment

18  rights and to compensate him for the damages he suffered

19  as a result of the actions of these two men.  And to

20  compensate him for the violations that these men

21  committed under the Pennsylvania Wiretap Act.  Which the

22  actions themselves are felony offenses.

23        With regard to the punitive damages, and the

24  Judge once again will go into this more in depth,

25  punitive damages have two purposes.  They're one to

80

1   punish these two defendants for violating Corporal

2   Diana's rights, to punish him.  Part of your

3   deliberations are what amount you believe is sufficient

4   to punish these two for what they did to this man.

5   That's in addition to the compensatory damages.

6          The second part of punitive damages is that

7   you're to make it high enough so that anyone in the

8   position of the defendants, anyone in the position of

9   authority like them again, not just these two, but

10  anyone in their position would be deterred from doing

11  something like this in the future.  So, punitive damages

12  serve two purposes.  One, punish these two, what amount

13  is sufficient, and two, to deter people in the future

14  from committing this type of act, from exercising this

15  type of behavior.  But, as a stated before, this is not

16  a complex case.  Who do you believe?  That's what it

17  comes down to.  Thank you.

18          THE COURT:  Thank you counsel.

19          MR. GOLDHABER:  Thank you, your Honor.

20          MS. REYNOLDS:  First of all, members of the

21  jury, I want to thank you for your time and attention in

22  this case.  We've been together now for -- this is the

23  fourth day, and I appreciate the fact that all of you

24  paid close attention to the facts of this case as it

25  went forward.  I know sometimes that's difficult when

81

1  you have lawyers arguing and witnesses talking and all

2  things that have been going on here, but I do appreciate

3  your paying attention.

4          Before I start my closing argument I'm going

5  to address a couple of things that were mentioned in Mr.

6  Goldhaber's argument for the plaintiff.  First of all, I

7  wanted to make it clear that you are not determining

8  criminal violations here.  The defendants -- it is the

9  position of the defendants that we did not commit any

10  crimes here, and that is not -- the exceptions to the

11  statute that I'm going to be talking about, the

12  exceptions created specifically for law enforcement to

13  operate properly are not affirmative defense, they are

14  exceptions to the wiretapping statutes.

15          Secondly, I want to address the comment

16  about Corporal Diana being the laborer, the man who puts

17  himself out on the line.  You heard both of the

18  defendants talk about their careers in the state police.

19  Both of them were laborers too at one time, both of them

20  put their lives on the line.  Every state police officer

21  out there puts his life on the line.  Corporal Diana

22  isn't any different than the defendants in terms of

23  putting his life on the line.  As a matter of fact,

24  since he's been promoted he is now minor management in

25  the state police.

82

1        The information that plaintiff's counsel

2   told you about with respect to why didn't Altavilla call

3   him from his home, why didn't Captain Altavilla call

4   him, it would have been the simple thing to do.  Well,

5   Captain Altavilla was on a day off.  As he testified, a

6   troop commander's job, there's a lot of responsibility

7   there.  He's entitled to a day off.  That's why they

8   appointed officer of the day to fulfill that role in his

9   absence.  That's why he called Lieutenant Oliphant and

10  said make this call for me.  He shouldn't have to be

11  making calls on his day off about these things.

12       And to clear up the question about why they

13  called him back on Friday.  There was testimony in this

14  case that the misunderstanding came from Trooper Diana.

15  He had been delivered the order on the 14th.  The

16  misunderstanding came from when he called in and said he

17  was waiting for the captain to call him back.  So

18  Captain Altavilla, being the considerate captain that he

19  is, said, Well, we have to clear up this

20  misunderstanding, Lieutenant Oliphant, that's why you

21  have to call him back.  We have to make sure that he

22  understands that that return to work order is

23  communicated to him and how he can disobey that order if

24  he thinks physical harm can come to him.

25       The plaintiff's counsel also mentioned