# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT
_____

## NO.  09-3360

## MARIO  J. DIANA

### Appellee

### v.

## WILLIARD OLIPHANT and CARMEN ALTAVILLA

### Appellants

_____

## BRIEF OF APPELLEE'S

_____

**Appeal from the Jury Verdict dated April 17, 2008 of the Honorable
Richard Caputo, Judge of the United States District
Court for the Middle District of Pennsylvania**

**Respectfully Submitted,**

**By:**        **/s/Don Bailey, Esquire**
              **PAID# 23786**
              **4311 N. 6th Street**
              **Harrisburg, Pa 17110**
              **717-221-9500**
              **717-221-9400 Fax**

## CORPORATE DISCLOSURE STATEMENT

I, Don Bailey, Esquire do hereby certify that I know of no corporate interest implicated in this case.

Respectfully Submitted,

By:  /s/Don Bailey, Esq.
4311 N. 6th Street
Harrisburg, Pa 17110
717 221-9500
717-221-9400 Fax

# TABLE OF CONTENTS

**Pages**

Corporate Disclosures Statement…………………………

Table of Authorities………………………………………    i-iii

Statement of Jurisdiction…………………………………    1

Statement of Issues……………………………………….    2-9

Statement of the Case…………………………………….    10-11

Statement of Facts………………………………………...    12-16

Statement of Related Cases………………………………    17

Standard of Review………………………………………    18-19

Summary of Argument……………………………………    20-26

Argument………………………………………………….    27-62

Conclusion………………………………………………    63

Certificate of Compliance…………………………………    64

Certificate of Word Count…………………………………    64

Certificate of Service…………………………………….    65

# TABLE OF AUTHORITIES

**CASES**                                                                 **Pages**

*Abott v. Village of Winthrop Harbor*, 953 F. Supp 931
(N.D. III. 1996)…………………………………………………    53

*Abraham v. County of Greenville*, 237, F.3d 386 (4th Cir 2001)  47,49

*Agnello v. U.S.* 269 U.S. 20 (1925)……………………………    29

*Amitti v. City of Woodstock*, 176 F.3d 952 (7th Cir 1990)……..  35,36

*Blake v. Wright*, 179 F.3d 1003 (6th Cir 1999)………………….30.32

*Boos v. Bar*ry, 485 U.S. 312……………………………………..47

*Blackiston v. Johnson,* No. 91-5111, 1995 U.S. Dist. (E.D. Pa. Sept. 19,
LEXIS 13823, at *3 1995)……………………………………30

*Davis v. Mich. Dep't of Treasury,* 489 U.S. 803 (1989)…………48

*Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir 1991)………35

*Hall v. Pa. Dep't of Cor*r., No. 3:CV-02-1255, 2006 U.S. Dist
LEXIS 68670 (M.D. Pa. Sept 25, 2006 (Memorandum)………57,60

*State Police Litig,* 888 F.Supp. at 1256…………………………53

*Inter Med. Supplies, Ltd. V. Ebi Med. Sys., Inc*. 181 F.3d 446
(3d Cir 1999)…………………………………………………….62

*Jandak v. Brookfield*, 520 F. Supp 815 (Northern Dist of Illinois,
1981) (Memorandum)…………………………………………35,36.

*Katz v. U.*S. 389 U.S. 347 (1979)………………………………28,29,32,53

*Klein v. Hollings,* 992 F.2d 1285 (3d Cir 1993)………………….18,44,45

*Kutner Buick Inc., v. Am Motors Corp.*, 868 F.2d 614
(3d Cir 1989)…………………………………………………34

*Lightening Lube v. Witco Corp*, 4 F.3d 1153 (3d Cir 1993)….   18

*Marbury v. Madison*, 5 U.S. 137 (1803)………………………  30,47

*McQueeney v. Wilmington Trust Co.,* 779 F.2d 916
(3d Cir 1985)……………………………………………...  41

*Parkway Garage Inc., v. City of Philadelphia,* 5 F.3d 685
(3d Cir 1993)……………………………………………………18

*PBA Local No. 38 v. Woodbridge Police Dep*'t, 832 F. Supp 808
(D.N.J. 1993)………………………………………………………53

*Phillips v. Cricket Lighters*, 584 Pa. 179 (Pa. 2005)……………62

*Saucier v. Katz*, 533 U.S. 194 (2001)……………………………

*Spence v. Board of Education*, 806 F.2d 1198 (3d Cir 1986)…….19,59

*Tapley v. Coll*ins,, 211 F.3d 1210 (11th Cir 2000)………………32,33

*U.S. v. Harpel*, 493 F.2d 346 (10th Cir 1974)……………………35

*U.S. v. Jackson*, No. 97-CV-2861, 2000 U.S. Dist LEXIS 1297
(E.D. Pa. Feb 14, 2000)……………………………………………51

*U.S. v. Riggi,* 951 F.2d 1368 (3d Cir 1991)………………………40,41

*Waldorf v. Shuta*, 142 F.3d 601 (3d Cir 1998)……………………..56

*Walter v. Holiday Inns, Inc*. 985 F.2d 1232 (3d Cir 1993)…………18

*Warden v. Hayden*, 387 U.S. 294 (1967)…………………………..29

*Williams v. Bitner*, 455 F.3d 186 (3d Cir 2006)……………………27

*Williams v. Po*ulos, 11 F.3d 271 (1st Cir 1993)……………………49

*Zap v. U.S*. 328 U.S. 624 (1946)…………………………………….29

**STATUTES**                                        **Pages**

Fourth Amendment of U.S.C……………………..    2,10,20,24,
                                                    27,28,29,52,55
Sixth Amendment of U.S.C…………………………    40
18 U.S.C. § 2510 (2) ……………………………….    55
18 U.S.C. § 2510 (5)(a)(ii)………………………….    2,4,21,33,29
18 U.S.C. § 2520 (d)………………………………….    5,46,47,49
Fed. R. Civ. P. Rule 50…………………………….    3,18,20
Fed. R. Civ. P. 51(c)………………………………….    61
Fed. R. Civ. P. Rule 50 (b)………………………….    18
Fed. R. Civ. P.59 (a)………………………………….    22
Fed. R. Civ. P. 61…………………………………….    41
F.R.E. 608 (b) ……………………………………….    45
F.R.E. 403…………………………………………….    44,45
18 Pa. Cons. Stat. § 5704(3) ………………………    50,51
18 Pa. Cons. Stat. § 5725 ……………………………    50
18 Pa. Cons. Stat. § 5725(c)………………………….    50

## STATEMENT OF APPELLATE JURISDICTION

This is a civil rights action brought pursuant to 42 U.S.C. §1983 and Pennsylvania state law over which the district court had subject matter jurisdiction under 28 U.S.C. § 1331, 1343 (a) (3) and (4) and §1367.

## STATEMENT OF QUESTIONS PRESENTED

I.  Defendant Altavilla and Oliphant's motions for judgment as a matter of

law.

### A. "Qualified Immunity" - Reasonable expectation of privacy in a private telephone call under the 4th Amendment of the United States Constitution.

Is the subjective and objective expectation of privacy in a private

telephone call a "clearly established" constitutional right under the 4th

Amendment to the United States Constitution, so as to defeat a "qualified

immunity" defense where a jury found the experienced and senior police

defendants recorded the Plaintiff's private call surreptitiously?

Suggested Answer: Yes!

### B. "Qualified Immunity" – 4th Amendment Reasonable Expectation of Privacy in a Private Telephone Call and an exception to Title III of the Federal Wiretap Law.

Can the statutory exception found at 18 U.S.C. § 2510(5)(a)(ii) of the

Federal Wiretapping law, Title III, for "… an investigative or law

enforcement officer in the ordinary course of his duties," trump 4th

Amendment warrant requirements, so as to afford Altavilla and Oliphant

"qualified immunity"?

Suggested Answer: No!

2

**C. Title III Claim:**

Should the Third Circuit Court of Appeals consider Altavilla and Oliphant's request for judgment as a matter of law with respect to "qualified immunity" under the Federal Wiretaping Act, Title III, when this issue was not advanced the pre-verdict Rule 50 Motion?

Suggested Answer: No!

D. **State Wiretapping Claim**:

Should the Third Circuit Court of Appeals consider Altavilla and Oliphant's request for judgment as a matter of law with respect to an alleged exception to the Pennsylvania Wiretap Statute when this issue was not advanced the pre-trial Rule 50 Motion?

Suggested Answer: No!

**E. Federal Wiretapping Claim**

When two experienced and senior law enforcement officers surreptitiously record a private telephone conversation with a subordinate to obtain information about a workers' compensation claim, and both officers admit they had no responsibility for investigating such claims, and testimony was adduced that the call violated the State Police's own communication

3

procedures, did Defendant's conduct fall within the statutory exception for interception of telephone calls "… by an investigative or law enforcement officer in the ordinary course of his duties," 18 U.S.C. § 2510(5)(a)(ii), otherwise known as the law enforcement exception, of Title III, the Federal Wiretap Act.

Suggested Answer: No!

II. Motion for a New Trial or Remittitur

A. **Re-Cross of Plaintiff**

When the Trial Court exercised its sound and wide discretion in not permitting recross-examination, and where it is not "highly probable" that the Altavilla and Oliphant were prejudiced by this, as there was alternative evidence by which the jury could have arrived at the same conclusion, should Defendant's be granted a new trial because of supposed Trial Court error?

Suggested Answer: No!

B. **Cross Examination of Plaintiff on Specific Instance of Conduct**

Where the primary issue at trial is if Diana heard beep tones while being recorded by Oliphant, did the Trial Court error in refusing to permit

**4**

cross examination on alleged prior misconduct that was previously undisclosed to the defense, entirely uncorroborated, and irrelevant to the primary issue at trial?

Suggested Answer: No!

C. **Good Faith Defense**

1. Good Faith Defense under Title III

Where § 2520(d) does not specifically provide for a "Good Faith" defense, precedent puts the onus on the wiretapper to be compliant with the Statute, and a broader construction of the relevant statutory provisions might prove unconstitutional, should Altavilla and Oliphant be granted a new trial because the Trial Court declined to instruct the Jury a "Good Faith" defense under Title III?

Suggested Answer: No!

2. **Good Faith Defense under the Pennsylvania Wiretap Act**

When the Pennsylvania Supreme Court has opined that "…to adopt the defense view would be to rewrite the statute [Pennsylvania Wiretap Statute] to make a good faith defense available to those who 'reasonably misinterpret

5

the provisions of the chapter[,]'" should Altavilla and Oliphant be granted a new trial because the Trial Court declined to instruct the Jury on a "Good Faith" defense under the Pennsylvania Wiretapping Statute?

Suggested Answer: No!

**D**. **Definition of "Administrative Purposes**

Where "[A] 'trial court need not define specific statutory terms unless they are outside the common understanding of a juror or are so technical or specific as to require a definition [,]" and the term has no special legal meaning, should Altavilla and Oliphant be granted a new trial because the Trial Court declined to instruct the Jury on the meaning of "Administrative purposes?"

Suggested Answer: No!

**E.      Beep      Tones      on      the      Telephone      Line**

Where the Trial Court instructed the Jury on the implications of the presence or lack of beep tones on the line when Oliphant surreptitiously recorded Diana, and also instructed the Jury specifically on the requirements to find liability under Title III, should Altavilla and Oliphant be granted a new Trial?

Suggested Answer: No!

6

F. **Passion or Prejudice of Jury**

Where the Jury's verdict on compensatory damages reflected analysis of the testimony adduced at trial, but the amounts awarded were not evenly apportioned between claims, does it necessarily follow that this aspect of the verdict was the product or passion or prejudice?

Suggested Answer: No!

G. **Alleged Misrepresentation of Facts by Plaintiff Counsel:**

Where alleged misrepresentation by Diana's counsel were not raised at the time, should the Court consider this in determining if a new trial is warranted?

Suggested Answer: No!

H. **Trial Testimony allegedly does not support the damages verdict:**

Where Diana testified the surreptitious recording of his private telephone call by Altavilla and Oliphant, and its implications for his future with the State Police, he being the sole bread winner for his family and having a new baby at home, left him "shocked," "assaulted," and "sick," impacted his relationship with his wife, caused him to lose weight and lose sleep, was sufficient evidence of emotional harm adduced to support the verdict?

Suggested Answer: Yes!

III. Altavilla and Oliphant's Motion for Remittitur

**A. Compensatory Damages**

Where the Trial Court found the Jury's compensatory damages award excessive, and remitted the award to $50,000.00 by comparing the fact of Diana's case with a factually analogous case, did the Trial Court abuse its discretion in remitting the award to $50,000.00?

Suggested Answer: No!

**B. Title III Compensatory Damages**

Where Diana and Altavilla and Oliphant (see Defendant's Brief at 42) agree that the Court properly remitted the Statutory damages under Title III to $10,000.00, should this aspect of the verdict stand?

Suggested Answer: Yes!

**C.    Damages    under    Pennsylvania    Wiretap    Act**

Where Altavilla and Oliphant did not object to the Trial Court's instruction or the Special Verdict form as to compensatory and punitive damages under the Pennsylvania Wiretap Act, should Altavilla and Oliphant be permitted to raise this issue later?

8

Suggested Answer: No!

**D. Punitive Damages**

Where Altavilla admitted ordering Oliphant to record Diana, and Oliphant admitted not telling Diana he was recording him (even though this was standard procedure), and both Altavilla and Oliphant were experience and senior supervisory police officers, and there was disputed evidence as to whether there were "beeps "on the line when the recording took place, and the State Police did not preserve the original recording even though a written request was made to do so due to a pending matter before a administrative law judge (the Workers' Compensation claim), was there adequate basis for an award of punitive damages?

Suggested Answer: Yes!

9

## STATEMENT OF THE CASE

Mario Diana filed the instant complaint on November 11, 2005, Plaintiff filed a Complaint (*Doc. 1*) under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. He alleged his supervisory, Altavilla and Oliphant, surreptitiously recorded his private telephone call without constitutional or legal basis. In addition, he also made claims under the Federal Communications Act (superseded by Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* and Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701 *et seq.*

Altavilla and Oliphant sought to dismiss the complaint, (*Doc. 5.*) which was granted as to the Fourteenth Amendment claim, and denied as to all other claims (including the Federal Communications Act claim) *(Doc. 19.)*

A motion for partial summary judgment was denied as to the First and Fourth Amendment claims. (Doc. 28.) The Court denied the motion. *(Doc. 38.)* A motion for reconsideration (Doc. 39) was also denied. (*Doc. 48).*

Trial was held in April 2008. After the Plaintiff's case (and their own), Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50. The motion was granted as to the First Amendment claim, but the Fourth Amendment, Title III, and Pennsylvania Wiretap Act claims went to the jury.

The jury found Altavilla and Oliphant liable with respect to each claim and awarded Mario Diana two hundred sixty-two thousand, one hundred twenty-six dollars ($ 262,126) in compensatory damages and two hundred thirty-eight thousand, eight hundred seventy-eight dollars ($ 238,878) in punitive damages. (*Doc. 93.*) On the Title III claim, and pursuant to the jury's findings, the Court awarding ten thousand dollars ($ 10,000) in statutory damages against each Defendant. (Doc. 95.) Judgments were entered by order on April 17, 2008. (*Doc. 96, 97.*)

Altavilla and Oliphant then filed post-trial motions, again requesting judgment as a *matter of law and a new trial or, alternatively, for remittitur.* (Doc. 102.)

11

**STATEMENT OF THE FACTS**

Mr. Mario Diana, a Pennsylvania State Trooper, received a telephone call from State Police Staff Lieutenant Oliphant who advised him he was required to return to work the following day or face possible disciplinary action (*Trial Tr. Vol. 2, pgs 63-64.*)

Diana had been on Workers' Compensation disability leave due to a work related injury and his doctor had advised he should not return to work *(Trial Tr. Vol. 2, pgs 93-94.)*

Unbeknownst to Diana, Defendant Oliphant surreptitiously recorded the conversation (*Trial Tr. Vol. 2, pgs 95-96.),* as directed by Captain Altavilla (*Trial Tr. Vol. 1, pg 83*.)

Even though Altavilla and Oliphant claim they regarded Diana as good Trooper (*Trial Tr. Vol. 1, pg 70) (Trial Tr. Vol. 2, pgs 48-49.),* they had no authority to investigate a Workers' Compensation cases (*Trial Tr. Vol. 1, pgs 67-68.),* and admit State Police staff had told them Diana did not have to return to work the next day (*Trial Tr. Vol. 2, pg 64.).*

Even so, Oliphant called Diana at Altavilla's direction (*Trial Tr. Vol. 1, pg 80.)* Further, Altavilla gave the order after having spoken to Diana,

12

who related his doctors concerns about his health *(Trial Tr. Vol. 2, pgs 92-93.)*

Both Altavilla and Oliphant were senior State Police officers, Altavilla a Troop Captain and Oliphant a Troop Staff Lieutenant *(Trial Tr. Vol. 1, pgs 67-68.)* In fact, Altavilla testified that he taught wiretap violations (*Trial Tr. Vol. 1, pg 58.)* Even so, and in violation of State Police communications regulations (*Trial Tr. Vol. 2, pgs 78-79*.), the call was made to Diana from a recorded line *(Trial Tr. Vol. 2, pg 80.),* and subsequently downloaded to a tape cassette *(Trial Tr. Vol. 2, pg 218)*.

Even though Oliphant made the tape and Altavilla ordered it to be made, both officers deny having ever listened to the tape *(Trial Tr. Vol. 1, 113)(Trial Tr. Vol. 2, pg 74.)*

Soon after Diana received the recorded call from Oliphant, Trooper Gerald Williams overhead Trooper Zukosky making a copy of the recording, and called Diana to tell him the call with Oliphant had been recorded (*Trial Tr. Vol. 2, 8-10.)*.

Diana was shocked and deeply concerned because he was not aware the conversation had been recorded *(Trial Tr. Vol. 2, 101.),* and consequently

13

suffered anxiety, depression, sleep loss and weight loss, as well as problems in his marriage, because of his deep concern over the implications to his career of his superior having surreptitiously recorded his private telephone call (*Trial Tr. Vol. 2, pgs 88-89, 92, 101, 103.*).

Oliphant admitted he did not tell Diana the call was recorded (*Trial Tr. Vol. 2, pgs 70-71.*), as is normal procedure when troopers call each other from a recorded line (*Trial Tr. Vol. 1, pg 91.*)(*Trial Tr. Vol. 2, pg 97.*). However, he asserts there were "beep" tones on the line to warn Diana of the recording *(Trial Tr. Vol. 2, pg 165.)*.

Diana, however, did not hear beep tones (*Trial Tr. Vol. 2, pgs 95-96.*). Gerald Williams, the Trooper who overheard a portion of the recording and notified Diana of the recording did not hear beep tones (*Trial Tr. Vol. 2, pg 9.*). Trooper Zukosky, who downloaded the recording at Lieutenant Oliphant's order did not remember if he heard beep tones (*Trial Tr. Vol. 2, pg 241.*)

Moreover, the manufacturer's representative for the electronic device, a TLP-107, that produces the "beeps" on the line, testified that the beep tones could be turned down so that the parties would not hear them *(Trial Tr. Vol. 2, pg 253.)* Further, Trooper Zukosky testified that the beep volume

14

could be turned down with a screwdriver (*Trial Tr. Vol. 2, pg 231.*) The manufacturer's representative further testified he received no maintenance requests for the "beep" device during this time frame *(Trial Tr. Vol. 2, pgs 252, 256-257.)*

After learning of the secret recording, Diana's workers' compensation counsel requested that Altavilla provide him a copy of the recording, and preserve the recording *(Document No. 21) (Trial Tr. Vol. 2, pg 18.).* Several days later Altavilla provided an alleged copy of the original, <u>but the original was never preserved and cannot, now, be produced by the State Police.</u> *(Trial Tr. Vol. 2, pg 19.)*(emphasis added).

<u>The expert retained by the State Police for trial admitted that the alleged copy of the recording was unreliable (*Trial Tr. Vol. 3, pg 88.*), and that he was not asked to "… determine or review the recording of this conversation with regard to the Dynametric TLP-107 as it relates to the beep volume adjustment screw to move the volume of the beep up and down and how it's recorded in this Celtronic E1000?"</u> (*Trial Tr. Vol. 3, pg 89*) (emphasis added).

15

Trooper Zukosky testified that a day or so after downloading the recording for Oliphant, Oliphant requested that Zukosky wear headphones in the future when downloading recordings, so the recording would not be overhead (*Trial Tr. Vol. 2, pg 229.)* Zukosky testified this was in response to Trooper Williams notifying Diana about the tape. Id. Further, Zukosky testified he did not make a written record of the recording because it was Oliphant who had requested it (*Trial Tr. Vol. 2, pg 218.)*

In response to the surreptitious recording, Diana filed a formal complaint with the State Police, but he was never interviewed about the incident (*Trial Tr. Vol. 2, pg 147.),* and it did not appear any action was taken as a result (*Trial Tr. Vol. 2, pg 146.)*

**16**

## STATEMENT OF RELATED CASES

Appellant knows of no related cases in this matter.


By:    /s/Don Bailey, Esquire

**STANDARD OF REVIEW**

Under Rule 50(b), judgment notwithstanding the verdict should be granted sparingly. *Walter v. Holiday Inns, Inc*., 985 F.2d 1232, 1238 (3d Cir. 1993). "[T]he trial court must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains 'the minimum quantum of evidence from which a jury might reasonably afford relief.'" *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691-92 (3d Cir. 1993)(subsequent history omitted).

A Rule 50 motion should be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving [the nonmovant] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube v. Witco Corp*., 4 F.3d 1153, 1166 (3d Cir.1993).

Under Rule 59(a) the decision to grant a new trial is left to the sound discretion of the trial judge. See *Blackiston v. Johnson,* No. 91-5111, 1995 U.S. Dist. LEXIS 13823, at *3 (E.D. Pa. Sept. 19, 1995)(subsequent history omitted). When evidence is conflicting, or can be interpreted in more than one way, the trial judge should be reluctant to grant a new trial. *Klein v. Hollings*, 992 F.2d 1285, 1295 (3d Cir.1993).

A trial courts grant of a remittitur will not be disturbed without evidence of a manifest abuse of discretion. *Brilla v. Pettit*, 57 Fed.Appx. 947, 949 (citing to *Spence v. Bd. Of Educ*., 806 F.2d 1198, 1201 (3d. Cir. 1986)

## SUMMARY OF THE ARGUMENT

The Trial Court's denial of Defendants Altavilla and Oliphant's motions for judgment as a matter of law should be upheld.

As to "Qualified Immunity" under the 4th Amendment, there is a "clearly established" objective and subjective expectation of privacy in a private telephone call. Diana's private telephone call was surreptitiously recorded without warrant or other recognized exception under the 4th Amendment. These requirements and generally known, especially to senior police officers, one of whom taught wiretap violations, so this renewed motion should be denied.

As to "Qualified Immunity" under the Title III Federal Wiretapping Act, since this issue was not advanced in Altavilla and Oliphant's pre-verdict Rule 50 motion, the Trial Court properly declined to consider this motion.

Likewise "Qualified Immunity" was not raised pre-verdict with respect to the State Wiretapping Claims. As with Title III and any other claim, Third Circuit precedent forbids consideration of issues not raised in a party's pre-verdict Rule 50 motion.

20

Next, Altavilla and Oliphant move for judgment as a matter of law because they believe their conduct fell within the statutory exception for interception of telephone calls "… by an investigative or law enforcement officer in the ordinary course of his duties," 18 U.S.C. § 2510(5)(a)(ii), otherwise known as the law enforcement exception, of Title III, the Federal Wiretap Act.

This motion should fail, however. Altavilla and Oliphant are experienced and senior law enforcement officers, one of whom taught wiretap violations, who surreptitiously recorded a private telephone conversation with a subordinate to obtain information about a workers' compensation claim. Further, both officers admit they had no responsibility whatsoever for investigating workers' compensation claims, and testimony was adduced that the call violated the State Police's own communication procedures. Thus, this motion should fail.

The Trial Court properly denied Altavilla and Oliphant's motions for a new trial, and properly remitted the Jury's awards. Therefore, the Trial Court's rulings should be upheld.

21

Altavilla and Oliphant seek a new trial because the Trial Court exercised its discretion and declined to permit re-cross. The Trial Court properly exercised its discretion, however, and because there was ample alternative evidence by which the Jury could have reached the same conclusion, it is not "highly probable" that the Court's ruling prejudiced the Defendants.

Next, a new trial is sought because the Trial Court exercised its discretion and declined to permit Mario Diana to be cross examined on alleged prior misconduct that was previously undisclosed to the defense, entirely uncorroborated, and irrelevant to the primary issue at trial. The information was apparently provided by a State Trooper who alleged that Diana asked him to lie and say a skiing injury had been incurred in the line of duty. Balancing F.R.E. 403, the Trial Court properly ruled this evidence was irrelevant to whether Diana had been improperly recorded, and excluded it.

Altavilla and Oliphant believe the Trial Court should have instructed the Jury to consider a "Good Faith" defense on the Title III claim. However, § 2520(d) does not specifically provide for a "Good Faith" defense, and

precedent puts the onus on the wiretapper to be compliant with the Statute. Further, a broader construction of the statute might prove unconstitutional. Therefore, the Trial Court properly declined to instruct the Jury a "Good Faith" defense under Title III.

Likewise, a "Good Faith" instruction was declined on the Pennsylvania Wiretap Act claim. However, the Pennsylvania Supreme Court has opined that "…to adopt the defense view would be to rewrite the statute [Pennsylvania Wiretap Statute] to make a good faith defense available to those who 'reasonably misinterpret the provisions of the chapter.'" Thus, the Trial Court properly declined to instruct the Jury on a "Good Faith" defense under the Pennsylvania Wiretapping Statute.

Next, Defendants' assert the Trial Court erred because it did not give the Jury an instruction on the definition of "Administrative Purposes." However, "[A] 'trial court need not define specific statutory terms unless they are outside the common understanding of a juror or are so technical or specific as to require a definition." "Administrative Purposes" has no special legal meaning, and the meaning Altavilla and Oliphant believe the Jury should have assigned are the meanings found in common dictionaries. Thus,

23

the Trial Court properly declined to instruct the Jury on the meaning of "Administrative purposes."

The Trial Court instructed the Jury on the implications of the presence or lack of beep tones on the telephone line under both the 4th Amendment and Title III. Altavilla and Oliphant suggest the Court's instruction was error.

However, under the 4th Amendment the Court instructed the Jury on the implications of the lack of a beep tone on the line as respects Diana's objective and subjective expectations of privacy.

Altavilla and Oliphant suggest because the Jury did not award compensatory damages evenly between the 4th Amendment and Pennsylvania Wiretapping claims, the verdict was the product of passion or prejudice. However, the Trial Court correctly found that a Jury could properly apportion damages disproportionately between claims with the same underlying harm. The Trial Court, therefore, properly declined a new trial on this basis.

Defendants also allege misrepresentation by Plaintiff Counsel in his closing, but did not object at the time. While misrepresentation is denied, the

24

Trial Court properly declined to consider this assertion since it was not objected to at the time.

Next, Altavilla and Oliphant assert the trial testimony does not support the damage awards. However, Diana testified the surreptitious recording of his private telephone call left him "shocked," "assaulted," and "sick," impacted his relationship with his wife, caused him to lose weight and lose sleep, because he was concerned about what this action by Altavilla and Oliphant meant for his future with the State Police.

As to compensatory damages the Trial Court properly remitted these awards to $50,000.00 by comparing the facts of Diana's case with a factually analogous case. As such, the Trial Court did not abuse its discretion in remitting the award to $50,000.00.

As to Title III Compensatory Damages, Altavilla and Oliphant (see Defendant's Brief at 42) agree that the Court properly remitted the Statutory damages under Title III to $10,000.00 for both Defendants. Further, in remitting this award the Trial Court relied on precedent from another Federal Circuit. Therefore, the Trial Court's remittitur should be upheld.

As to damages under Pennsylvania Wiretap Act, Altavilla and Oliphant did not object to the Trial Court's instruction or the Special Verdict form as to compensatory and punitive damages. Thus, they should not be permitted to raise an objection now.

Finally, Altavilla and Oliphant suggest the facts of the case do not support an award of punitive damages. However, where Altavilla admitted ordering Oliphant to record Diana, and Oliphant admitted not telling Diana he was recording him (even though Altavilla admitted it was standard procedure to tell other troopers if one was calling from a recorded line), and both Altavilla and Oliphant were experienced and senior supervisory police officers, and there was disputed evidence as to whether there were "beeps "on the line when the recording took place, and the State Police did not preserve the original recording even though a written request was made to do so due to a pending judicial matter before a administrative law judge (the Workers' Compensation claim), the Trial Court properly found ample evidence in the record to support a punitive damages award.

26

**ARGUMENT**

I.    Defendant Altavilla and Oliphant's motions for judgment as a matter of law should be denied because they lack foundation.

A.    Qualified Immunity – 4th Amendment Reasonable Expectation of Privacy.

The subjective and objective expectation of privacy in a private telephone call is a clearly established constitutional right under the 4th Amendment to the United States Constitution. As such, it defeats Defendant Altavilla and Oliphant's claim of "qualified immunity" where a jury found the experienced and senior police defendants recorded the Plaintiff's private call surreptitiously.

Defendants renewed motion for judgment as a matter of law should be denied because they are not entitled to "qualified immunity" under the Fourth Amendment. Altavilla and Oliphant may take advantage of "qualified immunity" if their conduct did not violate a constitutional or statutory right, *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006), or the rights in question are insufficiently clear to be "clearly established." Id.

27

Here, defendants Altavilla and Oliphant admit that when they recorded the November 21, 2003 telephone call with Plaintiff Mario Diana, a clearly established rule existed that secretly recording a call without a warrant is proscribed (*See Appellant's Brief at pg 7*) by the Fourth Amendment. *Katz v. United States*, 389 U.S. 347 (1979).

No warrant was obtained to record the conversation and no exception to the warrant requirement under *Katz* and its progeny is asserted by the Defendants. Altavilla and Oliphant were experienced and senior police officers, a Captain and a Lieutenant, respectively. Altavilla testified that he taught wiretap violations (*Tr. Vol. 1, pg 58).* There can be little serious question that these Defendants knew they were violating a "clearly established" right under *Katz* and its progeny when they surreptitiously recorded Diana's private telephone conversation.

Therefore, Altavilla and Oliphant's request for judgment as a matter of law on the "qualified immunity" defense under the 4th Amendment to the United States Constitution should be denied.

B.  Qualified Immunity – 4th Amendment Reasonable Expectation of Privacy in a Private Telephone Call and an exception to Title III of the Federal Wiretap Law.

28

Also with respect to the 4th Amendment, Altavilla and Oliphant advance the argument that an exception to Title III (the Federal Wiretap Law) creates an exception to the 4th Amendment warrant requirement. The Statutory exception excludes from civil liability calls recorded by "… an investigative or law enforcement officer in the ordinary course of his duties." at 18 U.S.C. § 2510(5)(a)(ii). This statutory exception, they claim, trumps the 4th Amendment.

This position flatly ignores the constitutional framework within which Title III was created. *Katz*, supra, not Title III, sets forth the 4th Amendment's requirements for lawful searches and interceptions of telephone calls, which generally requires a valid search warrant. *Katz*, 389 U.S. at 353.

The only exceptions to the Constitutional requirements are found in *Katz* and its progeny, e.g. search incident to arrest, see *Agnello v. United States*, 269 U.S. 20 (1925), "hot pursuit," see *Warden v. Hayden*, 387 U.S. 294(1967), and a search conducted with consent, see *Zap v. United States*, 328 U.S. 624 (1946). None of these constitutional exceptions to the warrant requirement are advanced by Altavilla and Oliphant.

29

Further, "… a law repugnant to the constitution is void …" *Marbury v. Madison*, 5 U.S. 137 at 77 (1803). Thus, the rights conferred by the 4th Amendment cannot be reduced or modified by Title III's exception for calls recorded by "… an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii).

However, Altavilla and Oliphant argue that *Blake v. Wright*, 179 F.3d 1003 (6th Cir. 1999) provides the necessary ambiguity for their actions to receive "qualified immunity." *Blake* is distinguishable from the instant case for several reasons.

First, the recording device *Blake* question was approved at a public meeting, and recorded all calls to and from the police station with the exception of two lines. Secondly, the lines were restricted to administrative uses. Id. at 3.

Unlike *Blake*, in this case, testimony was adduced that the phone lines at the State Police station were only sometimes used by troopers for administrative reasons, e.g. calling off sick or scheduling shifts. (*Trial Tr. Vol. 2, pg 118.*) Further, it was common practice for officer's to tell one another other they were calling from a recorded line. (*Trial Tr. Vol. 1, pg 91.*)

30

Oliphant admits he provided no such warning to Diana. (*Trial Tr. Vol. 2, pgs 96-98.*) Further, under cross examination on the policies set forth in the Pennsylvania State Police communications manual, a jury could have easily concluded that Altavilla and Oliphant's actions violated internal policy. *(Id. at pgs 78-80.)*

Also unlike *Blake*, there was testimony that the secretly recorded call was an effort to gather information about Diana's Workers' Compensation claim, even though both Altavilla and Oliphant denied having any responsibility for investigating such a claim. Joseph Plant, a union representative, testified that Altavilla told him the recorded call had been on orders from headquarters in Harrisburg. (*Trial Tr. Vol. 1, pg 124.*)

Thus, unlike the general administrative recording that went on briefly in *Blake*, Altavilla and Oliphant's surreptitious recording of the call with Diana was investigatory in nature, and likely improper under the Pennsylvania State Police's own policies.

31

The *Blake* Court opined:

"Although we acknowledge that the Fourth Amendment warns of inherent dangers with wiretapping, we agree with Wright that the case law, when examined with the relevant Ohio statute, was sufficiently uncertain regarding the unlawfulness of implementing the DigiVoice system in a police department's official phones in Ohio." Id. at 11.

It is apparent that the Court in *Blake* considered statutory wiretap exceptions and the apparent uncertainty under Ohio law, because the conduct in *Blake* did not clearly fall under the shade of *Katz* and its progeny. The secret recording of Diana, however, clearly comes under the auspices of *Katz* and it progeny because of the purpose for the call.

Altavilla and Oliphant also cite to *Tapley v. Collins*, 211 F.3d 1210 (11th Cir. 2000), which stands for the proposition that "qualified immunity" is available to public officials sued under the Federal Wiretap Act. The facts in *Tapley* are that a police officer overhead a wireless telephone conversation of another police officer through a police scanner. The district court denied the defendants summary judgment motions on "qualified immunity," holding that it was inapplicable to the Federal Wiretap Act.

The 11th Circuit reversed and remanded, holding that "qualified immunity" is applicable to claims under the Federal Wiretap Act. However,

32

the District Court deferred ruling on the Section 1983 claim, and the appellate Court's holding was restricted to application of "qualified immunity" to the Federal Wiretap claim only, making *Tapley* inapplicable to this case (even if it were applicable, Diana does not dispute the that "qualified immunity" may apply to Federal Wiretapping claims, but strenuously disagrees Altavilla and Oliphant should enjoy such immunity under the 4th Amendment via an exception to Title III or any by any other means).

When two experienced and senior supervisory State Police officers, Altavilla and Oliphant, violate a "clearly established" constitutional right, the statutory exception found in 18 U.S.C. § 2510(5)(a)(ii) cannot trump the constitutional requirements found in *Katz* and its progeny.

Therefore, because *Katz* and its progeny are controlling on the facts here, while *Blake* and *Tapley* are legally and factually distinguishable, the Court properly held that Altavilla and Oliphant are not entitled to "qualified immunity" on Diana's 4th Amendment claim under the warrant exception found at 18 U.S.C. § 2510(5)(a)(ii). Therefore, Altavilla and Oliphant's request for judgment as a matter of law on "qualified immunity should be denied.

33

C.    Title III Claim:

The Third Circuit Court of Appeals should not consider Altavilla and Oliphant's request for judgment as a matter of law with respect to "qualified immunity" under the Federal Wiretaping Act, Title III, when they did not advance these issues in their pre-verdict Rule 50 Motion. *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989).

D.    State Wiretapping Claim:

Third Circuit Court of Appeals should not consider Altavilla and Oliphant's request for judgment as a matter of law with respect to an alleged exception to the Pennsylvania Wiretap Statute when they did not advance this argument in their pre-trial Rule 50 Motion. *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989).

E.    Federal Wiretapping Claim:

Altavilla and Oliphant are not entitled to judgment as a matter of law on Diana's Title III claim because their conduct did not fall within the statutory exception for interception of telephone calls "… by an investigative or law enforcement officer in the ordinary course of his duties," 18 U.S.C. § 2510(5)(a)(ii) otherwise known as the law enforcement exception.

Altavilla and Oliphant cite to two cases to support their request for a judgment as a matter of law, *Amiti v. City of Woodstock*, 176 F.3d 952 (7th Cir. 1999), and *Jandak v. Brookfield*, 520 F.Supp. 815 (Northern Dist. Of Illinois, 1981)(Memorandum). However, neither case provides support for their contention that the Trial Court was incorrect in its instruction to the jury or the jury acted unreasonably.

In *Amiti*, the Court addressed the meaning of the term "ordinary" in the context of the law enforcement exception. The recorded line in dispute was used for business as well as personal calls. Previously, this line was the only line in the station that was unrecorded, but this was changed due to an incident where an investigation was hampered due to a call not being recorded. It was disputed if callers were on notice the line was recorded. In defining the term "ordinary" the Court opined:

"The boundary is between routine noninvestigative uses of electronic eavesdropping and its use either as a tool of investigation (which requires a warrant) or as a device for intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes. See *United States v. Harpel*, 493 F.2d 346, 351-52 (10th Cir. 1974)."

35

If anything, the *Amiti* Court's analysis supports the interpretation of "ordinary" provided by the Trial Court, and the jury's reasonable inferences that Altavilla and Oliphant were acting as investigators, improperly recording Diana in a scenario where even the State Police communications policy was not followed.

In *Jandak*, a non-binding memorandum opinion, the District Court applied the law enforcement exception where a Police chief recorded a call between an officer he suspected of misconduct, and citizen who was involved in the misconduct (an extramarital affair). The Court opined:

"… routine, nonsurreptitious, recording of a police investigative line which results in the recording of a conversation of an officer misusing the line for private purposes, where the officer should have known that the line was monitored, was in the ordinary course of the police chief's duties as a law enforcement officer, and is exempted from the statute by Section 2510(5)(a)(ii)."

However, both Altavilla and Oliphant deny they were investigating Diana for misconduct, or that they had any responsibility for investigating workers' compensation claims. (*Trial Tr. Vol. 1, 67-68.*) Further, there was testimony that the recording violated State Police communications policy *(Trial Tr. Vol. 2, pg 71.),* Oliphant admitted he did not tell Diana he was recording the call *Trial Tr. Vol. 2, pgs 96-98.),* and Trooper Williams did not

36

hear beeps on the portion of the call he overheard. *(Trial Tr. Vol. 2, pg 9.)*Thus, the call to Diana can hardly be considered routine or nonsurreptitious.

Next, the Trial Court clearly instructed the jury on this question *(Trial Tr. Vol. 4, pg 110, Apr. 10, 2008.)*, and Court made it clear that an interception within the exception was not a wiretap under Title III. Id. The Trial Court offered a broad interpretation of the term "ordinary," so that the jury could have found Altavilla acted within the "… ordinary course of [their] duties" if the call to Diana was investigatory or non-investigatory. Id. at 111. Critically, the Court instructed the jury that if it found that Altavilla and Oliphant's call to Diana was in the "ordinary" course of their duties, it was required to return a verdict in their favor. Id.  Based on the result, however, the jury weighed the evidence and found the call was not in the "… ordinary course" of their duties."

Factually, the jury had ample basis to support its finding the law enforcement exception did not apply. Testimony was adduced that while the recorded lines were sometimes used by troopers for administrative reasons,

e.g. lunch or calling off sick, when a trooper called off sick he was transferred from a recorded line to a supervisor on a non-recorded line. *(Trial Tr. Vol. 2, pgs 118-119, 143.)* Further, troopers routinely notified each other when calling from a recorded line. (*Trial Tr. Vol. 2, pgs 96-97.)*

Oliphant admits he never notified Diana that he was calling from a recorded line. *(Trial Tr. Vol. 2, 71*.) Also, Zukosky and Oliphant admitted that the recording was not in accordance with the State Police's own communication policy.(*Trial Tr. Vol. 2, pgs 78-79, 217-218.)* As mentioned previously, Altavilla and Oliphant admit they had no responsibility to investigate workers' compensation matters, and Oliphant admitted he knew the return to work order in question was not to be enforced. (*Trial Tr. Vol. 2, pgs 64, 68.)* Nevertheless, the call was made to Diana at Altavilla's direction. Union representative Joseph Plant testified that Altavilla admitted he had been directed to call Diana by someone in Harrisburg (*Trial Tr. Vol. 1, pg 124).*

The jury could have reasonably concluded, therefore, that the phone call had nothing to do with either Altavilla or Oliphant's normal duties. Instead, a reasonable jury could have inferred that Altavilla ordered the call

to find out more about Diana's workers' compensation claim, and ordered Oliphant to record it for future use.

Because the Trial Court properly instructed the jury, and the cases cited by Altavilla and Oliphant are distinguishable, or event helpful to Diana, and viewing the evidence in the light most favorable to Diana, giving him the advantage of every reasonable inference, and without weighing credibility of witnesses, the Trial Court properly concluded that a reasonable jury could have found that the recorded call was not make in the "ordinary" course of Altavilla or Oliphant's duties.

Therefore, the Trial Court's denial of judgment as a matter of law in favor of Altavilla and Oliphant should be affirmed.

## II. **Motion for a New Trial or Remittitur**

A. Re-Cross of Plaintiff

Altavilla and Oliphant should not be granted a new trial because the Trial Court declined to permit recross on Diana's testimony relative to his knowledge of the workings of the TLP-107 beep box. In so ruling, the Trial Court was well within its sound and wide discretion in not permitting recross-examination. More importantly, it is not "highly probable" that the

39

Altavilla and Oliphant were prejudiced by this ruling, as there was alternative and well-founded evidence by which the jury could also have arrived at the conclusion Diana heard no beeps on the line when Oliphant recorded him.

Trial Court properly exercised its discretion in declining to permit re-cross of Diana on the issue of his knowledge of the TLP-107 "beep" box because there was ample alternative evidence to support the jury's conclusion that Diana did not hear beep tones when Oliphant recorded his telephone conversation.

Altavilla and Oliphant urge that *United States v. Riggi*, 951 F.2d 1368 (3d Cir. 1991) supports their position. *Riggi* holds that it is error for the trial court to impose a blanket prohibition on recross, in a criminal case, where the Defendant has a Confrontation Clause of Sixth Amendment right to confront witnesses. In *Riggi*, the Court opined:

"When material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth Amendment mandates that the opposing party be given the right of recross-examination on those new matters. Id. at 18 (internal citations omitted).

This case is clearly distinguishable from the present matter where there is no Confrontation Clause question, and the Trial Judge exercised

40

sound discretion. Thus, the Trial Court properly applied the general rule:

"[A] trial court has wide discretion to restrict recross-examination, especially when no new matters have been raised on redirect. The conduct of a trial and the orderly presentation of testimony are committed to the sound discretion of the trial judge, and will not be disturbed on appeal absent a showing of abuse of discretion…" *Riggi* at 16 (internal citations omitted).

Under Fed. R. Evid. 611(a) "the district court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence."

Further, the ruling has not prejudiced Altavilla and Oliphant. An error in admitting or excluding evidence cannot be grounds for a new trial unless it affects the substantial rights of the parties. Fed. R. Civ. P. 61. A new trial is only warranted where it is "highly probable" that the erroneous exclusion of evidence contributed to the judgment. *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924 (3d Cir. 1985).

Altavilla and Oliphant claim the Trial Court erred after not allowing recross concerning the following testimony:

Q: Now, do you know anything about the beep box that is utilized to put the beeps on the tape communication lines at the state police?
A. You mean the way the system works or how the device works or --
Q: Do you know anything about it?
A: I know there's a little black box about the size of, I would say, a pack of Wood's matches that's attached to the line. And the lines are just plugged in both sides.

41

Q: It's my understanding that you knew about this box because you worked desk; is that correct?

A: Yes, ma'am.

Q: Okay. And would you have known about the beep box if the beep box hadn't needed to be repaired on occasion?

A: (no audible response.)

Q: Isn't that what you testified in your deposition?

A: Yes, I saw repair. You can visibly see the box.

Q: Had you hadn't it seen it repaired, isn't it - - wasn't it your testimony in the deposition that you wouldn't have thought about the beep box?

A: I believe so, yes.

Q: Prior to working desk, did you know what made the beeps on the recorded lines?

A: No. I mean -- not really.

Q: You never unhooked the beep box, have you?

A: No, ma'am.

Q: And the state police regulations specifically don't allow you to deactivate that, am I correct?

A: Correct, yes, ma'am.

(Trial Tr. Vol. 2, 122-123.)

On redirect examination, the following colloquy took place between Plaintiff and his counsel:

Q: Now, Attorney Reynolds asked you about the beep box as she referred to it. And she asked you if you know about and how it works. Your answer was yes?

A: Correct.

Q: What do you know about this box, sir?

A: As I stated before, it's about the size of a matchbox with -- it connected to the phone line. Someone calls in and takes the emergency, I was involved in a crash -- actually it emits a beep on the line so the person calling can actually hear an audible beep on the line.

Q: Now, to your knowledge what happens if you just remove that one plug from the beep box?

A: There's two plugs. If you remove either one, I'm not sure if it matters, the beep would still transmit to the -- our end -- to the state police end but not to the citizen's end.

42

Q: So the caller -- the person on the other end of the phone wouldn't know there was a beep there?
A: Correct.

(*Id*. *at 144-145.*)

Altavilla and Oliphant assert error because they believe the jury could have found in favor of Diana based on the testimony that the TLP-107 beep box could be disconnected at one end and not the other, and they should have been allowed to test Diana's knowledge of the TLP-107. However, this testimony was not the only evidence that the TLP-107 beep box could be manipulated. The jury had ample other testimony to conclude that beeps were not audible to Diana when Oliphant recorded him.

For example, Troop Communication Specialist Trooper Zukosky testified that the beeps could be turned down in volume by using a small screwdriver. (*Trial Tr. Vol. 2, pg 231.*) The representative of the manufacturer of the TLP-107 beep box also testified the beeps volume could be turned down or eliminated altogether (*Trial Tr. Vol. 2, pg 253.*)

Trooper Williams testified he did not hear beep during the period of time he listened to the recording *(Trial Tr. Vol. 2, pg 9.),* and Trooper Zukosky was not sure if he heard beeps (*Trial Tr. Vol. 2, pg 241.*) Further, the Court itself elicited testimony from Zukosky that contradicted Diana's

43

claim that the beeps could be disconnected from one end. (*Trial Tr. Vol. 2, 235-236,* Date.) Finally, the manufacturer's representative of the TLP-107, was asked about any calls for maintenance for problems with the TLP-107 and replied there were none (*Trial Tr. Vol. 2, pg 252.),* eliminating the possibility that Diana did not hear beeps on the line due to a malfunction of the TLP-107.

Therefore, the jury could easily have reached the conclusion there were no beeps tones audible to Diana based on any of the foregoing testimony, rather than on the disputed evidence.

Based on the foregoing, it is not "highly probable" that by declining recross the Trial Court contributed to the jury's verdict against Altavilla and Oliphant. Further, where the evidence is in conflict, and subject to two (2) or more interpretations, the trial judge should be reluctant to grant a new trial. *Klein v. Hollings*, 992 F.2d 1285, 1295 (3d Cir. 1993).

B. **Cross Examination of Plaintiff on Specific Instance of Conduct**

Altavilla and Oliphant assert they should receive a new trial because the Trial Court refused to permit cross examination on a previously

44

undisclosed, entirely uncorroborated, and irrelevant alleged instance of prior misconduct by Diana.

While Diana agrees the Court has broad discretion on evidentiary rulings, *Klein v. Hollings*, 992 F.2d 1285 (3rd Cir. 1993), he strenuously disagrees that the Trial Court errored in this ruling.

Federal Rule of Evidence 608(b) provides a court with discretion to admit or deny testimony of prior conduct going to character for truthfulness. Rule 608(b) is also subject to the balancing test of Federal Rule of Evidence 403, which requires the probative value of evidence not be outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. Fed. R. Evid. 608(b).

The Court determined that the danger of unfair prejudice, because Plaintiff was also receiving benefits for a work-related injury at the time of the recorded telephone call, outweighed its probative value in attacking his credibility.

The Trial Court's ruling is also supportable based on lack of notice, effectively preventing trial by ambush. Although notice is not necessarily required, failure to notify Diana's counsel of the intended questions

45

prevented an investigation to flatly refute what would no doubt have been an unfairly prejudicial attack on his credibility.

Finally, given the corroborating testimony of others supporting Diana's testimony about not hearing audible beeps on the line, e.g. Trooper Williams did not hear beeps and Trooper Zukosky does not remember if he heard beeps, supra, the probative value of this attack on the central question of whether there were audible beeps on the line, would have been far outweighed by the confusion of the jury. Thus, the Trial Court ruled properly in declining to permit this cross examination.

## C. **Good Faith Defense**

### 1. Good Faith Defense Under Title III

The Court properly declined to provide Altavilla and Oliphant with a "good faith" defense instruction under Title III because § 2520(d) does not specifically provide for a "Good Faith" defense, case law puts the onus on the wiretapper to be compliant with the Statute, and a broader construction of the relevant statutory provisions might prove unconstitutional.

18 U.S.C. § 2520(d) cannot be construed to provide a "good faith" defense to a violation of the 4th Amendment to the United States

Constitution. Minimally, it must be narrowly construed to prevent an instruction on a "good faith" exception in this case.

"It is well-settled that federal courts have the power to adopt narrowing constructions of federal legislation. Indeed, the federal courts have the duty to avoid constitutional difficulties by doing so if such a construction is fairly possible. *Boos v. Barry*, 485 U.S. 312, at 330-331 (internal citations omitted). Further, any law "…repugnant to the constitution is void…" *Marbury v. Madison*, 5 U.S. 137 at 77 (1803).

"18 U.S.C. § 2520(d) provides:

A good faith reliance on – (1) a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization … is a complete defense against any civil or criminal action brought under this chapter or any other law."

Altavilla and Oliphant assert the jury should have been instructed to consider if they acted in "good faith" by relying on a "statutory authorization," specifically the law enforcement exception of 18 U.S.C. § 2510(5)(a)(ii). The case of *Abraham v. County of Greenville*, 237 F.3d 386, 390 (4th Cir 2001) is instructive.

In *Abraham*, the Defendant County of Greenville recorded the telephone conversation of the City and County judges without their knowledge, while other phones in the same facility were not recorded, e.g. prisoner calls to attorneys. The County argued that the law enforcement

47

exception applied, shielding recordings made in the "ordinary course" of law enforcement duties. *Id*. at *pgs 386-389*. The 4th Circuit strenuously disagreed, finding the exception inapplicable unless: "… the device is "being used … by an investigative or law enforcement officer in the ordinary course of his duties." *Id*. *at pg 390*.

The County asserted a "good faith" defense, to which the Court responded:

"Title III provides no basis for a good faith addition to the law enforcement exception. It is not our place to create a good faith exception where one does not exist. The Act puts the onus upon the wiretapper to ensure that his activities are appropriate." Id. at 390-391 (internal citation omitted) (emphasis added).

As the Trial Court here observed, Congress provided specific references to statutory authorizations providing "good faith" exceptions within the following two subsections. It follows that had Congress intended a statutory "good faith" exception for the law enforcement exception, it would have said so. As it is, it did not.

The Trial Court further observed, "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, (1989).

48

Altavilla and Oliphant also assert a mistake of law should provide the basis for a "good faith" defense. They suggest that if they subjectively believed they were acting within the "ordinary course" of their duties, this is enough. However, as the *Abraham* Court, supra, opined with respect to a "good faith" defense under the "ordinary course" exception, "The Act puts the onus upon the wiretapper to ensure that his activities are appropriate." Id. at 391.

Further, in *Williams v. Poulos*, 11 F.3d 271, 285 (1st Cir. 1993), a case involving wiretapping in a business context, the 1st Circuit opined: "[N]othing in § 2520(d) supports a conclusion that the good faith defense applies where a defendant mistakenly believes that there exists a statutory authorization for the wiretapping." *Id*. at 44.

Therefore, the Trial Court did not error in not providing a "good faith" instruction to the jury because such an instruction would likely have violated the 4th Amendment, and § 2520(d) likely does not provide for such a defense.

2. Good Faith Defense under the Pennsylvania Wiretap Act.

49

The Court acted properly when it declined to instruct the Jury on a "good faith" defense under the Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. §5704(3).

Section 5725 of the Act provides:

"It is a defense to an action brought pursuant to subsection (a) that the actor acted in good faith reliance on a court order or the provisions of this chapter." 18 Pa. Cons. Stat. § 5725(c).

In this case, Altavilla and Oliphant look to the warrant exception found in 18 Pa. Cons. Stat. § 5704(3).

"Police … communications … if: (i) … limited to the exclusive use … for administrative purposes and provided the communication system employs a periodic warning which indicates to the parties to the conversation that the call is being recorded; (ii) all recordings … may be destroyed at any time, unless required with regard to a pending matter; and (iii) at least one nonrecorded telephone line is made available for public use …"

However, in *Boettger v. Miklich*, 534 Pa. 581, 633 A.2d 1146 (1993), the Pennsylvania Supreme Court found no basis for a "good faith" defense under the Pennsylvania Wiretap Act, when police officers unlawfully disclosed the contents of an otherwise legal (warrant based) wiretap. Even though the Commonwealth Court had found the officer's interpretation of the Wiretap Act was reasonable, the Court opined:

50

"Once it was established that the disclosure at issue was not permitted by a court order or the provisions of the Wiretap Act itself, there was no reason to reach beyond the words of the statute in order to interpret the good faith defense… As the trial court so aptly noted in rejecting this argument, 'to adopt the defense view would be to rewrite the statute to make a good faith defense available to those who 'reasonably misinterpret the provisions of the chapter.'" (emphasis added) Id. at 588-589.

Therefore, Altavilla and Oliphant's asserted belief that § 5704(3) shielded them from liability is of no moment if they otherwise violated this section, at least from the perspective of a "good faith" defense. Therefore, the Trial Court's decision to not instruct the jury on a "good faith" defense under the Pennsylvania Wiretap Act was proper, and should be affirmed.

## D. Definition of "Administrative Purposes"

Altavilla and Oliphant should not be granted a new trial because the Trial Court declined to instruct the Jury on the meaning of the term "Administrative purposes" 18 Pa. Cons. Stat. § 5704(3).

"[A] 'trial court need not define specific statutory terms unless they are outside the common understanding of a juror or are so technical or specific as to require a definition.'" *United States v. Jackson*, No. 97-cv-2861, 2000 U.S. Dist. LEXIS 1297, *25 (E.D. Pa. Feb. 14, 2000) (internal citations omitted).

As the Trial Court observed, "Administrative purposes" has no special legal meaning, and the commonly understood meanings of the word comport

51

with various interpretations, including that which Altavilla and Oliphant

suggest the jury should have considered, e.g. "Webster's Third New

International Dictionary (2002). "Administration" is defined as

"performance of executive duties: management, direction, superintendence."

Id. (*Trial Court's Opinion at pgs 32-33*).

**E. Beep Tones on the Telephone Line**

The Trial Court instructed the Jury on the implications of the

presence or lack of beep tones on the line when Oliphant surreptitiously

recorded Diana, and also on the requirements to find liability under Title III.

Thus, the Trial Court did not error and Altavilla and Oliphant should not

receive a new trial on this basis.

1. Fourth Amendment Claim

Altavilla and Oliphant misapprehend the law with respect to the 4th

Amendment claim. They assert the Court prejudiced them by instructing the

jury that the presence or absence of beep tones on the line when Oliphant

called Diana determine liability (*Trial Tr. 4, p. pg 107*).

Under 4th Amendment jurisprudence, Diana has a claim if he had both

an objective and subjective expectation of privacy when he spoke to

52

Oliphant. Since Oliphant admitted that he did not tell Diana he was recording the conversation, Diana's only notice he was being recorded would have been if he heard beep tones on the line, which he would have recognized, as a State Trooper, as being from the recorded line.

Diana's reasonable expectation of privacy under *Katz,* 389 U.S. at 360-61, would not exist if he heard beep tones, because beep tones would effectively put him on notice he was being recorded. *In re State Police Litig*., 888 F. Supp. at 1256 (notice may defeat reasonable expectation of privacy).

The Court's instruction recognized that to record a private conversation without notice or consent violates the Fourth Amendment, *Abott v. Village of Winthrop Harbor*, 953 F. Supp. 931, 943 (N.D. Ill. 1996), i.e. no beeps, while recording the conversation with beeps would not. *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F. Supp. 808, 818 (D.N.J. 1993).

Therefore, the Court did not error in giving the instruction as it did.

2. Title III Claim

53

The Court did not error in giving its instruction on beep tones with respect to the Federal Wiretapping claim, because this was not the entirety of the Court's instruction.

Altavilla and Oliphant provide an accurate, but partial, rendition of the Court's instructions relative to beep tones and liability under Title III. (*Trial Tr. 4, p. pg 110, Appellants Brief pg. 33),* to arrive at the conclusion that the Court's instruction worked to their prejudice.

What is omitted from Defendant's description is the Court's instruction on the Law Enforcement Exception, and the Court's direction to find for the Defendants if the exception applies. There is no reference to beep tones in this aspect of the instruction.

The Court instructed the jury on the three elements necessary to find liability under Title III (*Trial Tr. Vol. 4, pg 108.),* emphasizing that "oral communication" means a communication "uttered by a person who exhibits an expectation that his words are not subject to interception under the circumstances" (*Id.*), because this test mirrors the Fourth Amendment reasonable expectation of privacy test. (*Id. at pgs 108-110.*) The Court did not stop there, however, and went on to instruct the jury on the law enforcement exception to Title III and instructed that, if the Defendants met the exception, the jury must find for them.

Since the Court's instructions were consistent with the elements of the law in 18 U.S.C. § 2511(1)(a), including the definition of "oral

54

communication" which was quoted from the statute, see 18 U.S.C. § 2510(2) (oral communication means "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation"), and the jury was properly instructed on the law enforcement exception, the Court did not error in its instruction on Title III.

F. **Passion or Prejudice of Jury**

While the Jury awarded uneven amounts of compensatory damages for the 4th Amendment and Pennsylvania State Wiretapping claims, even though these claims were based on the same facts, it does not necessarily follow that this aspect of the verdict was the product of irrationality, passion or prejudice or an effort to punish rather than compensate. Apportioning compensatory damages for the same injury between claims is appropriate. *Gentile v. County of Suffolk*, 926 F.2d 142, 154 (2d Cir. 1991), and therefore the jury verdict on compensatory damages should not be disturbed.

G. Alleged Misrepresentation of Facts by Plaintiff Counsel:

Altavilla and Oliphant assert Diana's counsel misrepresented facts

55

during closing. This is denied, and since this suggestion was not raised at the time it should not be considered for the first time on appeal. *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) (by not objecting to errors at trial a party waives the right to assert error later).

H. **Trial Testimony allegedly does not support the damages verdict**:

The testimony adduced at trial does support the verdict. Thus, the verdict was not the product or passion or prejudice. Diana testified to significant emotional suffering after finding out the call with Oliphant had been recorded. This violation of his expectation of privacy left him "shocked," "assaulted," and "sick." (*Trial Tr. Vol. 2, pgs 101-102.*) The implications of the recording left him wondering about his future with the State Police and he lost sleep and. *(Id. at pg 102-103.)* His wife did not understand what was going on, and his relationship with her was damaged because he was depressed. (*Id. at pg 103.*) Further, Diana testified he made an internal affairs complaint about the surreptitious recording that apparently pended almost two years, wear Diana was not interviewed, and with no feedback to Diana. (*Trial Tr. Vol. 2, pgs 146-147).*

In its instructions, the Court identified emotional and mental harm as

56

Diana's damages, so the jury could not have been confused about what they were awarding damages for (*Trial Tr. Vol. 4, pg 113.),* and reasonably found Diana suffered compensable injury. Thus, the jury's verdict was not the result of passion or prejudice.

III. Altavilla and Oliphant's Motion for Remittitur

### C. Compensatory Damages

In remitting a judgment, a Court must evaluate the present claim in light of similar claims. *Hall v. Pa. Dep't of Corr.*, No. 3:CV-02-1255, 2006 U.S. Dist. LEXIS 68670, *66 (M.D. Pa. Sept. 25, 2006) (Memorandum). Further, the "… means employed should enable the Court to attain its objective of setting damages at the 'maximum recovery that does not shock the judicial conscience.'" 2006 U.S. Dist. LEXIS 68670, at 66-67.

In remitting Mario Diana's compensatory damages award, the Court found *Glass v. Snellbaker*, No. 05-cv-1971, 2008 U.S. Dist. LEXIS 71241 (D.N.J. Sept. 17, 2008) analogous. Glass, a police officer, was emotionally injured when his first amendment rights were violated by a superior for two years. *Id. at pg 76*. The Glass Court found support for remittitur in that he had not sought medical treatment for his humiliation and emotional

57

disturbance nor did he miss work. Further, he did not testify to manifestations of his emotional distress or sleep loss. *Id. at pg 72*. After looking to other similar cases, the Court remitted Glass' award to $50,000.00. *Id. at pg 80.*

Similarly, Diana's distress lasted almost two years, even though he returned to work after two months, because there was a pending internal investigation into the surreptitious recording of the telephone call and no action was taken by the State Police.

Further, like Glass Diana testified to feeling shocked, assaulted, and sick when he found out his call had been recorded. Unlike Glass, however, Diana testified to anxiety generated sleep loss and injury to his relationship with his wife because of his depression. Diana's anxiety was caused by his concerns for his job since his superiors had surreptitiously recorded him, and he was the sole breadwinner in his household which included a wife and newborn baby to support.

While the Trial Court contrasts Glass in concluding Diana's harm lasted only two months, where Glass's lasted two years, Diana's internal complaint about the surreptitious recording pended for two years also.

58

While Diana did not seek professional treatment for his anxiety and depression, he did consult with his family for help. Since the Court found the harm in Glass and here comparable, it remitted the jury's compensatory award to $50,000.00 ($25,000.00 against each defendant), which was appropriate.

Altavilla and Oliphant cite to *Spence v. Board of Education*, 806 F.2d 1198 (3d Cir. 1986) as a factually analogous case on the issue of damages. The *Spence* Court provided, "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *Id*. at 11 (internal citation omitted), the circumstances in Spence are not same.

Unlike Diana, Spence was not on disability leave when the misconduct occurred, so she did not begin in a vulnerable position as Diana did. Further, Spence was transferred from one position to another, while Diana had reason to question if he had a job for two months, and whether he would keep his job for the almost two years the internal affairs investigation pended. Spence did not suffer physically, while Diana lost sleep and weight. Spence testified that her creativity was hampered, while Diana's marriage was impacted by his depression, and suffered anxiety wondering if, as sole

59

bread winner for his family, he would lose his job. While neither offered additional witnesses to their distress, or consulted a mental health professional, there can be no question of a difference in impact between not knowing if one will be able to support one's wife and newborn child, and a person who has a secure job, just not the one she wanted.

In *Hall v. Pa. Dep't of Corr.*, 2006 U.S. Dist. LEXIS 68670 (Mid. Dist. Pa. Sept. 25, 2006) (Memorandum) (incorrectly identified in Defendants' brief as *Hall v. Pennsylvania*), after adjusting a verdict to statutory limits, the Court remitted the verdict from $300,000.00 to $75,000.00. It is argued that Hall was subjected to harsher treatment than Diana, that she did not present evidence of impact on family members, and that she did not consult a medical professional.

While Hall may have been subjected to harsher treatment that Diana, both were subjected to treatment directed at the heart of their ability to support themselves and their families. While neither sought mental health services, both were subjected to conduct that could easily have prompted such a referral by the average person. While each generally testified to their

60

own emotional reactions, lack of corroboration does not necessarily minimize the impact of conduct in question. While mental health treatment is evidence of how an individual chooses manage their pain, it does not necessarily follow that lack of treatment means the pain was not severe.

Finally, the Trial Court properly reduced Diana's compensatory damages to $50,000.00, not the $75,000.00 that Hall's award was reduced to. As such, the dissimilarity in treatment was properly reflected in each Trial Court's remitted award. Therefore, the Trial Court's remittitur of Compensatory Damages to $50,000.00 should be upheld.

## B. **Title III Compensatory Damages**

Diana agrees with the Court and Altavilla and Oliphant (see Defendant's Brief at 42) that Statutory damages under Title III should be reduced to $10,000.00.

## C. **Damages under Pennsylvania Wiretap Act**

As they did not object to the Court's jury instruction or Special Verdict Form at the time, Altavilla and Oliphant's assertions regarding the jury award for compensatory and punitive damages under the Pennsylvania Wiretap Act should not be considered. By failing to object at the time, these arguments are waived. *See* Fed. R. Civ. P. 51(c) (regarding timely objections

to instructions); *Inter. Med. Supplies, Ltd. v. Ebi Med. Sys., Inc.*, 181 F.3d 446, 463 (3d Cir. 1999) (failure to object to verdict sheet at time jury received it constitutes waiver of objection).

D. **Punitive Damages**

The Jury's award for Punitive Damages should be upheld because the record fully supports the award. Under the Federal standard, a punitive damages award is appropriate when a jury finds the Defendants acted maliciously or wantonly (see Jury Instruction at Trial Tr. Vol. 4, pg 116.). Pennsylvania law requires "… that the defendant has acted in an outrageous fashion due to either 'the defendant's evil motive or his reckless indifference to the rights of others.'" *also Phillips v. Cricket Lighters*, 584 Pa. pgs 179, 883 A.2d 439, 445 (Pa. 2005) (internal citation omitted).

Diana has met his burden under both tests. Altavilla ordered Oliphant to call Diana from a recorded line. (*Trial Tr. Vol. 2, pgs 54-56.*) Diana testified that Oliphant did not tell him the call was being recorded, although such a notice was standard procedure when officers called each other from recorded lines. (*Id. at 96-98.*) Oliphant admitted he did not tell Diana he was calling from a recorded line. (*Trial Tr. Vol. 2, pg 70.*) Altavilla and Oliphant

62

were senior, experienced police supervisors. Altavilla, who gave the order to record Diana, testified that he taught wiretap violations. (*Trial Tr. Vol. 2, pgs 54-56.*) (*Trial Tr. Vol. 1, pg 58.*) There was contested testimony suggesting that the telephone line could be manipulated so as not to emit audible beeps during the conversation and thereby alert Plaintiff to the fact that the call was recorded. (*Trial Tr. Vol. 2, pgs 232, 253*). Even though asked in writing to preserve the recording of Diana for an ongoing judicial proceeding, i.e. the workers' compensation matter (*Document 21*), the original recording was destroyed or recycled or otherwise disposed of. (Trial *Tr. Vol. 2, pg 19.)(emphasis added*). Given the foregoing, the Jury had ample basis to award punitive damages. Therefore, the Jury's punitive damage award should be upheld.

## CONCLUSION

Therefore Appellants Motion for New Trial should be denied.

By:   /s/Don Bailey, Esquire

## CERTIFICATE OF WORD COUNT

Appellee submits that his Brief consist of 65 pages which exceeds the page limit, but only consist of 12,277 words which is in compliance with Third Circuit Rules 15 pages

/s/Don Bailey, Esquire

## CERTIFICATION OF BAR MEMBERSHIP

I, Don Bailey, Esquire do hereby certify that I am a member of the bar of the U.S. Court of Appeals for the Third Circuit and I am in good standing.

/s/Don Bailey, Esquire

## CERTIFICATION OF VIRUS

I Don Bailey, Esquire do hereby certify that the above *Brief* is identical to the one served upon the attorneys listed in the Certificate of Service. I also certify that a *Virus Check* was performed on this document:

/s/Don Bailey, Esquire

64

## <u>CERTIFICATE OF SERVICE</u>

I, **Don Bailey**, Esquire, do hereby certify that on this **8TH day of February 2010** I served a true and correct copy of the foregoing **Appellants' Brief** via ECF (Electronic Filing) addressed as follows:

Joanna Reynolds, Esquire

Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA 171110

Respectfully Submitted,

By     <u>/s/Don Bailey, Esquire</u>
PAID# 23786
4311 N. 6th Street
Harrisburg, Pa 17110
(717) 221-9500

65